FILED - LN
February 14, 2017 12:46 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY:___clw /_____   SCANNED by /clw 2/14

# IN THE UNITED STATES DISTRICT COURT
## WESTERNDISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**UNITED STATES OF AMERICA,**

*Ex. Relators Joseph Odish, Cranbrook Capital Consulting Group, LLC*

Relators,

-vs-

NORTHROP GRUMAN CORPORATION, INC.
NUANCE COMMUNICATIONS, INC., COGNITIVE
CODE CORPORATION, APPLE, INC., INTERNATIONAL
BUSINESS MACHINES CORPORATION, TWEDDLE
GROUP, LLC, WESLEY BUSH, VIRGINIA ROMETTY,
TIMOTHY COOK, PAUL RICCI, THOMAS
BEAUDOIN, LESLIE SPRING, MIMI CHEN, JOHN CHEN,
SAL DIFAZIO, GARY MORGENTHALER, TODD MORGENTHALER,
MELISSA MORGENTHALER, ROBERT ROSEN, JOHN BOURBEAU, JR.,
HOWARD FREDMAN, LAWRENCE ELLISON, ORACLE, INC.,
HUNTINGTON INGALLS INDUSTRIES, INC., GOOGLE, ALPHABET,
ERIC SCHMIDT, COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION, MOOG,
INC.

Defendants.

_____/

*Qui Tam/False Claims Action; Hand Delivered In Camera & Under Seal*

## 1:17-cv-151
**Paul L. Maloney,
United States District Judge**

Attorneys for Relators
Timothy Hurban P72991
Joseph G. Odish P53629
39341 Fulton Ct., Ste 100
Farmington Hills, MI
310-345-2802
josephodish@gmail.com

_____/

### FALSE CLAIMS COMPLAINT PURSUANT TO 31 U.S.C. § 3729 et seq.

NOW COME Relators JOSEPH ODISH, a resident of Michigan and United States Citizen, in lawful conjunction and joined by his wholly controlled entity, RELATOR CRANBROOK CAPITAL CONSULTING GROUP, LLC bring this qui tam action on behalf of the United States of America and state as follows:

I.  **NECESSITY OF PROVIDING DETAILED OVERVIEW OF THIS EXTRAORDINARY ACTION OF GREAT NATIONAL IMPORTANCE AND SECURITY INTERESTS.**

1. This action even before filing is already criminally compromised through no fault of the Relators or their attorneys. Indeed, it is quite the opposite as Relator Odish is a whistleblower under two federal statutes but is unequivocally a federal crime victim.

2. Relator Odish admits to being scared and the statements herein will be more general. As Defendants are running their Artificial Algorithms constantly and given their knowledge that Relator must file this action before the 18th, they have heightened their criminal invasion, made documents that were fine completely unreadable, killed a second computer of Relator Odish's the day before this filing, corrupted the original complaint compelling Relator to draft this hurried, rushed version which will be amended without the pressure or fear of their actions and the impending SOL deadline.

3. Relator Odish has original source knowledge since February 18, 2011 and nearly thirteen hours into this matter, which is the fraudulent and corrupt birth of Artificial Intelligence in March 2011.

4. **Relator Odish possesses highly classified information that exceeds even the knowledge of the FBI, CIA and any government official**. This is not a statement of braggadocio but rather one of terror and fear.

5. It is now common knowledge that the US Intel community believes that the Russians hacked and unlawfully impacted the election while President Trump denies it.

6. But Relator Odish knows how, from whom and when the Russians got the this sophisticated Artificial Intelligence technology: it was from Defendant Wesley Bush, Northrop and his conspirators. And the same goes for the Chinese.

7. In an SEPTEMBER 15, 2015 article from the New York Times titled, "CYBER ATTACKS CONFOUND WHITE HOUSE", the Honorable President Obama is quoted as saying "the Russians are good, the Chinese are good, the Iranians are good…". Northrop and others took care of Chinese and Russians when the Artificial Intelligence was perfected in 2011, as discussed below, and Defendant IBM would be the principal reason it landed in IRAN because they were doing unlawful business with ZTE CORP, a Chinese corp that does business with Iran for decades. A very brilliant woman, Ms. Cecilia Blye, head of Global Security Risk department of the SEC, sent CEO ROMNETTY a correspondence in 2012 essentially saying 'Iran is on the sanctioned list for sponsoring terrorism, ZTE does business with Iran, please explain how your technology got into Iranian hands…".

8. The Defendants and their Conspirators have crippled the United States military. Conspired with foreign enemies. And worst of all, in an order to cover up their conspiracy and espionage, they started giving away degrees in "Artificial Intelligence" at the hundreds of universities they fraudulently use. Given that a significant part of the criminal scheme is making the AI open and available to everyone so they a 'criminal defense', now any bad actor can get a degree in AI or there adopted word "COGNITIVE", get easy access to the open source AI code, weaponize it, buy drones off Amazon and blow up the Sears Tower building.

9. After Relator Odish made certain filings, Defendants in early 2014 realized he knew too much and devised a fraudulent scheme called OPEN POWER to "give" AI source code (called Informix) to the Chinese government and military as a fraudulently effectuated potential defense.

10. And now they are racing to do the same thing with Putin and the Russians as articles only two days old state "Yanex (Russian Defense Company) hires Microsoft's Misha Bilenko to head up Machine Learning and Artificial Intelligence". In last two days, when Relator Odish tried to print the document the principal defendants once again ran their AI algorithms and make text appear unreadable hieroglyphics.

11. In August 2016 Relator Odish learned that Google had unlawfully and criminally created a "fraudulent gmail portal" in Relator Odish's name: "j.odish@gmail.com" that

Odish had never created. It is not an actual gmail account, but rather a fraudulent portal that leads directly to Odish's principal gmail account where he has stored over 3 years and 90 gigabytes of criminal evidence.

12.     Through court filings and records, it is public knowledge that Relator Odish is not only a whistleblower under two federal statutes but has also been cooperating with the FBI and will be sending materials to Senate Armed Services Committee and Senate Intelligence Committee. It is not proper for a citizen to know more than a government about such serious national issues. But the defendants have made it nearly impossible with their criminal invasion of Relator's life.


## II.     JURISDICTION AND VENUE

13.     This is an action by the United States against defendants pursuant to the False Claims Act, 31 U.S.C. § 3729 - 3732 et seq. ("FCA"). As a result, this Court has jurisdiction over this matter pursuant to 31 U.S.C. §§ 3729- 3732 et seq, and its general common law and equitable jurisdiction.

14.     Personal jurisdiction and venue for this action are predicated upon 31 U.S.C. § 3732 (a) which provides that "any action brought under § 3730 may be brought in any judicial district in which the defendant, or in case of multiple defendants, any one defendants can be found, resides, transacts business or in which any act proscribed by § 3729 occurred."

15.     Thus Venue is proper in this District as many of the defendants either transact business in this district or reside in this district, and multiple violations of §3729 have taken place in this district where Relator reside.


## III.     THE NAMED PARTIES.

16.     Relator Joseph Odish is an individual and resident of Michigan and a United States citizen.

17.     Relator and his Cranbook Capital Consulting Group, LLC, is a Michigan limited liability company controlled and owned by Odish. Relator LLC. The LLC is an affiliate of the

Defendant Cognitive Code Corporation pursuant to the Shareholders Agreement. Relator's LLC has lawful claims, in addition to non- dilutable stock in Cognitive Code that they presently own and a lawful and proper claim and beneficial interest in additional 7.5% non-dilutable equity stake in Cognitive Code, as well as a lawful claim for at least 20% equivalent to damages of the value of the Cognitive Code Corporation.

18.     Defendant Cognitive Code Corporation is a Delaware Corporation that conducts business in Alabama, Michigan, and New Jersey. Defendant Cognitive Code Corporation is a corporation with its headquarters in New Jersey.

19.     Defendant Cognitive Code Corporation is a Subcontractor to Defendant NORTHROP GRUMMAN, a Prime Contractor to the United States Government, Department of Defense and other government agencies.

20.     Defendant Huntington Ingalls, Inc. is a Virginia Corporation and a publicly traded spinoff of Defendant Northrop Grumman from March 2011.

21.     Defendant Cognitive Code is a Subcontractor that had technology company and has developed a software program predicated upon a patent known as SILVIA™ with interactive artificial intelligence capabilities on multiple platforms, including medical applications for Healthcare, Defense industry and sector, mobile/cellular, automotive telematics, gaming, toys, enterprise solutions, computing such as laptops, cloud capabilities.

22.     Defendant Leslie Spring is an individual who resides in Sherman Oaks, California. He is one of the three founders and controlling shareholders of Defendant Corporation. He is also its only engineer. Defendant Spring is married to defendant Defendant Mimi Chen, also a resident of Sherman Oaks, California.

23.     Defendant Mimi Chen is an individual residing in California. Along with Spring, one of the three founders and controlling shareholders of Defendant Corporation.

24.     Defendant John Chen resides in Flemington, New Jersey. He is the brother of Defendant Mimi Chen Chen and one of the three founders and controlling shareholders. Of the three founders, John Chen along his general counsel, Defendant Difazio, operate the headquarters of Cognitive Code corporation out of New Jersey.

25.     Defendant Sal DiFazio resides in Flemington, New Jersey and is the General Counsel of Defendant Corporation. He is not a shareholder in the Defendant Corporation but has issued himself backdated warrants on two separate occasions.

26.     Defendants Spring, Defendant Mimi Chen Chen and John Chen each own 25% (250,000 shares) of the capital stock of the Defendant Corporation for a total of 750,000 shares and 75% of the capital stock of Defendant Corporation.

27.     Given the familial relationship between the Husband-Wife relationship between Defendant Spring and Defendant Mimi Chen Chen and John Chen as her blood brother, for all intents and purposes these three Individual Defendants constitute the Controlling Majority Shareholders of the Defendant Corporation. The corporation has only issued and authorized 1,000,000 shares in total.

28.     Defendant NUANCE COMMUNICATIONS, INC, a publicly traded company with ticker symbol (NUAN) and originally funded by Morgenthaler Ventures.

29.     Defendant Gary Morgenthaler is a resident of California and equity partner in Morgenthaler Ventures, Canvas Venture Fund, L.P. and other entities.

30.     Defendant Apple, Inc. is a California corporation and the world's leading tech giant. It is a publicly traded entity.

31.     Defendant Timothy Cook is the CEO of APPLE and a resident of California.

32.     Morgenthaler Ventures is a multi-billion dollar venture capital company that has over a 45 year relationship with tech giant APPLE as it was one of APPLE's earliest investors and continues today to own significant stock in APPLE. See **Exhibits 12**. It has over 3 billion in funding assets and has funded over three hundred (300) companies since its inception in late 1960's and is widely considered one of the preeminent venture capital firms in the world.

33.     Defendant Nuance is the global leader in dictation services and now with APPLE, INC., hereinafter simply referred to simply as "Apple", is looking to effectuate a monopoly over EHRs through its products and services in conjunction with Nuance.

34.     The relationship between Morgenthaler Ventures and Apple remains very strong today and as Nuance actively markets Apple products and is rumored to be sold to APPLE SOON. Gary Morgenthaler sold the free app SIRI to Apple for 250 million.

35.     Defendant International Business Machines (IBM) is incorporated in state of New York.

36.     DEFENDANT COGNIZANT TECHNOLOGY SOLUTIONS CORPORATION is a resident of New Jersey.

37.     DEFENDANT NORTHROP GRUMMAN CORPORATION is a Delaware Corporation that is a prime US defense contractor. Ronald Sugar is a former CEO of Northrop Grumman who is a member of the Board of Directors of both Northrop Grumman and Apple.

38.     Defendant Robert Rosen, an attorney residing in Los Angeles, California.

39.     Defendant Howard Fredman is a resident of California.

40.     Defendant GOOGLE is a resident of the state of California.

41.     Defendant ALPHABET is parent company of GOOGLE and is a resident of California.

42.     Defendant Eric Schmidt is a resident of California.

43.     Defendant Paul Ricci is the CEO of Defendant Nuance and a resident of Massachusetts.

44.     Defendant Thomas Beaudoin was until recently the CFO of Defendant Nuance and presently a resident of Massachusetts.

45.     Defendant Tweddle Group, LLC is a Michigan based entity.

46.     Defendant Tweddle Group of Brazil, LLC, is a Michigan based entity. Defendant Tweddle Group Technologies, LLC.

47.     Defendant John Bourbeau is a resident of the state of Michigan.

48.  Defendant VIRGINIA MARIE ROMETTY is resident of the State of New York.

49.  Defendant MOOG, INC. is a publically traded company residing in New York.

50.     **AGENCY**. Agency with respect to corporate defendants. Relator Odish has original source knowledge and, based thereon, allege that at all times herein mentioned,

the Defendants, and each of them, were and are (for purposes of the law of tort, contract and otherwise) agents, principals, representatives, servants, masters, partners, trustees, associates, co-conspirators, employers and/or employees of each other, as well as predecessors-in-interest and/or successors-in-interest to each other, all acting within the course and scope of such capacities, within actual and/or apparent authority of such capacities, within the course and scope of such conspiracies, and with actual and/or constructive notice of the knowledge of their predecessors-in-interest and/or each other.

## IV.  ADDITIONAL PARTIES AND ENTITIES THAT HAVE LIABILITY AND WILL BE NAMED IN SUBSEQUENT ACTIONS.

51.     The trillion dollar hedge funds VANGUARD, FMR, LLC, STATE STREET CORPORATION. The basis of liability is that they fraudulently, in conspiracy, issued themselves Artificial Intelligence patents.

52.     The following entities also have liability and it must be stated that this is a partial list: AMAZON, INTEL, ATT, COMCAST, MICROSOFT, QUALCOMM, SONY, HUAWEI, HTC, CISCO, DELL, RAYTHEON, BOEING, BAE SYSTEMS, LOCKHEED MARTIN, and many more.

## V.  OVERVIEW OF FALSE CLAIMS ACT.

53.     The False Claims Act is the federal government's "primary litigative tool for combating fraud." See Senate Judiciary Committee, False Claims Amendments Act of 1986, S. REP. NO. 345 reprinted in 1986 U.S.C.C.A.N. 5266.

54.     The False Claims Act specifically refers to money or property, thereby including intellectual property and other items easily deemed property such as stock and SEC filings, matters related to money or property. The False Claims Act also refers specifically to contractual rights, express or implied, such as the rights that belong to Relator.

55.     Moreover, over the last decade, the scope of the False Claims Act ("FCA") has been broadened considerably by the adoption of the Fraud Enforcement and Recovery Act of 2009 ("FERA"), reflecting the clear intention of Congress to expand the reach of the FCA.

Indeed, FERA made clear that "intent' to submit a false claim is irrelevant, and that liability attaches even if an innocent third party submitted the actual false claim.

56.     The False Claims Act provides that any person who knowingly submits or causes to be submitted to the United States for payment or approval a false or fraudulent claim is liable to the government for a civil penalty of not less than $ 5500 and not more than $11,000 for each such claim, 2 plus three (3) times the amount of damages sustained by the government because of the false claim. The Act allows any persons having knowledge of a false or fraudulent claim against the government to bring an action in Federal District Court for himself and for the United States government and to share in any recovery as authorized by 31 U.S.C. § 3730 as well as assert Relator civil damages in the action. Relator claims entitlement to a portion of any recovery obtained by the United States as qui tam Relator in this action, per the maximum allowable under the statute as well as entitlement to civil damages as allowed by the statute.

57.     Defendants have exploited the trust the Government has reposed in them to act with honesty and candor; to provide accurate, complete and current cost and/or pricing data; to act without conflicts of interest; and to serve as independent third party objective advisors. To varying degrees, in furtherance of this scheme, Defendants expressly or impliedly represented or certified to the Government that they complied with various Anti-Kickback statutes, FARs, Truth in Negotiations Act (TINA)(10 U.S.C. § 2036a and 41 U.S.C. § 254b), and organizational conflict of interest laws, when, in fact, they had not, and do not, comply with such laws and regulations. Again, this resulted in the making of false statements and false claims in violation of the False Claims Act to the Government in connection with Defendants' contracts and/or subcontracts.

58.     The False Claims Act. The False Claims Act provides that:

    a.     Any person who knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

    b.  knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; conspires to

defraud the Government by getting a false or fraudulent claim paid or approved by the Government; [or] is liable to the United States Government for a civil penalty of not less than [$ 5,500] and not more than [$ 11,000], plus 3 times the amount of damages which the Government sustains because of the act of that person.

> b.    Knowing and knowingly defined. For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information; has actual knowledge of the information; acts in deliberate ignorance of the truth or falsity of the information; or acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

59.    The False Claims Act (FCA) provides that any person who causes a false claim to be submitted to the Government is liable for a civil penalty of between $ 5,500 and $ 11,000 per claim plus three times the amount of damages the Government sustained. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.3. For purposes of the FCA, "the terms 'knowing' and 'knowingly' mean that a person, . . (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts with reckless disregard of the truth or falsity of the information." Id. at § (b).

60.    The FCA "require[s] no specific intent to defraud." Id. § 3729(b)(1)(B).

61.    The False Claims Act provides that any person who knowingly submits or causes to be submitted to the United States for payment or approval a false or fraudulent claim is liable to the government for a civil penalty of not less than $ 5500 and not more than $ 11,000 for each such claim, 2 plus three (3) times the amount of damages sustained by the government because of the false claim. The Act allows any persons having knowledge of a false or fraudulent claim against the government to bring an action in Federal District Court for himself and for the United States government and to share in any recovery as authorized by 31 U.S.C. § 3730 as well as assert Relator civil damages in the action. Relator claims entitlement to a portion of any recovery obtained by the United States as qui tam

Relator/Relator in this action, per the maximum allowable under the statute as well as entitlement to civil damages as allowed by the statute.

62.     **The Anti-Kickback Act.** The Anti-Kickback Act of 1986, 41 U.S.C. § 52(2)(A), imposes liability on any person who makes a payment to any other person involved in the federal procurement process for the purpose of obtaining favorable treatment. The AKA defines the term "kickback" as follows: (a) The term "kickback" means any money, fee, commission, credit, gift, gratuity, thing of value, or compensation of any kind which is provided, directly or indirectly, to any prime contractor, prime contractor employee, subcontractor, or subcontractor employee for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract. The AKA, 41 U.S.C. § 53, further provides that "[i]t is prohibited for any person- 1) to provide, attempt to provide, or offer to provide any kickback; 2) to solicit, accept, or attempt to accept any kickback; or 3) to include, directly or indirectly, the amount of any kickback prohibited by clause (1) or (2) in the contract price charged by a subcontractor to a prime contractor or a higher tier subcontractor or in the contract price charged by a prime contractor to the United States.

63.     **Truth in Negotiations Act**. TINA, 10 U.S.C. § 2036a and 41 U.S.C. § 254b, provides, among other things, that: (a) A person required, as an offeror, contractor, or subcontractor, to submit cost or pricing data under paragraph (1) . . . shall be required to certify that, to the best of the person's knowledge and belief, the cost or pricing data submitted are accurate, complete and current.

64.     **Organizational Conflicts of Interest**. 48 C.F.R. 9.505, provides, among other things, that: The general rules in 9.505-1 through 9.505-4 prescribe limitations on contracting as the means of avoiding, neutralizing, or mitigating organizational conflicts of interest that might otherwise exist in the stated situations . . . Each individual contracting situation should be examined on the basis of its particular facts and the nature of the proposed contract. The exercise of common sense, good judgment, and sound discretion is required in both the

decision on whether a significant potential conflict exists and, if it does, the development of an appropriate means for resolving it. The two underlying principles are:

a)   Preventing the existence of conflicting roles that might bias a contractor's judgment; and

b)   Preventing unfair competitive advantage. In addition to the other situations described in this subpart, an unfair competitive advantage exists where a contractor competing for award of any Federal contract possesses Proprietary information that was obtained from a Government official without proper authorization; or Source selection information (as defined in 2.101) that is relevant to the contract but is not available to all competitors, and such information would assist that contractor in obtaining the contract.

65.   **The Service Contract Act**. The SCA, codified in 41 U.S.C. §§ 351-358, "requires government contractors to pay service employees minimum wages and benefits determined by the Secretary of Labor." United States ex rel. Sutton v. Double Day Office Svcs., Inc., 121 F.3d 531, 533 (9th Cir. 1997) (citing 41 U.S.C. § 351(a)). Though there is no private right of action for damages under the SCA, a party may bring an action under the False Claims Act as a qui tam Relator for the United States to recover damages to the government related to false claims arising out of contracts entered into pursuant to the SCA. See Sutton, 121 F.3d at 534 ("Double Day violated the FCA when it submitted a claim for payment to the United States falsely stating that it had complied with the SCA. The FCA attaches liability to the claim for payment, not to the underlying activity"); see also United States v. Universal Fruits & Vegetables Corp., 370 F.3d 829 (9th Cir. 2004) [*18] (citing Sutton with approval); Koren v. Martin Marietta Svcs., Inc., 997 F. Supp. 196 (D.P.R. 1998) (citing Sutton with approval); Miller v. United States, 213 Ct. Cl. 59 (1977) (noting the government could counterclaim under false claims act for violations of SCA).

66.   **General Services Administration Act**. In order to qualify for government procurement contracts (or GSA Schedule contracts, or General Services Administration contracts, or "GSA") contractors and subcontractors must certify and provide the

government with the "best price" for their work when compared to work performed for their commercial customers. If a company does not submit the best price when entering the GSA Schedule or when submitting bids for GSA Schedule contracts, then it has violated 48 C.F.R. § 552.215-72 because the information provided during price negotiations was not "current, accurate, and complete. "See id. at § (a)(2); see also Gelco Space, GSBCA 7916, 91-1 BCA P23,387, 1990 WL 145816 (1990) (defective pricing "occurs where a vendor submits false or misleading data for the purchaser to use in evaluating the proposed prices"). SBA Section 8(a) Certification Program for Minority and Female Set Asides.

67.     **Small Business Administration.** The U.S. Small Business Administration, Section 8(a) Minority Small Business Development Program (Section 8(a) Program)] allows federal agencies and entities to 'set aside' certain contracts for the sole benefit of Section 8(a) program participants. This process allows small, minority-owned businesses to obtain government contracts with little to no competition." United States ex rel. Fisher v. Network Software Assocs., 217 F.R.D. 240, 246 (D.D.C. 2003).

68.     **Defendant Cognitive Code Corporation is a Section 8(a) in violation of the statute, and upon information and belief, Northrop Grumman is aware of it.** As Cognitive Code is a Section 8(a) and this was instrumental in gaining vendor status and approval with Northrop Grumman, Section 8(a) is applicable to these facts and this action.

69.     "To qualify as a Section 8(a) program participant, the company must meet three requirements. First, the company must be 'socially and economically disadvantaged.' 15 U.S.C. § 637(a)(4)(A). For a company to be socially and economically disadvantaged, either one or more socially and economically disadvantaged persons must 'unconditionally' own at least 51% of the company, or 51% of the publicly traded stock must be 'unconditionally owned by one or more socially and economically disadvantaged individuals.' 15 U.S.C. § 637(a)(4)(A)(i)-(ii).".

70.     "Second, the 'management and daily business operations' must be 'controlled by one or more socially and economically disadvantaged individuals.' 15 U.S.C. § 637(a)(4)(B). Socially disadvantaged individuals are those individuals who have been 'subjected to racial or ethnic prejudice or cultural bias because of their identity as a member [sic] of a group

without regard to their individual qualities.'" Id. (emphasis added) (citing 15 U.S.C. § 637(a)(4)(B); 15 U.S.C. § 637(a)(5)); see also 13 C.F.R. 124.106 (noting that control includes the day to day management of the company).

71.    Northrop Grumman essentially during summer of 2011 took over control of the day to day operations of the company by doing all of the engineering work and helping to create SILVIA FOR UNITY (OR SILVIA 2.0) because Defendant Spring didn't have the know-how, despite fact Relator Odish had lined up money and engineers to assist pursuant to his status as shareholder and Board Member.

72.    "Finally, each Section 8(a) program participant must certify on an annual basis that each of the above-mentioned requirements concerning ownership and control of the company still exist. The Section 8(a) program requires each participant to submit the following annually:

(i)    a personal financial statement for each disadvantaged owner; (ii) a record of all payments made by the Program Participant to each of its disadvantaged owners or to any person or entity affiliated with such owners; and (iii) such other information as the Administration may deem necessary to make the determinations required by this paragraph." Id. at 246-47 (citing and quoting 15 U.S.C. § 637(a)(4)(C); 15 U.S.C. § 637(a)(6)(B)).

73.    Under United States Code and Code of Federal Regulations, an applicant for Section 8(a) certification and those companies seeking government contracts for these set aside programs have certain obligations, including not making false statements or misrepresentations of material facts concerning the certification process and also when bidding and contracting for payment of monies under these set aside contracts. See 15 U.S.C. § 637; 18 U.S.C. § 1001; and 15 U.S.C. § 645.

## FEDERAL STATUTORY COMPLIANCE REQUIREMENTS FOR SUBCONTRACTORS AND CONTRACTORS.

74.    Title 18 USCS 1001 applied to "statements" made and documents supplied during bargaining between contractor and UNITED STATES. United States v. Coastal Contracting & Engineering Co. (1959, DC MD), 174 F. Supp. 474.

75.     **DUTY OF DISCLOSURE FOR CONTRACTORS**. A Defense Contractor had duty to disclose complete, current, and accurate data to Department of Defense, arising under 10 USCS 2306, which was applicable to Defendant's prosecution under 18 USCS 1001. United States v. Poarch (1989, CA11 FLA), 878 F.2D 1355. The five elements necessary to sustain conviction under 18 USCS 1001 are: 1) "statement", 2) falsity, 3) materiality, 4) specific intent, and 5) agency jurisdiction. United States v. Godwin (1978, CA5 Ga), 566 F2d 975. The fraud need not be perpetrated directly on or to governmental agency or department involved; false statement need only relate to and affect a relationship within the jurisdiction of agency or department of United States. United States v. Munoz, 1974 ED MICH, 392 F. Supp. 183.

76.     **Through their unlawful actions, Corporate Defendants have conspired and violated the False Claims Act by**: (1) making, using or causing to be made or used, false statements and representations about their pricing and bidding in order to secure Government contracts and payments, (2) failing to fulfill contract bidding and performance requirements and related laws and rules, that preclude contractors from engaging in anticompetitive and collusive activities, including bid-rigging, price fixing and related agreements, and that require contractors to attest affirmatively that they are not party to any such arrangement, (3) offering inducements, coercing or otherwise inducing companies which submitted low bids for contracts to withdraw or otherwise curtail shipments under those contracts, and submitting or causing others to submit higher bids for the same work, (4) continuing on a regular and systematic basis to submit invoices and other documents to the Government seeking reimbursement for charges artificially established through non-arm's length agreements, and conspiring to and causing others to engage in one or more of the above.

## VI.     GENERAL ALLEGATIONS AND FACTUAL BACKGROUND.

77.     **THE IBM WATSON EMAIL FROM GERALD NEWMAN STATING COGNITIVE CODE HAD BETTER TECHNOLOGY THAN IBM'S WATSON**. On February 16, 2011,

Relator Odish received a "blast"-blind email from a California lawyer and "deal broker" named Jerry Newman. **SEE EXHIBIT 2.4,** "NEWMAN EMAIL TO ODISH REFERENCING IBM WATSON AND COGNITIVE CODE'S SUPERIOR TECHNOLOGY, FEBRUARY 16, 2011".

78.     The email was about an interesting business opportunity regarding the potential funding of a tech startup named DEFENDANT COGNITIVE CODE specializing in Artificial Intelligence software that supposedly had Cross-Platforming ability and "tremendous value" in multiple business sectors, including but not limited to Defense Sector, Healthcare, Enterprise Solutions, Automotive Industry, Moblie/Cellular, Gaming, Toys, Laptops/Computing, and a host of other potentially valuable "apps" or applications. SEE **EXHIBIT 1.1,** PROSPECTUS OF COGNITIVE CODE SENT TO ODISH, MARCH 1, 2011.

79.     The inclusion of certain portions of the Cognitive Code Prospectus sent to Odish on March 1, 2011 **(SEE EXHIBIT 1.1)** are relevant and important to understanding potential for defense, healthcare/medical and all other applications that could be created from this SILVIA PLATFORM, when perfected. These relevant portions are also extremely important in understanding the patent fraud and false filings upon the USPTO BY Principal Contractor Defendants. These portions of the Prospectus are submitted as follows:

a. *"SILVIA is a platform for development of conversationally intelligent applications"*
b. *Understand Human language and respond back*
c. *True and Revolutionary Artificial Intelligence*
d. *Cross Platform technology/Intellectual Property that operates in any device: laptops, smart phones, Blackberry, medical and health, consumer electronics devices, smart toys, etc.*
e. *Easy to train in multiple languages.*
f. *SILVIA technology can be "embedded" in many products across a variety of verticals, addressing a market of 2 billion*
g. *Cell Phones, Automotive Telematics, Video Gaming, Legal, Healthcare, Call Center Automation, Smart Toys.*
h. *Currently Seeking 2 million dollars in investment capital to expand its operations and exploit vertical opportunities.*
i. *Everything is becoming more digital.*
j. *Cognitive Code's mission is to enable smart digital technologies through the practical application of artificial intelligence. Natural Language Interaction,*

*Intelligent Response... Cognitive Code has achieved a breakthrough in human to system interaction..."*

k. *"Personal Assistant or Intelligent Agents". "Natural Language Processing" ("NLP") Artificial Intelligence compact enough to fit on a cell phone.*

l. *Language Independent. can be taught in English, Spanish, or French with the same effort, no special programming required.*

m. *Can support dynamic language translation. talk in one language and it can construct a response in another language.*

n. *SILVIA can be embedded in any processor, mobile device, computer, server, laptop or other consumer electronic products.*

o. *go to Market Strategy. engage top 5 leading vendors in each target market directly and build pre. production proofs. of. concept and custom prototypes. Cellular, Video Gaming, Automotive Telematics, Healthcare, Legal, Online Social Marketing, Automotive Fatigue Management, etc.*

p. *Key Competitors. NUANCE . "NATURAL LANGUAGE PROCESSING" ("NLP") processing to do speech recognition with Target Markets in Automotive Market, Legal, Medical, Casual Market. How We Compare to Nuance. Complementary Solution, They focus on speech recognition, we focus on meaning and context interpretation. [Page 15 of Prospectus].*

q. *Three Current Employees.*

r. *Intellectual Property and Legal Representation From Sonnenschein Nath & Rosenthal LLP (SNR Denton) AND PERKINS COIE.*

s. *Advisors and Ownership. The Company is actively recruiting members to its Board of Directors to bring strong financial and technical capabilities. Current advisory team includes Belmar Winds, LLC and Legal Consulting From SNR Denton and Perkins Coie LLP.*

t. *3% percent equity has been issued to two additional stockholders as part of a Friends and Family in a pre. Series A money raise. Schedule of Stockholders available upon request. "*

80.    Relator Odish was told the potential revenues and values that could be generated by such a valuable patent/Intellectual Property and software named by Cognitive Code as SILVIA™ could exceed billions of dollars just from significant penetration in just one or two business sectors.

81.    In March 2011 Business Plan for Cognitive Code Corp. that Relator were sent, it stated that SILVIA TECHNOLOGY could create unlimited "apps" or applications in multiple sectors based upon its Artificial Intelligence.

82.    Relator Odish would come to learn in recent events the significant difference in the value of Intellectual Property between a "Cross Multiple Purpose Platform"

technology/IP/patent such as SILVIA™ [which creates "apps" or applications] and mere "apps" or applications, such as SIRI or EVERNOTE. The vast majority of "apps" or applications are either free, or generate minimal income. SIRI was a free "app" that Gary Morgenthaler and Morgenthaler Ventures sold to APPLE, the world's largest tech giant, for approximately 300 million dollars.

83.     Serious Problem with Cognitive Code's SILVIA technology. It was not perfected. It had glitches. They needed money to fix the glitches and Spring openly admitted that he may not have the technical expertise to "perfect" the technology.

84.     As a result of the email, which showed SILVIA™ technology to potentially outsmart IBM's Watson and curious about "artificial intelligence" technology, Relator contacted Newman. In early March 2011, Relator would incur a $175,000 obligation for opportunity to do business with Defendant Cognitive Code Corporation and its three founders, Spring Chen and Chen who controlled and owned 75% (750,000 shares out of a possible 1,000,000 issued shares).

85.     Relator Odish would come to learn the technology and artificial intelligence developed by Defendant Cognitive Code Corporation was far from being perfected. It had glitches and the company needed a cash infusion or capital investment to finish SILVIA 2.0 AND SILVIA FOR UNITY.

86.     At the time these events began to unfold, Relator was 41 years old with a wife that was 4-5 months pregnant with the couple's first child. Relator was and is a licensed attorney in good standing in the state of Michigan, who focused on real estate and transactional work, but Relator after dealing with cancer in 2008 was not sure he wanted to continue practicing law.

87.     Newman introduced Relator to Defendant John Chen in late February 2011 and Chen arranged for a conference call on March 1, 2011 between Relator and the three founders, as well as Relator's former partner in Cranbrook LLC, Defendant John Bourbeau.

88.     On March 1, 2011, Defendant Chen sent Relator an email informing him of their attorney and their representation. The company was represented by Joel Bock, a partner specializing in Intellectual Property and patents of the global law firm SNR DENTON.

89.     Also on March 1, 2011, Defendant John Chen emailed Relator the Company's PROSPECTUS and business plan seeking funding, which specifically stated that the company was represented by law firms SNR DENTON and PERKINS COIE.

90.     The as yet not-built SILVIA PLATFORM Relator was informed that upon funding and perfecting of the SILVIA the monetary revenue streams would be limitless The PROSPECTUS further represented that potential value of SILVIA™ platform and discussed its enormous potential in multiple business sectors of defense industry, medical/healthcare, mobile/cellular, gaming, toys, automotive telematics, and Enterprise solutions.

91.     The conference call on March 1, 2011 went well and on March 6, 2011, the parties executed a Letter of Intent for "Cranbrook" to seek and procure funding of 2.5 million dollars for 20% non-dilutable equity stake in Defendant Cognitive Code Corporation. See Index of Exhibits. The LOI provided for a window for Relator to conduct due diligence.

92.     During this period, and at all relevant times there were a number of documents sent through the mails, enormous amounts of electronic mail, and significant number of phone calls between Relator and Cognitive Code Defendants.

93.     At the time, Relator Odish was not informed that Defendant Cognitive Code and its founders had signed a similar funding agreement that contained an 'advice of counsel' provision on the same date of March 1, 2011 with a company called the Prescient Group. See **Exhibit 1.5**, "Funding Agreement with Prescient Group".

94.     On March 2, 2011, Defendant Spring sent Relator an email regarding information on Cognitive Code's patent and intellectual property, SILVIA™.

95.      Immediately subsequent to the execution of the March 6, 2011 LOI, Defendant Chen used the mail service to "overnight" some due diligence documents from New Jersey, where Cognitive Code was headquartered, to Relator's home in Michigan. The documents were not coherent, nor organized in a professional manner, nor were some important documents (such as Assignment of Patent) even signed. Some documents had been ripped out of a binder.

96.     **Relator Odish Incurs a Legal and Contractual Liability for mere opportunity to do business with Defendant Subcontractor Cognitive Code**. On March 5th, 2011, Gerald

Newman and Relator Odish verbally agreed to a deal where Odish would be legally obligated to pay Newman $175,000 for opportunity to do business with and possibly fund Cognitive Code. **See Exhibit 62,, "Email stating Yes, we are agreed"**. Cognitive Code had been under a Non-Circumvention Agreement with Newman (See ***Exhibit 208,*** NEWMAN and COGNITIVE CODE NON-CIRCUMVENTION agreement) which Relator Odish had to respect.

97.      **Defendant John Chen encouraged Odish to assume legal and monetary liability so that they could do business**. Relator Odish would sign a NON-CIRCUMVENTION AGREEMENT with NEWMAN, obligating the payment of $175,000 dollars upon funding but also putting Relator in potential breach of "additional damages". **See Exhibit 45, Odish and Newman Success Fee agreement pertaining to Cognitive Code.**

98.      Thus, Relator Odish incurred a $175,000.00 obligation, which was later memorialized in a written agreement,

99.      Relator was also emailed a significant number of documents for the due diligence, both prior and subsequent to execution of March 6, 2011 Letter of Intent. **See Exhibit 2**. There was no reference to legal duties.

100.      Documentation submitted to Relator to conduct due diligence was impossible and Relator Odish would come to learn that Cognitive Code Defendants never had any intention of performing the agreements they signed.

101.      The submission of documents for due diligence was a bit overwhelming and asked his associate, a 3rd law student at time, JASON GREEN, and now a licensed attorney in good standing in State of Michigan to assist with the due diligence and Relator Odish would pay him for his time.

102.      The documents submitted to Relator showed a company that truly was a startup and was essentially a mess as the company, by Defendant Chen, had signed a number of horrendous agreements, the most disturbing of which was the INTELLITAR SOFTWARE AGREEMENT, which had a venue and forum for any potential litigation to be conducted in Huntsville, Alabama.

103.    The only reason Relator took a gamble on the company was the fact that in 2010 it had become an approved vendor and Subcontractor for Defendant NORTHROP GRUMMAN, a United States Government's leading prime contractor for Department of Defense and defense sector in general.

104.    Defendant Spring emailed Relator Odish an email correspondence from Defendant Charles "Jerry" Waugh, a high- ranking executive at Northrop Grumman and the IMI Manager at Northrop Grumman for Virtual Training Systems (VTS) dated February 23, 2011, **SEE EXHIBIT 23.1**, which stated in part:

*"our group at Northrop Grumman is pleased to be developing products for our customers using Cognitive Code's "SILVIA" technologies... in just over a week we will be demonstrating a new custom interactive military training system. This Northrop Grumman developed will be our first product line to use the SILVIA PLATFORM, and will be shown at the upcoming AUSA (Association of the United States Army) in Ft. Laurderdale. Because of the compelling nature of the product, we expect to begin taking a significant number of orders at, or soon after the show... In addition to our work on this upcoming product, our group at Northrop Grumman is also seeking an expanded R & D license for the SILVIA technology. In working with the SILVIA platform we recognize the broad range of intelligent applications... and will allow us to more rapidly develop those applications using SILVIA on a variety of hardware and software platforms.*

*Cognitive Code's technology is unique in the marketplace, and is proving to be ideal for our needs in creating conversational applications for training and defense. We have made great progess using the SILVIA PLATFORM and we believe that this first product line is only the beginning of what is possible for Northrop Grumman with the SILVIA technology... Cognitive Code is helpful as we move forward with SILVIA technology, offering free samples, code samples, and rapid response to requested enhancements of the software... given rapid success we are achieving using SILVIA platform, we at IMI GROUP AT NORTHROP GRUMMAN look forward to a long and mutually beneficial relationship with Cognitive Code.*

*Best Wishes, Jerry Waugh*

*Charles J. Waugh IMI Manager Northrop Grumman"*

Jerry Waugh Northrop Grumman Letter February 23, 2011, **SEE EXHIBIT 23.1**.

105.    Subsequently on March 7, 2011, Defendant Leslie Spring would introduce Charles "Jerry" Waugh of Northrop Grumman to Relator Odish via email:

*From: Leslie Spring [leslie@cognitivecode.com] Sent:Monday, March 07, 2011 2:44 PM*

*To:     Joseph Odish; Waugh, Charles J (IS)*

*Cc:     john@cognitivecode.com;mimi@cognitivecode.com Subject:        Introductions*

*Joseph and Jerry,*

*Allow me to introduce you fine gentlemen to one another.*

*Joseph Odish and his group will be investing in Cognitive Code, once the standard due-diligence phase is complete. Joseph is one of the "good guys", and we look forward to having him as our investment partner.*

*Jerry Waugh is the IMI Manager at Northrop Grumman, and is Cognitive Code's primary contact within the organization. Jerry has also been a supportive champion of the SILVIA technology within Northrop Grumman, and has been a big part of why we enjoy working with them so much.*

*Joseph, to help you with your due-diligence, Jerry will be expecting your call, and is ready to talk with you about our relationship with his company.*

*Here is Jerry's phone contact info: 256-612-3402*

*And Jerry, thank you for your time in doing this for us. All the best,*

*Leslie*

*Leslie Spring Founder and CTO*

*Cognitive Code Corporation 818.321.3729*

106.   **COGNITIVE CODE HAD AGREEMENTS WITH CHRYSLER AND VISTEON DATING BACK TO 2010.** Chrysler Confidentiality Agreement with Cognitive Code Corporation dated December 10, 2010. Additionally, Relator Odish was given CONFIDENTIALITY AGREEMENT between Cognitive Code and Chrysler signed in December 2010 by Defendant John Chen and Ralph Smith, Chief Patent Counsel for Chrysler. And there was a second Confidentiality Agreement presented to Relator Odish in March 2011 between Cognitive Code and Visteon, **SEE EXHIBIT 69**, VISTEON CONFIDENTIALITY AGREEMENT WITH COGNITIVE CODE, and **EXHIBIT 101**, 2010 CHRYSLER CONFIDENTIALITY AGREEMENT WITH COGNITIVE CODE.

107.   Defendant Spring and Relator become close friends the first few weeks of March 2011 but Relator after reading the Alabama Intellitar contract, the worst and most one-sided contract he had ever read, called Spring and stated he wanted to give him a release from the Letter of Intent and wish him the best of luck. Spring stated to Relator, *"joseph, I knew you would say that... I knew when you read that awful contract you would want to jump ship..."*.

108.   On March 16, 2011 Defendant Spring emails Relator asking him to be a partner in the company. [They offered Relator Odish ten equity points to be their partner. Relator Odish offered his former partner and now co-conspirator Defendants Bourbeau five points if he would procure the option money of $937,000 for the additional 7.5% non-dilutable points, but Bourbeau would never perform on that agreement and breached it as Relator Odish had to, through a relative of his, procure the option money.]

109.   On March 18, 2011, the parties executed an addendum to the agreement that made Relator a shareholder and Board Member of the tech startup specializing in artificial intelligence. The Contractual Addendum was and is lawful under delaware law, pursuant to statutory code § 152 regarding lawful consideration, and federal law as well. The agreements signed by Relator, both individually and on behalf of his LLC with Cognitive Code were lawful under any applicable delaware, state and federal laws. **See Exhibit 5.1, MARCH 18, 2011 CONTRACTUAL ADDENDUM.**

VII.   **THE DUAL SIGNATURE AND REVIEW RIGHTS OF RELATOR**
**ODISH ARE KEY TO WHY HE WAS TARGETED AS PART OF THE**
**FRAUD.**

110.   **The Dual Signature And Review Rights of Relator Odish are contractual rights**
**tied Relator's stock**. Relators contractual rights, which are tied to his non-dilutable stock
rights, are relevant to the Defendants actions and this action brought on behalf of United
States Government. In order to the protect the company from anymore bad contracts being
signed by Defendant John Chen.

111.   **Northrop Grumman CEO WESLEY BUSH gets presentation on SILVIA artificial**
**intelligence Cross Platform software capability**. On March 30, 2011, Defendant Spring
emails Relator Odish that the 'NORTHROP GRUMMAN PRESENTATION of SILVIA
TECHNOLOGY TO THE CEO [WESLEY BUSH] TOMORROW", **See EXHIBIT 4.1**,
'NORTHROP GRUMMAN CEO PRESENTATION OF SILVIA TECHNOLOGY" with
Improvements by Northrop Grumman.

112.   **Northrop Grumman wants to Dedicate Entire Business Unit to Cognitive Code**
**Technology.** Defendant Spring inform Relator that Northrop Grumman wants to dedicate
an <u>entire business unit</u> to Cognitive Code Technology.

113.    Spring also informs Relator Odish that Northrop Grumman intended to use the
technology in their new publically traded company and spinoff, HUNTINGTON INGALLS,
INC., which Northrop Grumman announced to be spun off on March 15, 2011. **See**
**EXHIBIT 24**, ARTICLE, NEWS RELEASE ON NORTHROP GRUMMAN SPINNING OFF
AND CREATING HUNTINGTON INGALLS.

114.   **MILITARY GENERALS AND PENTAGON OFFICIALS AT THIS**
**DEMONSTRATION PURSUANT TO EXHIBIT 4.1.** At this demonstration were Generals
from the United States Military, senior Pentagon Officials and high-ranking Northrop
Grumman executives. Defendant Spring and Mimi Chen both informed Relator Odish of
these material facts. **SEE EXHIBITS 4.2 AND 4.3**.

115.   **The demonstration consisted of Northrop Grumman's own improvements on the Cognitive Code SILVIA technology**.

116.   DEFENDANT Spring informs Relator Odish that NORTHROP GRUMMAN wants a long-term licensing agreement.

117.   Relator was told this would be a "multi-million" dollar licensing contract.

118.   Soon thereafter, Cognitive Code Defendants would inform Relator Odish that IBM'S WATSON LIKE COGNITIVE CODE'S SILVIA TECHNOLOGY, despite its imperfections. They turned to their family friends and "advisors" the Morgenthalers.

119.   On april 1, 2011, Relator Odish was sent the following email regarding Nuance, Inc. and IBM, through the Morgenthaler relationship:

*__April 1, 2011 First Morgenthaler Email and use of term "advisors."__ First Email regarding Cognitive Code's "advisors" - the Morgenthalers, specifically Gary Morgenthaler, the lead partner of Morgenthaler Ventures, the VC fund that backed and still owns a piece of DEFENDANT NUANCE. The April 1, 2011 Morgenthaler email from Mimi Chen specifically states as follows,*

*[Fwd: RE: Gary & Todd -- any advice for Mimi?] 1 message*

*Joseph Odish <josephodish@gmail.com>*

*Mimi Chen <Mimi@cognitivecode.com>      Fri,   Apr   1,   2011   at   2:23   PM   Reply-To: Mimi@cognitivecode.com*
*To: Joseph Odish <josephodish@gmail.com>, John Bourbeau <johnbourbeau@hotmail.com>Cc: leslie@cognitivecode.com, john@cognitivecode.com, Jason Green <welt_reisender@hotmail.com>*

*These are from our advisors, Lissa and Dave Jones.  They are both serial entrepreneurs; Lissa was my roommate in college, Dave was a bizdev guy for Apple.  Her family is behind Morgenthaler Ventures. Papa M gave the kids a family rule not to invest in ventures by friends.  But they give us advice freely. M*

*From: Gary J. Morgenthaler [garym@morgenthaler.com] Sent: Friday, April 01, 2011 12:24 PM To: Lissa Morgenthaler-Jones; Mimi@cognitivecode.com; dave@livefuels.com; Todd Morgenthaler*

*Cc: leslie@cognitivecode.com*

*Subject: RE:  Gary & Todd -- any advice for Mimi? Hi Liss and Mimi,*

*I know of the IBM Watson team only indirectly, as I have not met them.*

*Nuance cut a deal with IBM to license the "Watson" technology, and they are busily productizing it. Regarding dialog with the Watson team, reverse engineering is always a risk.  However, Watson was designed for a very specific goal of a statistical-based question answering system.  Beyond a basic ontology, very little semantics is involved.  Therefore, their architecture may not map well to what Leslie is doing with SILVIA.*

*In discussions like this, it's always best to establish the objective of the dialog beforehand.  Then, you can decide how much to disclose.  In my experience, IBM is very unlikely to remarket SILVIA. It's equally unlikely that they will be effective in marketing AI avatars in the market.  So, you have both little to gain and little to fear.*

*Good luck! Gary*

*-----Original Message-----*

*From: Lissa Morgenthaler-Jones [mailto:lissa@livefuels.com] Sent: Friday, April 01, 2011 9:25 AM To: Mimi@cognitivecode.com; dave@livefuels.com; Gary J.  Morgenthaler;*

*Todd Morgenthaler'*

*Subject: RE: Gary & Todd -- any advice for Mimi? IBM Watson's team likes SILVIA.*

*Question is, what do you think of IBM Watson..........?*

---

120.    In early April 2011, Relator is informed that Chrysler and GENERAL MOTORS want to integrate SILVIA™ in test and trial applications in their smart cars. John Chen on April

3rd, 2011 sent Relator Odish an email stating that "General Motors and Chrysler wanted to use SILVIA technology in their "smart cars"… hold onto your seats…". **See Exhibit 1.2.**

121.   **ONSTAR trial demo agreement from April 2011 submitted to Cognitive Code.** In April of 2011, Relator is sent the ONSTAR trial agreement which he reviews and adds the dual signature as he and Defendant Spring decide whether they can pursue the opportunity in light of Spring being the "only" engineer and the company's limited resources.

122.   This ONSTAR TRIAL DEMO agreement submitted to Relator in April 2011 is the last and only Agreement Relator was ever provided to this date, irrespective of his Dual Signature rights, rights as Board Member and Shareholder of the tech Defendant SUBCONTRACTOR startup. **See Exhibit 26.**

123.   **Relator Odish was a full time Employee for Defense Subcontractor Cognitive Code Corporation providing honest and lawful services for approximately a year from 2011 well into 2012.** Relator Odish provided honest services and was retaliated against because he knew of and did not want to be part of any fraudulent or criminal activity or misconduct such as misappropriation of funds, embezzlement.

124.   Despite simply providing benefits, honest services and working nearly 3000 hours as a shareholder and Board Member for the startup Cognitive Code Corporation during 2011 and into 2012, Relator was only paid $8,000 over a 12 month span, in violation of Service Contract Act and federal minimum wage laws.

125.   On April 4th, 2011, Spring authorized Relator to speak to their Intellectual Property attorney DEFENDANT Joel Bock of DEFENDANT SNR DENTON/ now known as US DENTONS LLP.

126.   And in early April 2011, when Cognitive Code was sued by Alabama company INTELLITAR and its parent company, MEI DEFENSE TECHNOLOGIES, Relator Odish made himself personally liable to the Alabama attorney Patrick Miller that would represent Relator Odish and Cognitive Code in the litigation matter. The Alabama litigation matter between Cognitive Code and MEI DEFENSE TECHNOLOGIES, was conducted in Alabama state court with a case number of 2011-000368 and went from April 6, 2011 through well into September 2013.

127.    On three occasions subsequent in April and May of 2011, Relator felt overwhelmed by all the work and offered Defendant Spring and other founders the willingness to give back the non-dilutable ten points that had been granted to him. Cognitive Code defendants refused and asked Relator to keep the points and continue the provision of benefits and honest services. Defendant Spring specifically told Relator in May of 2011 that "joseph, if you jump ship, I will shutter the doors of this company…".

128.    In the hiring of ALABAMA COUNSEL, Patrick Miller, Relator sends Miller an email and states that Miller can hold Relator personally liable for any and all legal fees that accrue from the ALABAMA-INTELLITAR-MEI DEFENSE TECHNOLOGIES, INC proceedings. Defendant Mimi Chen sends Relator Odish an email thanking him for this.

129.    Relator on or about April 7, 2011 had also sent Joel Bock an email requesting a timeline and amount of legal fees owed and paid and Relator promised Bock that they would be paid, making himself personally liable pursuat to any fees regarding the issuance of the pending artificial intelligence patent.

130.    **MAY 17, 2011 RELATOR ODISH AND DEFENDANT BOURBEAU LEARN OF COMMISSION OF FRAUD BY DEFENDANT JOHN CHEN AGAINST RELATOR - HE IS ASKED TO RESIGN.** On May 17, 2011, Relator learns that Defendant John Chen had committed fraudulent acts against Relator and Defendant Spring asked for Chen's resignation from the company. Relator asked for Spring to send him a copy of the Resignation Letter to make sure it comported with the truth and corporate formalities. Spring refused. Arguments ensured into June 2011, continuing to only days before Relator's son was born on June 23, 2011. **See Exhibit 54**, written from John Bourbeau to Cognitive Code Defendants, titled "Unethical Behavior.

131.    Relator was deeply disturbed by this conduct and was willing to give back the ten points in the company but Defendant Spring refused to accept them.

132.    In early June 2011, Defendant Spring seeks advice and counsel from his close friend and godparent of his children, Gary Morgenthaler of Morgenthaler Ventures. Relator is told that Spring gave Gary Morgenthaler the agreements that had been signed and Gary Morgenthaler advised Spring to try and get out of these agreements, that the non-dilution

and other contractual rights Relator possessed would be issues if the company were ever to be acquired or go public.

133.    Spring sends emails acknowledging the vesting of Relator' stock rights, etc, on or about June 10, 2011.

134.    The litigation in Alabama is going well by the end of summer 2011 and the parties believe they are going to easily prevail over INTELLITAR and MEI DEFENSE TECHNOLOGIES, INC.

135.    On July 6, 2011, Defendant Spring sends Relator Odish an email regarding use of **SILVIA FOR THE UNITED STATES ARMY, AIR FORCE, NAVY, AND NORTHROP GRUMMAN'S** use thereof stating:

> *"looks like we will have to adjust our numbers upward for SILVIA FOR UNITY... Looks like UNITY just passed the 500,000 user mark and now they have a player install of 60 mm users. So that effectively doubles our original revenue estimates for SILVIA FOR UNITY that were based on 250k... In related news, the Army and Air Force have certified the Unity Platform and Web Player as a secure content delivery system... I'll have to talk to the NG folks about that one, and see how much their work is tied into that certification. ;) ".*

136.    Over the next months, Relator Odish continues to work full-time on behalf of the Defendant Subcontractor, seeking engineering resources, creating valuable potential licensing arrangments with companies such as Magna, trying to secure financing to pay said engineers and continues the potential joint venture between brilliant programming engineer, **STEVE PRAST,** and his world class engineering company, 3EOS, and Defendant Subcontractor Cognitive Code.

137.    **BRILLIANT PROGRAMMING ENGINEER STEVE PRAST OF 3EOS AND LEGAL SIGNFIGANCE REGARDING DEFENDANT SPRING AND SUBCONTRACTOR COGNITIVE CODE**. Relator Odish in performance of lawful and honest services and as full-time

employee realized early on that Defendant tech Subcontractor Cognitive Code needed significant financing and even more importantly a significant number of engineers to help "perfect", improve and create the flawed technology SILVIA FOR UNITY (or SILVIA 2.0).

138.     As early as April 2011, realizing the Defendant Spring did not have the resources or technical know-how as a "gaming engineer" and not a "programming engineer", Relator Odish used his relationships to reach out to individuals, friends and associates with such "programming engineer" expertise. Through a friend in April 2011, Relator Odish was introduced to a brilliant "programming engineer" STEVE PRAST, who owned his own world-class engineering company called 3EOS based in Rochester Hills, Michigan.

139.     Steven Prast and his company 3EOS employed nearly 30 world class engineers. Prast and his group had programming engineer experience far beyond Defendant Spring.

140.     From that initial introduction in approximately May 2011 through well into 2012, Defendant Spring, Relator Odish and Prast discussed a joint venture to provide engineering services to Defendant Subcontractor.

141.     **Defendant Spring never had the proper programming engineering expertise to perfect the SILVIA TECHNOLOGY.**   During this time, Defendant Spring repeatedly acknowledged he did not have the expertise or programming knowledge to finish SILVIA FOR UNITY, or SILVIA 2.0 and perfect the artificial intelligence technology that would be the ULTIMATE STATE OF THE ART "ARTIFICIAL INTELLIGENCE" PLATFORM to create applications in every government and private sector, from defense industry, medical and healthcare field, mobile/cellular, banking and retail, automotive telematics, video gaming, and virtually all other fields.

142.     However, as time progressed, Relator Odish was repeatedly inquiring about the supposed multi-million dollar licensing agreement with Northrop Grumman and was now being told it "was a long way off".

143.     **During Summer and into Fall of 2011 Material Events are taking place**.

144.     Defendant Spring inform Relator Odish in July 2011 that Northrop Grumman is doing a "little work" on SILVIA technology.

145.     Concerned that Northrop Grumman may unlawfully misappropriate the technology, Relator Odish on July 29, 2011 sends Defendant Joel Bock an email inquiring about any potential legal issues. Defendant Bock does not respond.

146.     Defendant TIMOTHY COOK becomes CEO OF DEFENDANT APPLE in AUGUST 2011 after the passing of former CEO Steven Jobs.

147.     **Raging Patent Wars between APPLE and HTC.**  There is raging patent litigation between Apple and HTC at this time, but they are over "old patents" from 1990's and not related to new state of art artificial intelligence patents. **See Exhibit 2.3, Los Angeles Times Article on Patent Wars between Apple and HTC.**

## VIII.     OCTOBER 2011 - APPLE'S NEW IPHONE WITH MORGENTHALER-BACKED SIRI DEBUTS IN NEW IPHONE - HAILED AS "ARTIFICIAL INTELLIGENCE" AND DIGITAL "VIRTUAL ASSISTANT" BUT IT IS A FAILURE AND MORE IMPORTANTLY COGNITIVE CODE'S PENDING PATENT IS SUPERIOR.

148.     APPLE debuts new iphone with SIRI™, a feature that is supposedly a "virtual assistant" and heavily hyped by Gary Morgenthaler of Morgenthaler Ventures in articles and interviews. SIRI was sold by Gary Morgenthaler and Morgenthaler Ventures to Apple in 2010 for an approximately 300 million dollars.

149.     **APPLE'S "SIRI" is hailed as " REVOLUTIONARY ARTIFICIAL INTELLIGENCE".**  Defendant Gary Morgenthaler of Morgenthaler Ventures gives an enormous amount public support and a number of interviews stating that SIRI is true "artificial intelligence" and will change the way people live and work and is the next generation of voice generation investments, etc. **SEE EXHIBIT 18**, *WALL STREET JOURNAL ARTICLE WITH DEFENDANT GARY MORGENTHALER TITLED "SIRI INVESTOR MORGENTHALER ON THE NEXT GENERATION OF VOICE INVESTMENTS."*

150.    But these statements and predictions turned out to be false as SIRI was merely an "app" that APPLE had problems with because SIRI was deemed a "data hog" and it could not run natively on devices.

151.    **BOTH APPLE'S SIRI AND IBM'S WATSON SHARE THE SAME COMMON FLAW – THEY REQUIRE MASSIVE BANDWITH AND ENORMOUS AMOUNT OF SERVERS TO RUN THEIR PROGRAMS**. Relator Odish would learn from Defendant Spring, emails from Newman, and his own due diligence, that both APPLE'S SIRI and IBM'S WATSON, both being hailed as "artificial intelligence" applications and much more, that SIRI and IBM'S WATSON shared the same massive flaw that SILVIA did not: they each required massive bandwith and warehouses of servers to run properly. **See Exhibit 53**, article, **"SIRI IS NO DATA HOG". See also, EXHIBIT 95**, ARTICLE, "SIRI IS CLUELESS".

152.    **A "PERFECTED" SILVIA TECHNOLOGICAL ADVANTAGE OVER APPLE'S SIRI AND IBM'S WATSON – ONCE PERFECTED IT COULD RUN "NATIVELY" ON A SMALL MICRO CHIP.** Relator Odish would learn that a "perfected" SILVIA technology had one massive superior technological advantage over both APPLE'S SIRI and IBM'S WATSON – it could run "natively" on something as small as a micro chip and therefore did NOT need massive bandwith and warehouses of servers to run properly.

153.    This was stated in Newman's very first email to RELATOR ODISH in February 16, 2011 and Relator would learn this to be true. **See EXHIBIT 2.4, COGNITIVE CODE TECHNOLOGY BETTER THAN IBM'S WATSON.**

154.    SIRI was essentially all commercial hype and one needs look no further as to its commercial and business failure that Morgenthaler-backed NUANCE entity whose own website now mocks SIRI while touting the fraudulently and illegally procured and repackaged "NINA", as a true digital virtual Artificial Intelligence assistant.

155.    On October 21, 2011, Defendant Spring informs Relator Odish that he has handed the sale of company over to their "advisor" DEFENDANT Gary Morgenthaler.

156.    Relator Odish mildly objected and stated in an email that this was a definitive conflict of interest on two fronts: 1) Odish and Spring had exchanged and discussed over a hundred emails and phone calls specifically stating that SIRI was by far the closest competitor (BACKED BY MORGENTHALER VENTURES and NOW THE TECH WORLD'S NEW "APPLE" DARLING THAT BY GARY MORGENTHALER'S OWN PUBLIC INTERVIEWS WOULD BE REVOLUTIONIARY) and 2) NUANCE, was specifically listed as a Competitor in the Cognitive Code Business Plan that Relator had been submitted by Defendant John Chen on March 1, 2011.

157.    Defendant Spring wrote an email to Relator Odish to allay his concerns about allowing Defendant Gary Morgenthaler to act as "broker" in selling the company to HTC and COMCAST which that stated in as follows:

*"...Guys, I have told you many times that Gary Morgenthaler of Morgenthaler Ventures is a close friend and I trust him. I am always careful about the information I share with people...Gary is on the board of Nuance and is one of the most ethical men that I know..."*

[October 21, 2011 email from Defendant Spring to Odish, **SEE EXHIBIT 56**.]

158.    The Raging Patent Wars Between Global Tech Giants such as Apple & HTC and Apple versus Samsung Cause the Valuation of the Corporation to Skyrocket in late 2011 when Cognitive Code's pending Artificial Intelligence patent is granted a Notice of Allowance, months prior to date United States issuance on February 28, 2012 by United States Patent Office.

159.    But the Patent Litigation between APPLE and HTC are over "old patents" relating to patents in mid-90's and not related to any "artificial intelligence" patents.

160.    <u>A "PARTNERSHIP" RELATIONSHIP BETWEEN THE MORGENTHALER-BACKED ENTITY NUANCE EXISTS WITH THE TECH GIANT APPLE</u>. The Relationship Between Morgenthaler Ventures-Defendants and APPLE is much closer and profound than a mere Venture Capital Firm that has a significant financial interest in a tech

behemoth and simply monitors its stock on a daily basis, there exists in a very real sense a true "partnership" between the two entities. NUANCE's executives recently stated exactly that: "that they are in partnership with Apple."

161.    This in and of itself is not illegal or improper but it does become so when Morgenthalers illegally misappropriate - through the exploitation of material, non-public information - and steal a multi-billion dollar patent and IP affording it potential monopoly power in area of digital AI voice transcription with learning capabilities.

162.    And of course this theft was blessed and made possible with the knowing conspiratorial acquiescence by their close family friends, the Cognitive Code Co-Conspirators have children and the Melissa Morgenthaler and her husband David Jones are the godparents.

163.    Relationship Synergy, illicit "tying" arrangements through the use of information and medical technology with the end result of procuring profits from the sale of the products and services related to the lifeline of Apple's cellular products and tablets, especially in the healthcare industry where they can now exploit this artificial intelligence patent in the enormously profitable ACA statutory compliance provisions related to EHRs (or Electronic Health Records), Medicare, and TRICARE from Department of Defense.

164.    As stated herein, the Morgenthalers own substantial stock in APPLE, who was at war with HTC, both of which are publicly traded companies making the misappropriation theory under _UNITED STATES v. O'HAGAN,_ 538 U.S. 528, applicable.

165.    And they own a significant chunk of DEFENDANT NUANCE.

166.    This is applicable to DEFENDANT WESLEY BUSH and NOTHROP GRUMMAN.

167.    On October 24, 2011, the United States Patent and Trade Office sends a Notice of Allowance to Defendant Spring. Relator relied on the fact that Gary Morgenthaler of Morgenthaler Ventures would act in an honest, lawful and appropriate manner in brokering the sale of the tech startup to either HTC or COMCAST. For obvious reasons that would become clear to Relator, a substantial number of them which Relator Odish only learned within the 60-90 days prior to the filing of this action. Instead Relator has recently learned

that DEFENDANT NUANCE IS NOW IN BUSINESS WITH HTC, COMCAST AND THE GOVERNMENT.

168.    Spring informs Relator that HTC and COMCAST want to buy cognitive code outright or acquire at the bare minimum a controlling 51% equity stake in the company.

169.    On November 9, 2011, Defendant Mimi Chen emailed Relator regarding the Morgenthalers and potential sale of company to tech giant, HTC and stated the following:

> "meemersc@netzero.net on behalf of Mimi Chen
> [mimi@cognitivecode.com]
> Wednesday ,November 09, 2011 6:07 PM
> josephodish@gmail .com
> mimi@cognitivecode.com; jbourbeau@hestia.com Re: mimi,
> I've told you this before but...
>
> Thanks Joseph⸗
> Very nice to hear from you and no worries, I'm the first one
> to watch how hard Leslie has been working . And yes, it's
> true, the cash flow problem has been a little tough to deal
> with, but as Leslie
>
> knows, I'm the master at figuring out cash flow.        I've
> been dealing with this for more than I care to remember.
>     I will say the credit card companies have become tougher
> and nastier as of late⸗ but unbelievable as it may sound, I
> still have two usable credit cards left!  (isn't that how
> entrepreneurs fund their companies!?  grin) We still have a
> little left in the retirement account, but not much . Luckily⸗ I
> still have my pension! (so if all else fails...)
> http://techcrunch.com/2811/11/89/gary-morgenthaler-
> siri-will-eat-google/
> Meanwhile, here's an article featuring Gary M.Google
> obviously needs to respond to SIRI and our job now is getting
> Eric Schmidt to realize he needs SILVIA.       Melissa M tells
> me that Eric is in Asia helping HTC on their lawsuit with
> Apple. sounds like Google just purchased Motorola Mobility
> just to help HTC out.      Eric and Wendy live only a half a
> mile from Liss so I think we'll have to wait til he gets home.
> From what I can glean, this whole lawsuit against HTC is
> just venom spewed from Steve Jobs (who from what all of my
> friends from Silicon Valley tell me, was a really unpleasant
> person

> *- he's done stuff that would make anyone reel as to the*
> *horrible way he treated people)*
> *The jury is out as to what HTC wants to do with SILVIA. I*
> *may have made the first contact and they are definitely*
> *interested, but don't know what extent. we'll keep you poste.*
> *And yes, thanks for the chuckle on those emails.       I knew*
> *eventually we·d all get our misunderstandings straightened*
> *out. And hopefully, we'll all get a nice exit on this to really*
> *have fun with .*
>
> *Peace_, Mimi :0*
> *Leslie and I thought STEVE PRAST rocks! Great guy.*
> *Thanks for the connection."*

170.   In this email, Defendant Mimi Chen explicitly references the relationship with
programming engineer Steve Prast, who had visited Defendants in Los Angeles at least
three times in order to effectuate a joint venture agreement and assist Defendant Spring.

171.   On that same exact date of November 9, 2011, an article is published which incorporates
an interview by Gary Morgenthaler wherein he states that "SIRI is going to eat GOOGLE's
lunch". The important statements, projections and assertions by Gary Morgenthaler are
reprinted herein:

> *Gary Morgenthaler Explains Exactly How Siri Will Eat Google's*
> *Lunch Posted Nov 9, 2011 by Rip Empson (@ripemp)*
>
> *The iPhone 4S is on the streets, and accompanying it is a helpful*
> *young virtual assistant named Siri. You've probably heard*
> *something about Siri by this point, as tech blogs and the media*
> *writ large, have been yammering about Siri's technology at*
> *full blast. Since the beginning, and even more so since Siri was*
> *acquired by Apple in 2010, there's been a lot of excitement*
> *about voice recognition technology.*
> *This hit fever pitch with Siri's native launch on the 4S. Of*
> *course, Siri isn't perfect. She's been  down and out and has*
> *experienced a backlash due to limitations in voice recognition,*
> *inability to open apps, etc. But many people (among them, one*
> *Eric Schmidt) take another stance: Siri is game-changing, and*
> *not only that, she poses a significant threat to Google (and*
> *beyond).*

*In his letter to the Senate Subcommittee on Antitrust, Competition Policy, and Consumer Rights, Google Executive Chairman Eric Schmidt talks quite a bit about Siri and how it represents "an entirely new approach to search technology" — one that is a "significant development". Basically, he says that Siri is the biggest threat to Google's control of search, well, ever. The writing, as they say, is on the wall.*

172.    **AS STATED BEFORE COMCAST AND HTC WANT TO BUY COGNITIVE CODE, LARGELY BECAUSE OF THE PATENT**. In October  2011 Cognitive Code Defendants inform the Relator that both Comcast and HTC have contacted them about a Buyout or at least acquiring a majority equity stake in Cognitive Code Corporation.

173.    The valuation of the company skyrocketed in large part because its patent was only months away from being formally issued and its IP was far superior to SIRI. HTC was at this time a 32 billion dollar company and the world's 3rd largest cell phone manufacturer but it has gotten beat up by Apple for having a weak patent portfolio. It desperately needed to make acquisitions to stay viable.

174.    The HTC executives admitted to Spring who admitted to Relator that the pending patent and SILVIA™ technology was superior to APPLE's technology and more importantly, in light of the raging patent wars at that time between HTC and APPLE (which eventually on December 19, 2011 led the Federal Trade Commission to ban HTC cell phones through April 2012), the HTC executives specifically stated that they needed the patent and intellectual property to fight APPLE in court all over the world.

175.    During December of 2011, Relator does extensive research into the patents owned by APPLE related to SIRI and artificial intelligence. Relator learns that Apple may be infringing upon our (Cognitive Code's) patent. As stated previously, it was in late October 2011, the US Patent Office issues a Notice of Allowance on the pending patent of Cognitive Code, the latest official hurdle before the United States Patent and Trade Office formally grants official issuance of the patent. In this case, the US patent office would officially issue the artificial intelligence patent.

176.    Relator Odish learned through own diligence on December 17, 2011 that, upon information and belief, the Cognitive Code Pending Patent would not only be superior to the APPLE'S SIRI patents, there was a potential serious issue of the SIRI patents filed by APPLE in 2010 (and stated as "Contextual Voice Commands") infringing upon the Cognitive Code Pending Artificial Intelligence patent filed in March 2008 and granted US issuance on February 28, 2012.

177.    HTC paid 300 million dollars for a 51% stake in BEATS AUDIO in August 2011. Audio is not HTC's core business. HTC's core business is cellular - the strongest area for Cognitive Code's patent and intellectual property.

178.    ***RELATOR ODISH LEARNS THAT DEFENDANT WESLEY BUSH AND DEFENDANT NORTHROP GRUMMAN HAVE EXPLICIT "INSIDER TRADING" KNOWLEDGE OF COGNITIVE CODE AS ACQUISITION TARGET AND SEEK TO UNLAWFULLY EXPLOIT IN VIOLATION OF O'HAGAN 'MISAPPROPRIATON PRINCIPLE.*** The day before Thanksgiving in November of 2011, Defendant Spring called Relator and informed him that Northrop Grumman, realizing that Cognitive Code was an acquisition target, wanted a long-term licensing agreement. Spring told Relator that licensing agreement with Northrop Grumman would be 5 million dollars for ten years and Northrop Grumman would pay them an "earnest money deposit" of several hundred thousand dollars in January 2012.

179.    Obviously, Relator knew Spring had once again been making fraudulent misrepresentations regarding these numbers. Only a month before in October 2011, Spring told Relator the Northrop Grumman licensing agreement was "a long way off, ten months off".

180.    Indeed, only five days later Defendant Spring would call Bourbeau and inform him that the licensing agreement with Northrop Grumman was actually a ten (10) million dollar agreement for a few years with 6 million dollars to be paid by Northrop Grumman to Cognitive Code in January 2012. Spring would later mention these same numbers to Relator and inform him that the company was getting 6 million dollars in January 2012.

181.  HTC was at this time a 32 billion dollar company and the world's 3rd largest cell phone manufacturer but it has gotten beat up by Apple for having a weak patent portfolio. It desperately needed to make acquisitions to stay viable. They (the HTC executives) admitted to Spring who admitted to Relator that the pending patent and SILVIA™ technology was superior to APPLE's technology and more importantly, in light of the raging patent wars at that time between HTC and APPLE (which eventually on December 19, 2011 led the Federal Trade Commission to ban HTC cell phones through April 2012), the HTC executives specifically stated that they needed the patent and intellectual property to fight APPLE in court all over the world.

182.  In early November 2011, Relator and Spring had discussions about the Relator' right to exercise the Option to buy the additional 75,000 shares as referenced in the LOI and extended in the Option Agreement.

183.  During these conversations, Relator politely asked Spring if he would be upset if Relator and Bourbeau exercised their Option rights to acquire the additional non-dilutable 75,000 shares for $937,000 dollars now that company was worth possibly 400 or 500 million. Spring told Relator he would not be upset and specifically stated that the Option Rights they possessed in late 2011 were still valid because the patent had not yet been formally issued.

184.  Relator informed Spring that Bourbeau and he were considering perhaps Assigning their Option Rights and upcharging the Assignee so that could make perhaps a few million dollars from the assignment of the Option Rights. Spring acknowledged that Relator and Bourbeau certainly had the right of assignability for these Option rights but made it clear he would be very upset if they assigned their option rights for a profit and that they would have no future with the company if they did that.

185.  Relator knew their Option rights under Cranbrook were valid and relied on Spring's statement expressly confirming the fact. It also gave them the absolute right of assignability to another corporation or entity within Relator sole and absolute discretion.

186.  After the October realizations that HTC and COMCAST wanted to buy the company and seek licensing agreements, Defendant Spring admits to Relator that he was right about Gary Morgenthaler about a potential conflict as Gary Morgenthaler admitted to Defendant

Spring he"had a conflict" and now the sale of the company was being handled by Gary Morgenthaler's brother, TODD MORGENTHALER. Relator originally thought Spring had said "Bob" but much later would go online and from website wikipedia see that it was "Todd".

187.    [THIS SAME ALLEGATION IS IN THE OCTOBER 22, 2012 COMPLAINT FILED BY DEFENDANT ROSEN.]

188.    On December 6, 2011, Relator emailed Defendant Mimi Chen. Relator Odish stated the following the email where he specifically referred to the Morgenthalers as their "Advisors", a term repeated throughout by Cognitive Code Defendants. The   DECEMBER 6, 2011, **EXHIBIT 102,** submitted herein as follows:

> From: Joseph Odish [josephodish@gmail.com]Sent: Tuesday, December 06, 2011 4:07 PM To: Mimi@cognitivecode.com
> Subject: Re: @BreakingNews, comcast doing deal with Verizon
> (sorry, for all these emails)
> You are welcome. It sounds like you have quality advisors who are family friends, which is great. My only suggestion would be to use a top notch attorney in conjunction with your friends morganthalers. Whether its joel bock or maybe someone else in LA. I'd ask the morganthalers.
> You are swimming with sharks re Comcast, HTC, NG. I despise attorneys (yeah I know) but they are a necessary evil. Especially now.
> Now speaking of increasing valuation: leslie wants me and JB to set up web demonstrations and/or meetings with these fortune 500 tier ones. I just got off the phone with my friend at Magna.
> Number 2 tier one in the world. They have more money than chrysler. They've been interested in a demonstration (and eventual licensing agmt) for months, actually since the summer. I will email
> leslie later and cc Michael Macauley at Magna for dates, but one question: can we tell him about comcast and htc? Have we signed
> any confidentiality agmts with either comcast or htc?
> I doubt we have but wanted to make sure. I'd like to use these names as leverage for a licensing agmt with magna but dont want  to run risk of breaching any confidentiality agreement we may have in place. thanks!
> Regards, Joseph

189.    Previously on December 7, 2011, Chen and Odish had exchanged emails about the

situation:

*Re: some tax advice for you and the kids, 2012 is a very important*

*Mimi Chen <Mimi@cognitivecode.com>  Wed, Dec 7, 2011 at 3:01 PM Reply-To: Mimi@cognitivecode.com*
*To: Joseph Odish <josephodish@gmail.com> Cc: John Bourbeau <jbourbeau@hestia.com>If Comcast decides to make a bid, it would be interesting to see if HTC would make it a bidding war. Fun thoughts indeed!*
*Mimi*

*From: Joseph Odish <josephodish@gmail.com> To: Mimi@cognitivecode.com*
*Subject: Re: some tax advice for you and the kids, 2012 is a very important year tax wise + intellitar was blessing in disguise*
*Date: Wed, 7 Dec 2011 01:56:24 -0500*

*It's incredibly important stuff. Tax considerations drive 80% of the structure of deals and their acquisition. As leslie told me tonight SIRI sold for 250 mm, which is ridiculous because it was a FREE APP, with no potential for ever making money. Given my research a fair valuation of the company RIGHT NOW IS ABOUT 300 MM, not a penny less. Likely more, but that's the baseline from what I've seen. If we get lucky next month or so, the bottom line number will 300 mm. If you disregard tax consequences, you are looking at giving away anywhere from 40-70 million dollars. You will a*
*lot of good in the world that uncle sam. Now...*

*In a few months we will have Magna, Sony, Comcast under license as well as NG and Chrysler and Unity will be launched for the 500,000 game developers. That will easily add 100-200 in valuation. Valuation revenue multiples are less important in such special tech companies by the acquiring company is buying a massive expectancy interest. all that said, leslie did absolutely agree that if an offer came in for 250 or 300 mm tomorrow, we jump all over it. It would be crazy not to. And someting tells me comcast will make a significant offer very soon. Just a hunch after reading their acquisitions. Extremely aggressive company. Joseph*

190.   Then on December 12, 2011 Mimi Chen thanks Relator Odish "*for getting the company up and rolling*", via email, **SEE EXHIBIT 4**.

191.   On December 12, 2011, in an email from Spring to Odish discussing the 6 mm dollars [of the ten million dollars, which is Fifty Million] starting in January 2012. Spring also gives extensive detail about SILVIA™s platform over SIRI, and specifically mentions at the end of the email that "Beta SILVIA FOR UNITY" RUNTIME already being deployed in SILVIA products in use by the **US Army"**. **SEE EXHIBITS 123, relating to emails dated December 12, 2011 and December 16, 2011 from Defendant Spring to Relator Odish.**   See below in full:

> *From: Leslie Spring [mailto: leslie@cognitivecode.com] Sent: Monday, December 12, 2011 6:04 PM*
> *To: josephodish@gmail.com Subject:    Bullet point notes*
> *"Joseph,*
> *Here is are the bullet points from a current doc that I use for a "1 minute snapshot" of the business.*
> *SILVIA is a platform for developing conversationally intelligent applications.*
> *You can talk to the computer/mobile device/etc., it talks back, and does practical things for you. Launch of SIRI by Apple as part of iOS validates the voice control market for consumer products, increasing market demand for SILVIA. SIRI is NOT a portable developer's platform, and requires massive server infrastructure. Because of this, Apple is having serious scaling problems as more users come online.*
>
> *SIRI is based on DARPA/Stanford research. Apple/SIRI just filed for patents in Dec. 2010.*
> *In contrast, SILVIA is: a practical software developers' platform, is scalable, runs natively on desktops/servers/mobile/game consoles, and SILVIA is truly proprietary technology, developed solely by Cognitive Code, with patents already approved, having been initially filed in 2007.*
> *Cognitive Code is self funded, with 2012 projected revenues of over $6M based on currently booked and closing business. Current customers include Northrop Grumman and one of the "Big 3" automotive manufacturers. SILVIA has been adopted as*

*the standard for ALL Northrop Grumman training and simulation applications.*

*SILVIA-based applications products have already been deployed to the US Army.*

*Based on customer demand, Northrop Grumman is launching a new "Artificial Intelligence" division, dedicated to SILVIA-based applications. We are negotiating a new licensing deal with NG for this new business unit.*

*SILVIA-enabled "Big 3" concept vehicle already in production, SILVIA integration to begin in Q1, 2012.*

*Additional markets for 2012 include mobile, gaming, and cable/home entertainment. SILVIA for Unity - official launch early Q2, 2012, targeting over 500,000 [NOW OVER 1,000,000] registered gaming developers, ongoing revenue to include back-end royalty structure. Beta "SILVIA for Unity" runtime already deployed in SILVIA products in use by US Army.*

*Hope some of these help frame the one-pager for you. Leslie ".*

*[December 12, 2011 email from Defendant Spring, SEE EXHIBIT 123. Upon Relators recent October 2013 discovery regarding Nuance SEC filing, as delineated in detail below, the Amazon/Comcast/HTC/SONY/SILVIA FOR UNITY are now all taken over by DEFENDANT NUANCE per the SEC filing.]*

192.  As Relator continued to work on the one minute snapshot for MAGNA, that Relator had approached through a friend and they wanted four software SILVIA™ licensing applications. Relator sent Spring another email on December 16, 2011 asking him to review the memorandum he was drafting to Magna's counsel.

193.  Spring's response on December 16, 2011, **EXHIBIT 123**, is restated herein:

*From: Leslie Spring [mailto: leslie@cognitivecode.com] Sent: Friday, December 16, 2011 4:22 PM*
*To: josephodish@gmail.com*
*Subject:   Re: Cognitive Code and Magna (draft email for leslie's review (to magna's in house Counsel)*

*"Hey Joseph, Three Points:*

*A little less detail on the NG relationship would be good. The NEW NG business unit and the new contract, I feel comfortable sharing verbally, under a CA, but not in writing (email), not yet). I think it's safe to mention we're in the process of closing a broader licensing, and that should be enough until I talk to them via voice.*

*For setting the right tone, I would take out Denso as the alternative.*

*These days I'm CEO, not CTO, which I think is helpful for them to know they are talking to a decision maker.*

*Leslie".*

*Spring December 16, 2011 email to Relator Odish.* See exhibit 123.

194.    On December 19, 2011 an email from DEFENDANT MIMI CHEN informs RELATOR ODISH "meeting with HTC" went great.

195.    December 19, 2011 Defendant Spring calls Relator and said his presentation to HTC EXECUTIVES went terrific and "they were drooling, joseph", "they had nothing like this in their portfolio". On that same day of December 19, 2011 that same day FTC rules in favor of Apple against HTC in their patent infringement suit. NY TIMES article talks about ruling and how HTC has a weak patent portfolio.

196.    Relator is told that Spring is meeting with senior HTC executives on December 19, 2011. Relator sends Spring an email wishing him good luck. On December 19, 2011, HTC executives from Tiawan fly in to meet with Defendant Spring and after the meeting an excited Spring calls Relator and tells him "they were drooling, joseph… they admitted they needed this in their portfolio…".

197.    During this month, Relator is researching patents and emails Spring on December 17, 2011 stating that some of Apple's potential SIRI patents might infringe upon "our patent" as Cognitive Code's patent was filed in 2008, and predicated upon Artificial Intelligence while some of Apple's patents were filed later and related not truly to Artificial Intelligence but rather "Contextual Voice Commands".

198.    Not coincidentally, on this very same date of December 19, 2011, as HTC and
APPLE had been dueling over patent infringement in US court, the Federal Trade
Commission rules in favor of Apple that HTC has infringed on certain Patents owned or
licensed by Apple and imposes a ban on HTC [a tiawanese company] from importing their
cellphones into United States until April of 2012. Sometime during 2012, the feud is quietly
settled and APPLE and HTC quietly enter into a licensing agreement. Upon information
and belief, and through Relators own personal information from this matter this licensing
deal was likely "brokered" by NUANCE SHAREHOLDER AND FORMER BOARD
MEMBER Gary Morgenthaler in an unlawful act of Insider Trading [from realization that
Cognitive Code's technology was superior to SIRI and about to be acquired by HTC] as well
as serious anticompetitive and likely antitrust violations.

199.    On DECEMBER 19, 2011, the same day that Defendant Spring was meeting with
senior HTC executives over SILVIA's revolutionary capabilities, the FEDERAL TRADE
COMMISSION in an action brought by APPLE against HTC in their raging patent wars
ruled in favor of APPLE and issued a ban on HTC from importing their cell phones into the
United States that would last until April 2012.


200.    Northrop Grumman made a significant commitment to the state of the art
Intellectual property of Cognitive Code's software SILVIA™. After the October 2011 emails
relating to Gary Morgenthaler handling sale of company, when HTC and COMCAST
expressed acquisition.

201.    Subsequently in late 2011, when Northrop Grumman realizes cognitive code is a
serious acquisition target by htc and comcast, it moves for exclusivity of Silvia™ intellectual
property in the defense industry with a 10-50 million dollar licensing agreement - that
cognitive code defendants have, upon information and belief, misappropriated and
embezzled with such funds being stashed overseas.

202.    During the middle of December 2011, HTC execs flight out to Los Angeles and meet
with Spring and he tells Relator the meeting went great and they were drooling. Defendant
Mimi Chen Chen sends Relator an email thanking him for getting the company up and

running on December 12, 2011. HTC's true interest in the company was their desperate for our patent in order to fight off Apple. Cognitive Code's patent had received the Notice of Allowance which basically meant the patent was going to be issued in a few months.

203.    In this email, Defendant Spring unequivocally states that the 10 million dollar licensing agreement from Northrop Grumman with 6 million to be paid to the corporation in January 2012.

204.    Furthermore, despite the clear language of Defendant Spring stating the 6 million had already been "booked", and Defendant General Counsel Difazio repeated assurances that no contract has been executed, in an email to Jeff Bezos, the founder of Amazon.com, Defendant Mimi Chen specifically uses the word "partnership" to describe the business relationship between Defendant Corporation and Northrop Grumman.

205.    During the months of November and December 2011, Defendant Spring makes several disturbing statements to Relator. Defendant Spring states to Relator that he and his wife and his brother in law already had plans to "invest the 6 million in conservative investments" to their own personal benefit. When Relator politely suggests that the money belongs to the Corporation and should be used to hire engineers and grow the company, Defendant Spring simply shrugs off the suggestion.

206.    During December 2011, Spring reaffirms that the option rights held by cranbrook are valid because the LLC, an affiliate of the company, are valid because of two weeks of formal issuance of patent.

207.    **Embezzlement and Misappropriation of the Northrop Grumman monies paid to Cognitive Code Defendants.** DEFENDANT Spring states to Relator Odish in December 2011, spring admits to Relator odish that the 6 million [initial payment of licensing agreement] coming from Northrop Grumman in January 2012, Defendant Spring admits that he and defendant mimi chen already had plans for the 6 million and they were planning to invest the money in very conservative investment devices.

208.    Relator Odish states that money belongs to the company. Spring just goes silent. Odish throughout this entire period tells his former partner Bourbeau of the embezzlement,

misappropriation of funds, and unlawful misconduct and Bourbeau agrees that these people are "crooked". But now Defendant Bourbeau, because he is not an attorney like Odish, is willing to retaliate and destroy his former partners' rights and be in business with Cognitive Code defendants despite this unlawful misconduct and his long-time knowledge of it.

209.    They received the six million and refuse to acknowledge receipt of such funds. And this is why they cannot go through discovery. Relator objected slightly, reminding Spring that the 6 mm dollars belonged to the company. Spring shrugged it off and did not comment and Relator did not want an argument but simply hoped that with sale of the company or at least a majority stake being imminent, Morgenthalers and other attorneys.

210.    **The 10 million from Northrop Grumman is 50 million dollars, and has been buried and embezzled in overseas accounts**. Upon strong information and belief, the "10 million from Northrop Grumman" that Relators were told was coming was in fact likely to be 50 million dollars from Northrop Grumman given a conversation that Relator would have Defendant Difazio on February 9, 2012 as stated below.


211.    **During the First Week of January 2012 Relator travels to Los Angeles to spend time with Spring and Defendant Mimi Chen Chen**. During dinner on January 2, 2012, Defendant Spring stated to Joseph Relator that Jerry Waugh of NG was releasing money to the company while "they negotiated the licensing agreement".

212.    **January 4th, 2012 Phone call from Spring to Relator: HTC wants to buy at least 51% of the Company and Chrysler and Fiat may be shipping 3 million units in the Summer of 2012**. Relator is still in Los Angeles on the 4th of January and he wants to arrange a lunch with his friend **PHIL HUML**, whom has access to Wistron, arguably the world's largest OEM. A potential licensing deal or any business arrangement with Wistron would significantly increase the valuation of the company.

213.    Defendant Spring calls Relator Odish on this day of January 4th, 2012 and tells him he has some "great news" and makes the following extremely significant admissions and statements:

214.    Spring states that HTC definitely wants to buy at least a 51% stake in the company, if not the entire company. Spring states also that Chrysler and Fiat want to ship 3 million units of our software this summer (summer of 2012), a statement consistent with the December 12, 2011 email Spring wrote to Relator regarding the state of the business.

215.    Additionally, Defendant Spring states to Relator that HTC - the world's 3rd or 4th largest cell phone manufacturer - *"wants to be in the automotive business and Chrysler wants to be in the cellular business".* Spring continues and states *"isn't this amazing that our small company is the hub for all these huge things".*

216.    It is during this call on January 4th, 2012, that Defendant Spring for the first time in a long time brings up the issue of Relator's dual signature rights and rights to review and approve every contract, saying "**joseph, we need to clean up the record books**" in reference to the "**dual signature and review rights**".

217.    Relator Odish says he is willing to consider it as long as the proper mechanisms are in place to protect the company and its shareholders so it couldn't be harmed by any disastrous contracts signed by John Chen. And that the company must abide by and follow corporate formalities. Essentially be run properly. Defendant Spring promises and assures Relator that he (Spring) will be running things out of Los Angeles and that Chen will not be involved. **Spring then states something about how the Company is setting up new bank accounts with 24 hour service. Relator finds this statement odd and it is not the first time he has heard it.** Why would the company need 24 banking service?

218.    They schedule a lunch date the following day with **PHIL HUML**, who has access to the largest engineering company in the world, WISTRON. However, before the call ends, Spring once again mentions how he's going to get his "consulting fees" and Relator is yet again convinced the Defendant Majority Shareholders are misappropriating Corporate funds for their own personal use, or worse just straight out embezzling and sending money overseas.

219.    Relator and his friend **PHIL HUML** have lunch with Defendant Spring with the express purpose of setting a meeting with **BRIAN GROH**, the head of North America for

Wistron. Defendant Spring showed up unkempt as if he had just woken up. The lunch with PHIL HUML for the following day to discuss the Wistron opportunity and meeting with BRIAN GROH, the head of North America of Wistron, an engineering behemoth who did 21 billion in sales and revenues in 2011. Relator set up lunch with PHIL HUML for the following day to discuss the Wistron opportunity.

220.  **Lockheed Martin inquires about the technology.** On the way to the sushi restaurant, **Spring mentions that a second billion dollar defense company had contacted them**. When Relator asked who it was, Spring refused to answer. Upon information and belief, that company was almost certainly to be Lockheed Martin.

221.  During lunch Spring speaks openly to **PHIL HUML** about the impending HTC deal. **HUML** asks him what the company is worth and Spring replies, "400 million dollars". This is a realistic number given that HTC paid 300 million US dollars for a 51% stake in Beats Audio only six months prior - and that was not their core business. When **HUML** asked about the management of the company, Spring said he had a four member management team (which contradicts sal's statements and actions in how they are willfully ignoring our board and management rights).

222.  **Then Defendant Spring mentions yet again that the company is taking some measures to open up new bank accounts with 24 hour service.**

223.  Huml asked about the present management team, Spring replied it was only four people – obviously referring to Bourbeau, Relator, Defendant Mimi Chen Chen, and Spring as Defendant John Chen had not been heard from or cc'ed on an email or taken part in a board meeting since his fraudulent conduct in May of 2011. Defendant John Chen had not yet reappeared.

224.  This comment disturbed HUML and Relator. HUML told Relator after they dropped Spring off that even the mere appearance of impropriety is unacceptable and why would he need to wire money at 2 am? Phil Huml would provide an affidavit to these effects in the subsequent California proceedings.

225.  Incredibly, the following day Defendant Spring ignores the corporate opportunity of meeting BRIAN GROH and Wistron for second time. He doesn't even have the courtesy to

call PHIL HUML the following day. Defendant Spring had now repeatedly disregarded on multiple occasions corporate opportunities with two separate multi-billion dollar companies in Magna and Wistron.

226.    The importance of Magna and Wistron and the business benefits Odish had provided to the company for over a year.

227.    **Amazon email, "partnership with Northrop Grumman.**" In a January 2012 email to Jeff Bezos of Amazon, Defendant Mimi Chen **refers to her relationship with Northrop Grumman as a "partnership**".

## IX.    JANUARY 12, 2012 - DURING THIS WEEKEND, SPRING STATES THAT COGNITIVE CODE IS NOW WORTH "SEVERAL HUNDRED MILLION DOLLARS".

228.    Spring calls calls Relator and tells him that HTC thinks the SILVIA™ IP is better than SIRI's, and that Spring will be traveling to Tiawan at end of January. Then out of the blue a bold- faced lie "joseph, I thought you transferred your board seat to John?" which he damn well knew I hadn't and said "transparency is a courtesy". Relator had to send him an email immediately after saying that transparency to a fellow board member was a fiduciary duty.

229.    Relator Odish emails Defendant Spring telling him I know "he's freaked out about the dual signature requirement and they will address it when he comes back from Tiawan".

230.    Spring tells Relator Odish that the HTC executives made a number of very significant admissions to him: the HTC executives told Spring that Cognitive Code's Intellectual Property, patent and software was far superior to SIRI and that they needed the patent and intellectual property to fight off Apple in their ongoing patent wars being waged here in the United States. Relator was excited over the news but wanted to know more and who would be handling all of this business, negotiation, etc.

231.    The subject of Defendant John Chen returning to the company came up it became awkward. Spring said the Joint Venture with Steve Prast and 3EOS, Prast's engineering company, would handle all this business. Relator asked to be more involved and be entitled

to more disclosure as Relator is a Board Member. Spring replied, rather absurdly, "Joseph, transparency is a courtesy".

232.    Then Defendant Mimi Chen fabricates a lie about Relator Odish promising to give up dual signature at dinner (she was trying to play that foolish "there's three of us versus your one word").

233.    In subsequent email exchanges, Relator Odish accuses Defendant Mimi Chen of running the company, who has two other shareholders, of running the company "as their own personal slush fund" and violating federal laws, criminal activity which relator wants no part of obviously.

234.    At this same time, Relator emails Patrick Miller on January 17, 2012, and thinks Miller should contact Barbara Pearson of MEI DEFENSE TECHNOLOGIES, a company in business with NASA.

235.    Patrick Miller says Joseph "please do not contact Barbara Pearson". Relator immediately replies, "Okay. I wouldn't do it unless we were all on board."

236.    Having returned home to Michigan, on January 12, 2012, Defendant Spring calls Relator and tells him the following good news. Defendant Spring had spoken to the Senior HTC executives and they wanted Spring to fly to Taiwan to meet with their engineers and the HTC acquisition and Portfolio Manager at the end of January to discuss the acquisition and train the engineers on our SILVIA software.

237.    **DEFENDANT SPRING ADMITS TO DEFENDANT BOURBEAU THAT COGNITIVE CODE IS WORTH SEVERAL HUNDRED MILLION DOLLARS.** *Spring admits to DEFENDANT BOURBEAU that the Company is worth "Several Hundred Million dollars"* now that HTC wants at least 51% of the Company. That same weekend, Spring called Bourbeau and told him the great news about HTC and how they would be flying him to Tiawan to meet with the HTC Portfolio and Acquisitions Manager.

238.    Defendant Bourbeau asked what that meant to the value of our company if HTC were to purchase a 51% stake in the company, Defendant Spring replied "several hundred million dollars".

239.    In January 2012, Cognitive Code Defendants essentially start to harass Relator Odish over his Dual Signature Rights, despite Relator not seeing a single contract since April of 2011 (the Onstar Agreement).

240.    The last document or contract Relator had seen or reviewed [but he and Spring did not sign] was the OnStar [GM] Agreement in late April 2011.

241.    On January 17, 2012, Defendant Sal Difazio, the new general counsel of Cognitive Code Corporation, sends Relator Odish a Cease and Desist. Patrick Miller and Defendant John Chen are cc'ed on the email correspondence.

242.    Subsequently Defendant Difazio emails Relator Odish that this "in no way creates a cause of action" against Odish.

243.    The first conversation between Relator Odish and Difazio was testy and revolved around Relator's dual signature rights. Defendant Difazio, supposedly General Counsel of the Corporation, was immediately threatening "to seek judicial relief to strip Relator of his dual signature rights" were contractually granted to him and part of the bargain as well as a part of his stock rights.

244.    During the first call with Defendant Difazio as the new "general counsel" for Cognitive Code Corporation threatens to seek judicial relief of dual signature rights and screams at him over the phone in an obvious attempt to intimidate and harass Relator into giving up something so that Cognitive Code Defendants can cover up their fraud. Defendant Difazio states to Relator Odish, "you don't need to know everything."

245.    Defendant Difazio promised in this email and in phone conversations with Relator Relator and Bourbeau that he would act ethically and in the best interests of the corporation. Defendant Difazio requested that Relator and Bourbeau send him "their version of the facts" and a "wishlist" as to what they wanted to see accomplished.

246.    Difazio stated he already had the individual Defendants version of the facts but needed Relator in order to effectuate a resolution and draft a new shareholders agreement.

247.    Relator relied on Defendant Difazio's representations and began preparing their version of the facts and a supposed wishlist and their version of the events or "dispute".

Defendant Difazio admits to Relator attorneys that he and Defendant John Chen are essentially running the company, a very disturbing proposition to Relator.

248.   After the initial confrontation, Relator relied upon Defendant Difazio's representations that he would act ethically as General Counsel.

249.   On January 18, 2012, Difazio sent Relator an email stating that the Cease and Desist Letter he sent Relator "created no causes of action against Relator".

250.   On January 20, 2012, Relator sent Difazio an email stating that he wished to discuss a buyout of his shares, he had basically had it with this disturbing conduct and it had taken a significant toll on him.

251.   Difazio asked Relator to compile "their version of the facts" and a "wishlist" of what they wanted to see done with the company. Difazio was in retrospect trying to conduct free discovery.

252.   Relator Odish had told his Alabama attorney Patrick Miller - repeatedly, in multiple emails - that he wanted to assert damages on behalf of Cranbrook in November and December 2011 in the ongoing Alabama litigation against MEI DEFENSE TECH, the billion dollar defense parent company. In light of the cease and desist that Difazio sent to Odish, he was precluded from doing so because he knew if tried they would lie and create some additional fabrications.

253.   On a Monday February 6th, 2012, Shareholders Relator Odish and Defendant Bourbeau had a conference call with their General Counsel Sal Difrazio. During the call, Difrazio did not at that time reveal his lifelong friendship with John Chen. But during that call, General Counsel explicitly acknowledged that Relator and Bourbeau each owned five equity points in the company.

254.   When Defendant Bourbeau, Jr. mentioned that Relator had only been given paper issuances of stock certificates dated April 11, 2011, General Counsel assured us that the issuance of the formal certificates was a mere formality and he would get those certificates out to us within the week or very soon. This was a fraudulent misrepresentation.

FEBRUARY 9TH, 2012:  REVELATION OF 50 MILLION DOLLAR CONTRACT WITH NORTHROP GRUMMAN.

255.  **On Feb 9**[th]**, 2012 at 4:58 PM**, Relator had a phone call with General Counsel Sal Difrazio. The two spoke for some time. Shareholder Relator mentioned that he had offered to help Defendant Spring and Defendant Mimi Chen with their mortgage, Defendant Difrazio mentioned that "money is not an issue, Joseph, there is massive money coming into the company... you are going to be a very rich man, Joseph. Relax and take care of yourself... Now, I will need you to give up that dual signature requirement...".

256.  When Relator Odish mentions his right to review and sign every contract and he asked to see the Northrop Grumman agreement, Defendant Difazio promised to send it to him. Difazio then said, **"I told John Chen, you spend $200,000 in legal fees on a 50 million dollar contract."**

## X.   FEBRUARY 28, 2012 - EXHAUSTIVE DEMAND LETTER SENT OUT TO DEFENDANT DIFAZIO BY RELATOR' ATTORNEYS BILL HORTON AND SEAN WALSH VIA US MAIL AND ELECTRONIC MAIL. DIFAZIO RESPONDS VIA US MAIL AND ELECTRONIC MAIL.

257.  On February 28, 2012, Relator Odish's attorney sends out an exhaustive Demand Letter to General Counsel Sal Difazio.

258.  In the demand letter, sent out for a legal and proper purpose pursuant to Delaware Corporate General corporate statutory law § 220, it specifically requested information related to the following corporations: HUWAEI, HTC, COMCAST, **NORTHROP GRUMMAN,** AMAZON, GENERAL MOTORS, CHRYSLER, FIAT, QUALCOMM, MATTEL, MAGNA, SONY, NBC, IBM, INTELLITAR, WISTRON, ETC. It was for a proper purpose and pursuant to Delaware Statutory Code § 220.

259.    The Demand Letter also specifically requested information on any and all patents relating to Cognitive Code. **See Exhibit 8, and Exhibit 124 – RELATOR ODISH'S DEMAND LETTER TO DEFENDANT SUBCONTRACTOR COGNITIVE CODE AND ITS GENERAL COUNSEL DIFAZIO.**

260.    On that same date of February 28, 2012, the US ARTIFICIAL INTELLIGENCE Patent US8126832 for Cognitive Code was issued. Thus, pursuant to agreements signed by Spring and CCC Defendants the Relator now had fourteen calendar days in which to exercise their option to acquire additional shares through Cranbrook LLC and secure 7.5% of non-dilutable equity in Cognitive Code company. **SEE EXHIBIT 9**, COGNITIVE CODE ARTIFICIAL INTELLIGENCE PATENT US8126832 FROM 2012.

261.    As stated in greater detail below regarding the discussion of patent fraud and false filings upon USPTO (***IN EXHIBITS 300 – 500***), that exact same patent COGNITIVE CODE ARTIFICIAL INTELLIGENCE PATENT US8126832 being used by Department of Defense, Army, Navy, Air Force and in Healthcare field, did not at this time REFERENCE the Lieberman and Apple patents. (Relator would discover this later in 2014.)

262.    On March 8, 2012 Relator rightfully exercise the Option to Purchase an additional 7.5 non-dilutable points (75,000 shares) in Defendant Corporation Cognitive Code for $937,000.00 at $12.50 per share. **SEE EXHIBIT 5**, 'STOCK OPTION PURCHASE AGREEMENT LAWFULLY EXERCISED'.

263.    Relator exercise of their option for additional 7.5% non-dilutable equity stake, bringing Relators original non-dilutable equity interest to 17.5%[ this includes the 5% Relator gave to Bourbeau on condition that he procure the 937k in option money which he did not].

264.    The closing date set for the Stock Purchase Agreement was May 1, 2012 in the eastern district of Michigan pursuant to a forum clause provision.

265.    The stock purchase agreement on Relator's affiliate entity Cranbrook LLC (pursuant to Shareholder Agreement) showed proof of funds of a seven million dollars in a capital account by a close relative (and attorney) of Relator, thus showing legitimate proof that Relator had access to close and fund Cognitive Code pursuant to the Letter of Intent.

266.    This was the stock purchase agreement that Defendant Bourbeau was supposed to procure the option money for the equity points that he and Odish had orally agreed to but Bourbeau did not perform and Odish had to procure 7 mm proof of funds from a family relative and attorney.

## XI.    MARCH 16, 2012 CONFERENCE CALL BETWEEN DEFENDANT DIFAZIO AND RELATOR'S ATTORNEY SEAN WALSH OF GIARMARCO, MULLINS & HORTON, P.C.

267.    On March 16, 2012, Relator's attorney Sean Walsh (AND DEFENDANT BOURBEAU) and the general counsel Sal Difazio held a conference call to update Relator's attorney. The call was designed to have our supposed General Counsel update Relators on where things stood with the Corporation and all the terrific opportunities that were taking place. But during the call Defendant Difazio continued his pattern of harrassment, in a veiled attempt to extort Relator into giving up his dual signature rights.

268.    Additional statements and representations made by Difazio during the call include the following:

   a.    *Difazio stated that the Corporation was on the verge of "signing three huge deals, one particularly significant."*

   b.    In willful violation of basic corporate laws and governance, Defendant Difazio refused to disclose or name any of the companies related to these "three huge deas", though one was obviously Northrop Grumman. Such refusal of disclosure regarding material information is a breach of his fiduciary duty.

   c.    Defendant Difazio stated that "they" (Spring, Mimi Chen and John Chen) reject the demand for the option.

   d.    Defendant Difazio then stated that if Relator Odish wanted his formal stock certificates he had to agree to give up dual signature rights, board seat, and the anti-dilution provision that protect his shares from being diluted. Difazio stated "so, sean, if the company is worth 500mm? these guys think there are entitled to 50mm? oh, c'mon..". Defendant Difazio then admitted that he was not just acting as General

Counsel but he was in fact, with John Chen, "leading up" the charge to find people to negotiate the contracts. He essentially admitted that he and Defendant Chen were running the company out of New Jersey, a fact Relator find deeply troubling;

e.       Defendant Difazio admitted his primary participation in running the Corporation now as he said he was actively involved in finding a company to help negotiate deals moving forward… that there had been too much patience in getting a deal done. Marketing and negotiations will be handled by a 3rd party. Relator did not know it at the time but upon receipt of April 30, 2012 documentation as discussed below, the third parties heading up this negotiation or special committee were the individual Morgenthaler family members: Gary Morgenthaler, Todd Morgenthaler, Gaye "Lissa" Morgenthaler and David Jones.

f.       During March 16, 2011 call, Defendant Difazio admits HTC had made a formal tender offer or [DEMAND] for the Company and had given Spring "a number" but refused to disclose what that number was, but that Spring had countered with his number and HTC said Spring's number was too high and preferred to acquire a majority stake, 51%. Again, Difazio refused to say what the numbers were, but upon information and belief, Spring asked for "700 million dollars" the latest valuation number he had stated in January 2012.

*g.       Defendant Difazio then fraudulently states that Northrop Grumman deal is likely dead and it won't be worth anything more than "only 600,000 or 700,000 dollars". This was and is a fraudulent misrepresentation.*

h.       Difazio states that NORTHROP GRUMMAN had developed the prototype for Chrysler. What Defendant Difazio didn't know was that Relator was aware of the fact that **NORTHROP GRUMMAN had also created a prototype cellphone employing SILVIA™ for HTC.**

269.    A significant number of the fraudulent representations made by Defendant Difazio were memorialized by Relator's attorney in **Exhibits 6 to 6.2**, Correspondences from Attorney Sean Walsh to Defendant Difazio.

270.    Defendant Bourbeau as Odish's former partner was on the conference call.

271.    Through certain documentation and bank statements, Cognitive Code Defendants have been misappropriating and embezzling corporate funds for their own personal use, while also intentionally violating federal currency transaction reports that financial institution are required to file.  Relator is in possession of such documentation evidencing this fraud by Defendant Subcontractor Cognitive Code.

272.    Relator Odish also has original source knowledge that Defendant Cognitive Code has set up overseas and offshore accounts and likely buried the 50 million from Northrop Grumman and done same with new licensing agreement.

273.    Subsequently, the parties agree to an April 17th  Inspection date of books and records in the headquarters in New Jersey at Difazio's office. Difazio would lie and cancel.

*274.*    Then Difazio would promise to come to Detroit after flying to San Francisco to meet with **Nixon Peabody**  on April 25th, 2012 but that was also a false promise, and other instances of mail and wire fraud.

275.    On March 27, 2012, Defendant Difazio sends Relator's attorney Sean Walsh a formal correspondence essentially stating that they have no intention of performing on the Option to purchase the additional 7.5 equity points because "it had lapsed". This material misrepresentation in writing by Difazio completely contravenes the representations made by Defendant Spring in late November 2011 when he told Relator that their Option rights were absolutely still valid as the patent had not yet been issued.

276.    The statements in this March 27, 2012 letter from Difazio stating the grounds for the company's non-performance (that time had lapsed) are in direct contrast to the representations made by Spring in December 2011 to Relator that the Option rights were

still good until two weeks after the issuance of the US patent for Cognitive Code, per the agreement the parties had signed.

277.   **Defendant Difazio offers Relator Odish 5 million dollars for Relator's shares and rights, which is rejected as it was not provided with full disclosure**. This was a personal offer made by Difazio, not the corporation, to Relator's attorney and almost certainly backed up the Morgenthalers. Under Delaware law, the buyout of a minority shareholder's shares must come with full disclosure. And given the valuation's being thrown around by Spring and Chen and the others, the shares were worth at least 20-25 mm, if not more - based upon projections from Spring and valuation opinions as the company was a target acquisition by two multi-billion dollar companies. **(See Affidavit executed by attorney Sean Walsh, Exhibit 263, WALSH AFFIDAVIT STATING RELATOR WAS OFFERED FIVE MILLION FOR HIS SHARES).**

278.   On April 4, and April 10, 2012, Relator attorney Walsh sends Difazio a written correspondence. On April 12, 2012, Relator Attorney Walsh sends Difazio another written correspondence. In correspondences Relator's attorney Sean Walsh urges Defendant Difazio to respect Relator's lawful contractual rights and status as a lawful shareholder and Board Member of Cognitive Code Corporation. **See Exhibits 6 to 6.2**, Attorney Sean Walsh Correspondences to Defendant Difazio.

279.   These correspondences reference NIXON PEABODY on two separate occasions. These correspondences, like the rest of the documents and emails in Relator Odish's possession create an important "paper trail" of the facts and the circumstances of the bringing of this action. In recent discoveries by Relator, NIXON PEABODY'S SAN FRANCISCO ADDRESS is listed on SEC FILINGS on behalf of NUANCE AND SHAREHOLDERS/ AFFILIATES.

280.   All the dates of inspection of books and records. Several weeks pass and Difazio had not sent a single document pursuant to the exhaustive Demand Letter sent by Relator attorneys. Difazio cancelled the April 17th, 2012 inspection. Difazio then promised he fly to detroit with the Book and Records on April 25, 2012 but this was yet another empty and false promise.

281.     **APRIL 30, 2012  SUBMISSION OF STOCK LEDGER AND OTHER DOCUMENTS BY DEFENDANT DIFAZIO ON BEHALF OF DEFENDANT SUBCONTRACTOR COGNITIVE CODE TO RELATOR'S ATTORNEYS.** Then on April 30th, 2012, Defendant Difazio sends Relator attorneys a mere fraction of the documents requested and not a single contract or even draft of a contract. In April 30th, 2012 Defendant Difazio outrageously writes in a letter to Relator attorneys that Relator's board seats and dual signature rights are "mere perceptions". The warrants sent by Defendant Difazio were fraudulently backdated. And the warrants were issued only weeks after Relator exercised their Stock Option Rights at 12.50 per share. The documents display Defendant Difazio issued warrants to himself, to Gaye "Lissa" Morgenthaler, David Jones, for a price per share less than the option price Relator were prepared to pay for the 7.5 non-dilutable equity points. [See Issuance of the backdated Warrants which were issued for a price less than what Relator LLC was prepared to pay.]

282.     **Relator Odish showed proof of funds of 7 million, and these funds are from a close family relative of Relator who also serves as his attorney and attorney for his family. See Exhibit B-2, Lawful Exercise Relator Cranbrook LLC's rights to purchase 7.5% of Cognitive Code stock for $937,000.** The proof of funds of 7 million far exceeded the 2.5 million contemplated by Original LOI.

283.     A warrant is a contract - and every contract must be reviewed and signed by Board Member Relator Odish and Spring per the contractual addendum, a contractual right that flows with his stock rights.

284.     As the Cognitive Code Defendants engaged in serious misconduct of misappropriation and embezzlement of corporate funds as Relator would ultimately learn, that dual signature right was a problem for them and a source of the retaliation against Relators.

285.     For a General Counsel to freeze out a Board Member who possesses dual signatory rights in order to issue fraudulently backdated warrants is outrageous. Moreover, they were

executed without Board Member Relator's signature and with Defendant John Chen's signature making them legally null and void.

286.   **"Mere Perceptions"**. The April 30th, 2012 documents are accompanied by a Letter from Defendant Difazio stating Relator's board seat and his dual signature rights are "mere perceptions" that will not forestall this company's operations.

287.   In this same set of documents, Defendant Difazio sends the Corporate Stock Ledger of Defendant Corporation showing Relator as a shareholder of the company. No corporate record books or copies of corporate minute books were sent by Difazio. To this day, Relator still have not received a copy of Relator corporate record book. The meager and fraudulent collection of April 30, 2012 did not display a single contract with any business entity such as Northrop Grumman.

288.   The Demand Letter even went so far as to request emails and other date related to the ongoing business. It easily requested well over 200 documents - and Defendant Difazio sent 12 documents.

289.   The April 30, 2012 documents submitted by Difazio show that the stock options/warrants issued to Gaye Morgenthaler and David Jones, in lieu of putting Gary Morgenthaler's name on them, is essentially one of many violations of the AKA, Anti-Kickback Statute.

290.   Relator had offered $12.50 per share for the exercise of their stock option rights. By the April 30, 2012 submission of documents, it is clear that one day prior to sending the Rejection Letter on March 27, 2012, Difazio and the three other founders-directors issued warrants to Difazio and other individuals at significantly less an amount than Relator option price. See Index of Exhibits, Issuance of Warrants. And these warrants were fraudulently backdated with an exercise date of November 1, 2011. There were additional disturbing factors of the documents emailed by Difazio to attorney Walsh as stated below.

291.   **Fraud Upon the Corporate Stock Ledger**. The Corporate stock ledger showed Relator's name on it. Additionally, the corporate stock ledger provided by Difazio had

fraudulent entries besides the stock warrants. Laura Pelletier had loaned the company 50,000 dollars which was converted to stock. She only owned ten thousand shares, but Difazio fraudulently gave her debt instrument and treated as an equity purchase from 2009, giving her an additional 10,000 shares she does not own. The word "ownership" was also misspelled on the document. **SEE EXHIBIT 11.1, FRAUDULENT CORPORATE STOCK LEDGER PROVIDED BY COGNITIVE CODE.**

292.   **Fraud Upon the Financial Statements Provided by Difazio.** In addition to the fraudulent entries on the corporate stock ledger, Difazio sent financial statements of the corporation which had obvious fraudulent entries, such as the Peter Winslow entry.

293.   **Fraudulently backdated Stock Warrants** issued to Difazio and Gaye "Lissa" Morgenthaler and her husband David Jones. The stock warrants the Difazio issued to himself, and two of the Morgenthaler Defendants.

294.   **Fraud Upon the Transaction Log submitted by Defendant Difazio.** Difazio submitted a transaction log for the corporation that stated it was current through Dec 31, 2011 but in a rather absurd fashion, the transaction log cut off somewhere in the middle of 2009. It was an intentionally utterly incomplete document.

295.   Nuance Defendants instructed Difazio in exercise of control authority to engage in intentional dilution and issuance of bogus stock warrants to prevent the Cognitive Code Company from Relator's LLC having or being able to lawfully exercise its right to purchase the additional non-dilutable 75,000 shares for $937,000.00 at a per share price of $12.50. The fraudulently issued warrants to Difazio and two of the Morgenthaler-Nuance defendants were issued to them at a heavily manipulated price which would constitue a "kickback" in violation of the anti-kickback statute, at prices of $5.00 per share and $7.00 per share as delineated below and in the March 26, 2012 "Consent in Lieu of Meeting of Directors".

296.   The stock options/warrants were executed on March 26, 2012, after Relator's LLC (Cranbrook) lawfully exercised it's option rights on March 8, 2012 and these stock options and warrants were fraudulently backdated to November 1, 2011. The stock options and warrants from March 26, 2012 document sent to Relator's attorney Sean Walsh on April 30, 2012 were in part listed as follows: SAL DIFAZIO granted himself 5000 shares at $7.00 per

share with an expiration date of October 31, 2015 and a fraudulent backdate of November 1, 2011, and an additional 2,000 shares to himself for $5.00 per share. 10,000 fraudulent stock options/warrants were issued each to Gaye Morgenthaler and her husband David Jones at a price of $7.00 per share, for a total of 20,000 shares to Gaye Morgenthaler and her husband.

297.    The entire list of fraudulent stock options/warrants totaled 33,000 shares and distributed as shown in the document, to be provided to Attorney General; Cognitive Code Corporation's March 26, 2012, List of Fraudulently Backdated Stock Options issued to destroy Relator's LLC rights in acquiring an additional 75,000 shares.)


JULY 5, 2012 - FORBES MAGAZINE ARTICLE ON COGNITIVE CODE "Riding the Wave of Artificial Intelligence. Forbes specifically states that Spring and CC are in business with Northrop Grumman. See Exhibit 83.

298.    On July 5, 2012, Cognitive Code was featured in Forbes Magazine and specifically stated that the company was in business with Northrop Grumman and "one of the big three" and had received money from an "angel investor". **SEE EXHIBIT 83, FORBES ARTICLE ON COGNITIVE CODE, "RIDING THE WAVE OF ARTIFICIAL INTELLIGENCE.**

299.    Relator would eventually learn that the "angel investor" is Nuance Defendants (and/or their agents and officers, likely the Morgenthaler family), who wrongfully and illegally exploited MATERIAL, NON-PUBLIC information in violation of insider trading laws and then used that misappropriated information [that Cognitive Code was about to be acquired by APPLE competitor HTC] and realized that CC's SILVIA technologies and virtual artificial intelligence software [as perfected by Northrop Grumman's engineers] actually did work and decided to "gut" and misappropriate the IP/Patent and technology for himself and his VC company, and upon strong information and belief, for APPLE.

300.    The FORBES article on Cognitive Code Corporation and Defendant Spring has specifically acknowledge the Cognitive Code is in "business with Northrop Grumman, one

of the big three (which was obviously known to Relator to be Chrysler) and an angel investor". **Forbes Article on Cognitive Code Corporation. SEE EXHIBIT 83**.

301.    Defendant Spring said to Relator in December 2011 that Relator and Bourbeau were - in complete contravention to the contractual grant of their stock - going to get tagged and 1099'd each for 250,000 dollars for a total of 500,000 dollars. They backed off this when it became obvious that their "advisors", upon information and belief, told them this would constitute massive tax fraud.

302.    Fraudulent concealment and actions of Cognitive Code Defendants. These revelations of fraudulent actions by Defendants prove unequivocally that they never had any intention of ever performing on their agreements signed with Relator, creating an undeniable securities fraud claim under 10b5. At the time of filing of this action, the Defendants still have not tendered Relator their Formal Stock Certificates.

303.    They withheld the material fact that they had executed another agreement only five days [March 1, 2011] before the Relator Cranbrook LLC's Letter of Intent. The revelation that Defendant John Chen had signed this Agreement was fraudulently inducing Relator Odish to agree and sign the Newman agreement that initially obligated to pay Newman $175,000 US dollars upon funding but then exposed Relator Odish to "damages above and beyond that amount", constitutes a 10b5 violation under United States Supreme Court under _WHARF HOLDINGS v UIH, 532 U.S. 528,_ as it is clear that Cognitive Code Defendants from the get-go never had any intention of performing on the agreements they signed. Despite all other resolutions and appropriate corporate docs being signed, Relator still does NOT have his official and formal stock certificates.

304.    They have been trying to extort him into giving up his rights for those certificates, constituting other acts of retaliation based solely on the fact that Relator Odish, as an attorney, wanted the company to be run in a proper and lawful manner. Cognitive Code defendants wanted the company to run like their personal slush fund.

305.    For much of year while working to save and build the tech startup, Relator Odish also assisted Patrick Miller, Alabama Counsel for Relator Odish and Cognitive Code in those proceedings. Defendant spring admitted this to Relator in October 2011 that the ten points they had offered him were being used to assert additional damages against Intellitar and its parent company MEI DEFENSE TECHNOLOGIES, INC.

306.    Patrick Miller in those Alabama proceedings asked Relator to sign **two separate sworn affidavits** which stated he was a shareholder in the company and those affidavits were used in the proceedings. **SEE EXHIBITS 51**, SWORN AFFIDAVITS STATING RELATOR ODISH IS SHAREHOLDER IN ALABAMA PROCEEDINGS.

307.    Patrick Miller and Robert Rosen would NOT use those sworn affidavits in the LA proceedings. Furthermore, despite owing Odish and Cranbrook a fiduciary duty as their counsel, Miller willfully breached and engaged in a manipulative scheme at the behest of Cognitive Code Defendants as soon as the DEMAND LETTER was sent out in late February 28, 2012 - as Miller immediately, in conspiracy with Difazio, filed a protective order in the Alabama action.

308.    Patrick Miller would also file a FRAUDULENT DECLARATION AGAINST RELATOR ODISH IN THE LOS ANGELES PROCEEDINGS.

309.    In the Alabama proceedings, Relator Odish was repeatedly referred to as a shareholder, employee by all parties, including Cognitive Code.

## XII.    RELATOR ODISH AND DEFENDANT BOURBEAU ENGAGE LOS ANGELES SECURITIES FRAUD ATTORNEY AND DEFENDANT ROBERT ROSEN TO SUE COGNITIVE CODE AND MORGENTHALERS IN CALIFORNIA PROCEEDINGS 12-09069.

310.    During summer of 2012, Relator and his former partner Defendant John Bourbeau engaged and hired a top securities fraud attorney in Los Angeles, California on August 27, 2012 to pursue his civil damages against Cognitive Code Defendants and specifically name the Morgenthalers.

Case 4:17-cv-10991-MAG-DRG   ECF No. 1, PageID.66   Filed 03/29/17   Page 66 of 116

311.     By Summer of 2012 Relationship between Relator Odish and Defendant Bourbeau, Jr had broken down. By this point the relationship between Relator Odish and Bourbeau had broken down because Bourbeau had not performed on any promises or agreements; he breached the contract for 90,000 the two had signed in August of 2011, and he had not spent more than a few days towards this matter while it had dominated Odish's life as he was officially an employee of Cognitive Code who wasn't getting paid and the threat of having to resort to litigation was deeply upsetting to Odish.

312.     Defendant Bourbeau did not care because he knew the points were Odish's and throughout the entire he had simply kept working for his father, collecting a paycheck every week.

313.     Defendant Bourbeau during this summer of 2012 attempted to go behind Odish's back and reach a settlement agreement with Defendant Difazio and Cognitive Code that protected only himself so Cognitive Code could go after Relator Odish.

314.     By this point, all the parties were aware of the fact that the key element was Relator's Odish's contractual Dual Signature Rights and Rights to review every contract. Relator did not know this at the time, but the principal reason they needed to fraudulently strip those rights was because of the unlawful conspiracy the principal defendants were already engaged in and a part of, both against Relator and United States Government.

315.     When Defendant Bourbeau reached out to Difazio out of his own self-interest, Defendant Difazio told him he needed a "global settlement" which meant he needed Odish to sign off and relinquish those contractual rights in order to cover up the conspiracy.

316.     Relator Odish and Bourbeau hired Attorney Robert Rosen, an attorney who was certified as securities fraud expertise and had been licensed to practice law since 1970.

317.     Prior to the execution of the engagement agreement, Relator Odish commencing on July 3rd, 2012, began sending Defendant Rosen a significant number of documents, emails, and other materials supporting naming the Defendant Morgenthalers in the action. Indeed, the only reason to file in California would be to procure jurisdiction over Defendant Morgenthalers.

318.     Relator knew he had securities fraud claims against the parties but Relator Odish was not a litigator, nor was he a securities fraud attorney. Defendant Rosen was engaged to a large extent on the fact that he was an attorney for the Securities and Exchange Commission during the 1970's and because he was based in California to secure jurisdiction over Defendant Morgenthalers.

319.     The parties discussed filing direct claims and derivative claims against Cognitive Code prior to execution of engagement of Defendant Rosen. Relator Odish and Defendant Bourbeau traveled to Los Angeles in late July 2012 to meet with Rosen about the case. Defendant Rosen would "solicit" Relator's engagement by sending him an email on August 3rd, 2012 with a case and complaint he had worked on that allowed him to assert DIRECT and DERIVATIVE claims in the action. **See EXHIBIT 35**, "DOWERS COMPLAINT". In the email Defendant Rosen stated to Relator Odish, "by the way, this settled for 8 figures."

320.     Prior to filing of complaint, Defendant Rosen would state in emails and other conversations to Relator that he had not practiced in law in California and Defendant Cognitive Code could use any state statutes fraudulently against him.

321.     Defendant Rosen who filed a federal complaint against Cognitive Code defendants for 175 million US dollars in damages and in first complaint only Cognitive Code Defendants. Inexplicably, he did not file one federal law claim. They were all state law claims.

322.     Relator Odish only gave his consent with the promise that the Defendant Morgenthalers would be named in a subsequent amended complaint.

323.     The only reason to file in California was to obtain jurisdiction over the Morgenthalers. The complaint filed on October 22, 2012 had the Morgenthaler name and discussed Gary Morgenthaler and other Morgenthaler defendants extensively without

naming them, though promising to name them - this was the sole reason of filing in California. **See EXHIBIT 104**;October 22, 2012COMPLAINT FILED BY ROSEN AGAINST COGNITIVE CODE DEFENDANTS SEEKING 175 MILLION DOLLARS IN DAMAGES.

324.   The complaint filed by Defendant Rosen heavily referenced APPLE, SIRI, MORGENTHALERS and artificial intelligence technology but original complaint did not name.

325.   **Straight Contingency Fee Arrangement with Relator's California Attorney Defendant Robert Rosen**. RELATOR ODISH'S ATTORNEY IN CALIFORNIA PROCEEDINGS Defendant Robert Rosen accepted the engagement on a straight contingency fee arrangement for 21 percent.

326.   One of the Plaintiffs in the CALIFORNIA ACTION was an LLC titled Cranbrook Capital Consulting Group, LLC, which at time was controlled by both Odish and Bourbeau upon filing of the complaint.

XIII.

XIV.   <u>AS CALIFORNIA PROCEEDINGS COMMENCED AND CONTINUED, RELATOR WAS DEEPLY DISTURBED BY WHAT WAS TAKING PLACE.</u>

327.   The proceedings as a result of Relator's own attorney and the opposing counsel, DefendantHoward Fredman, who represented the Cognitive Code Defendants were deeply disturbing, compromised and ultimately corrupted.

328.   Immediately upon filing the complaint in October 2012, Relator Odish received an email from Gerry Newman in November 18, 2012 specifically inquiring about the case and stating that his friend, Defendant and Relator's attorney, had reached out to him and intentionally breached attorney client privilege.

329.   Relator Odish communicated this disturbing development to his attorney, Defendant Rosen, who did not seem to care. Subsequent to this, Defendant Rosen would

give Relator's case to his senior partner, JOHN WALLACE, and junior associate, JORDAN ROCK, who was only one year out of law school.

330. Relator realized that his Defendant Rosen had a serious conflict with Jerry Newman and he should have never accepted the engagement.

331. Newman was expected to be named never was and Attorney intentionally breached attorney-client privilege by communications with Newman in early November 2012 only a few weeks after filing the complaint.

332. **Morgenthalers on the Cognitive Code Advisory Board.** In the emails in possession of Relator, the Cognitive Code Defendants usually refer to Gary Morgenthaler, his siblings and David Jones as "their advisors". Presently, Cognitive Code's website listed Gaye Morgenthaler and her David Jones as members of the ADVISORY BOARD of Cognitive Code. **SEE EXHIBIT 13.**

333. At the time of the filing of this action, Defendants Melissa Morgenthaler and her husband, David Jones, were still listed on the ADVISORY BOARD OF COGNITIVE CODE.

334. Defendant David Jones is a former employee of Defendant Apple.

335. Relator actively sought new counsel but it was extremely difficult as his friendship and relationship with Bourbeau had broken down.

336. Defendant Rosen then engaged in a series of disturbing acts and misconduct over the course of nearly the next year.

337. Defendant Rosen in compliance with Rule 26 would turn over RELATOR'S attorney client priviled material from his previous attorneys such as Bill Horton and Sean Walsh to Cognitive Code Defendants.

338. Defendant Rosen without Relator's consent or knowledge signed a protective order in the matter.

339. In late January 2013, Gary Morgenthaler was sent a subpoena by Defendant Rosen.

340. Defendant Gary Morgenthaler did not lawfully comply with the subpoena in that action.

341. On January 29, 2013, Defendant Rosen sent Relator correspondences that he "was propounding discovery" and continuing to conduct discovery, but Relator would ultimately learn this was a fraudulent representation and the subpoena sent to Defendant Gary Morgenthaler would the only subpoena sent in that entire action – a fact as described below Relator would not learn until August 1, 2013.

342. Relator sent Rosen a number of emails over the next few months inquiring about the status of any Subpoenas to all the relevant entities including Northrop Grumman, HTC, Comcast, Chrysler. Defendant Rosen stated they were being prepared.

343. Relator would inform his attorney Defendant Rosen of extremely material facts, documents and filings only to have Defendant Rosen intentionally ignore them.

344. **Perjury on Delaware State Annual Franchise Tax Filings made by John Chen and Cognitive Code Defendants**. Chen filed these state of Delaware documents in the commission of perjury and stated that the company has Zero members on the board of directors for year of 2012, filed on February 2013. John Chen committed perjury for 2012 filing when he didn't name Relator as a Board Member as required by the State of Delaware Annual Franchise Tax Report, 502(b), filed under penalty of perjury. **SEE EXHIBITS 112.**

345. Relator would learn in March 2013 that Defendant John Chen and Cognitive Code committed two counts of perjury for 2012 and 2013 filings when he didn't name Relator as a Board Member as required by the State of Delaware Annual Franchise Tax Report, 502(b), filed under penalty of perjury. And the 2013 filing was absurd because Defendant Chen filed that report and named "zero present directors" running the company.

346. The fraudulent and false filings of documents of this nature do constitute FALSE FILINGS pursuant to federal and state statutes.

347. **THE AMENDED COMPLAINT IN CALIFORNIA ACTION**. The deadline for amending the complaint and adding and naming new parties was April 8, 2013 per the scheduling order.

348. Defendant Rosen's partners Jordan Rock and John Wallace had over the course of several explicity stated to Relator Odish that the morgenthalers would be named. **SEE EXHIBIT 117**, EMAIL FROM JOHN WALLACE ON MARCH 17, 2013 TO ODISH, titled "SIRI AND MORGENTHALER" and specifically contemplated naming them in Amended Complaint.

349. Defendant Rosen waited until the few days before this deadline to inform Relator he was not naming any of the Morgenthalers. Relator was deeply upset by this ommision and it only confirmed that his attorney was compromised.

350. **FRAUDULENT AND FALSE FILING WITH SEC BY COGNITIVE CODE DEFENDANTS**. On that date of June 11, 2013, Relator learned the Cognitive Code defendants had filed a Fraudulent SEC Reg D Form with the Securities and Exchange Commission. They only filed their Reg D filed November 29, 2012, after the filing of CALIFORNIA PROCEEDINGS action in filed in October 2012.

351. On June 11, 2013, Relator went onto the SEC website and for first time used EDGAR research function. Relator is not a securities fraud attorney and was not aware of this search feature. On this date and using the EDGAR function Relator for first time saw that Cognitive Code Defendants had made a filing with the Securities and Exchange Commission, a REG D FORM that contained a multiple fraudulent statements in the document. The date of "6/11/13" is listed in the left hand corner of the print off of the SEC filing.

352. The fraudulent REG D FORM filed by Cognitive Code Defendants was filed on December 20, 2012, nearly two months after the filing of the California complaint Relator's attorney, Rosen. It is well settled that the intentional misstatements or omissions on documents with the Commission can constitute a Title 18 U.S.C.S. § 1001 violation.

353.    It is patently obvious to determine that the Reg D Form has intentional fraudulent misrepresentations made by Cognitive Code Defendants by simply comparing it the Corporate Stock Ledger Difazio had created and sent Relator Odish's attorney Sean Walsh.

354.    Relator Odish immediately informs Defendant Rosen and specifically asks him as an attorney with 43 years of legal experience in securities fraud if he and the other members of his law firm had scoured the SEC website for any relevant information related to this matter.

355.    Defendant Rosen informs Relator that they "scoured the SEC website" and had found nothing. This was a fraudulent misrepresentation from an attorney to his own client.

356.    **Relator Odish would learn in June 2013 that Defendants Cognitive Code had made a "false filing with the SEC"**. **See Exhibit 11**, false filing with SECURITIES AND EXCHANGE COMMISSION BY COGNITIVE CODE DEFENDANTS.

357.    Relator Odish informs his attorney Defendant Rosen of this fact and he does nothing.

358.    This false filing  upon the SEC took place after Defendant Howard Fredman's engagement and he would be made of aware of this material fact repeatedly during summer and fall of 2013.

359.    Relator stumbles on sec.gov and for first time in June 2013 starts scouring the "Edgar" function on the SEC site. As perhaps stated previously herein, Relator is a real estate and transactional attorney. As his attorney Robert Rosen was and is one of the top securities attorneys and a former attorney for Securities and Exchange Commission during the 1970's, Relator reasonably relied upon his expertise in the area of securities fraud and other matters.

360.    **Rosen does not send a single subpoena to a single business entity**. In another disturbing revelation, Relator's learned in June of 2013 after several months of filing the complaint that his Attorney had not sent a single subpoena to Northrop Grumman, HTC, Chrysler, Comcast or any of the entities listed in the Demand Letter and the voluminous emails and documentation. Rosen had filed a complaint for 175 million dollars and not sent a single subpoena to any entity.

361.    **A Single Page of Discovery throughout course of California Proceedings**
**litigation**. After nearly months of civil litigation, the entire scope of discovery Defendant
Rosen had conducted could be summarized in a single page: John Chen's Resignation Letter
from June 2011 that Relator had insisted comport with the truth. This was the only
document Defendants Fredman, Defendant Difazio and Cognitive Code Defendants
produced during the entire almost three year litigation in California Proceedings.]

362.    On the date of August 1, 2013, Relator Odish deeply disturbed by the revelation
that his Defendant Rosen had lied to him about "propounding discovery" and did not send a
single subpoena to Northrop Grumman, HTC, Comcast or any other company listed in
attorney Walsh's Demand Letter of February 28th, 2012, Relator continued his diligence in
doing research into securities laws and for first time used the EDGAR feature on the sec.gov
website.

*MATERIAL DEVELOPMENTS ON AND SUBSEQUENT TO*
*AUGUST 1, 2013. RELATOR ODISH LEARNS HIS ATTORNEY*
*DEFENDANT ROSEN HAS NOT SENT OUT A SINGLE SUBPOENA AND DEMANDS HIS*
*WITHDRAWAL FROM CASE, BUT DEFENDANT ROSEN REFUSES TO WITHDRAW.*

363.    On August 1, 2013, Relator Odish learns from his attorney Defendant Rosen that he
has not sent out any subpoenas to any corporate entities. Relator Odish is deeply disturbed
by this and a number of fraudulent misrepresentations Defendant Rosen had made to his
client, Odish.

364.    On or about August 1, 2103, Relator caught his Defendant Rosen in yet another
fraudulent misrepresentation regarding the matter and disgusted by this Relator tries to
"fire" his attorney and asks for his immediate withdrawal. His withdrawal is mandated by
california court rules and case law.

365.    On this date of August 1, 2013, Relator Odish upset that he has been deceived and
lied to by his own attorney demands Defendant Rosen's removal from this case.

366.    But after spending a year telling Odish that Cognitive Code *"is broke ... and naming the Morgenthalers is a loosing [SIC] strategy and any chances for settlement are being ruined..."*. **See Exhibits 201 and 202**.

367.    This was a case Defendant Rosen took on straight contingency fee, did no discovery, tried to convince and "con" his own client Relator Odish that Cognitive Code was "broke" and now refuses to withdraw from the case.

368.    On August 5, 2013, Defendant John Bourbeau, Jr. sends Odish a threatening email "threatening to go after his law license, his father and everyone else". **SEE EXHIBIT 206**.

369.    Defendants Bourbeau and Defendant Rosen were now in conspiracy against Odish. On August 7th, 2013, Defendant Rosen sent Odish a draft settlement agreement that if Odish had signed, he would have immediately been put in breach.

370.    **NORTHROP GRUMMAN EMPLOYEES ON WITNESS LIST IN AUGUST 2013 IN CALIFORNIA PROCEEDINGS - DEFENDANT NORTHROP GRUMMAN KNEW OF ODISH'S RIGHTS AND THE CALIFORNIA PROCEEDINGS**.   After requesting Defendant Rosen's withdrawal from the case, Odish and Rosen spoke. Defendant Rosen sounded panicked and asked Odish what he wanted, Odish simply replied, "I want you to withdraw from the case"> But Rosen would refuse and knowing Odish was upset that not even Northrop Grumman was served a subpoena, Defendant Rosen in same conversation stated to Odish, "I'll send a subpoena to Northrop, Joseph".  It was simply too late as factual discovery ended August 17, 2013.

371.    Subsequent to this conversation between RELATOR ODISH and his attorney DEFENDANT ROSEN, ROSEN would email Odish a WITNESS LIST WITH NORTHROP GRUMMAN EMPLOYEES on the list. **See Exhibit 697, WITNESS LIST FROM CALIFORNIA PROCEEDINGS WITH Northrop Employees on it.**

372.    **Coordination and Conspiracy with Defendant Northrop Grumman**. Relator Odish did not realize it at the time because he was actively pursuing other counsel and attorneys to represent him, but the Northrop Grumman names on the WITNESS LIST from August 2013 matched the names of the Northrop Grumman employees on the Cognitive Code and

NG documents, invoices and purchase orders, such as Northrop Grumman employee, Vicki Richard.

373. The Witness List from August 2013 includes a number of Northrop Grumman divisions, Visteon, Chrylser, Northrop Grumman IT SOLUTIONS, Northrop Grumman Systems Corporation, JP Morgan Chase, HTC Corporation, Samsun, SNR DENTON (NOW KNOWN AS US DENTONS, LLP), etc.

374. **August 8 2013 Defendants Rosen and Fredman make a fraudulent filing upon the Court and Judge Olguin supported by Sworn Declarations and Representation they had Relator Odish's consent**. On August 8, 2013, Defendant Rosen and Defendant Fredman make a joint filing with the Federal Judge Olguin {docket entry 53} that they intended to limit discovery and "not subpoena" a significant number of entities or individuals.

375. This August 8, 2013 filing in California Proceedings was made by Defendant Rosen over a week after Odish had informed Rosen he wanted to withdraw from the case and Rosen had refused. This filing was also made without Odish's consent, knowledge or approval of Odish as Defendant Rosen was still Odish's attorney of record and Odish would not be e-filed or served with the filing.

376. This fraudulent filing was made by Defendant Rosen and supported by a Sworn Declaration executed by Defendant Rosen representing to the Court that he had Odish's consent.

377. The filing was made for the purpose of "limiting discovery" and only made after Relator Odish sought to "fire" and seek his Rosen's Removal and withdrawal.

378. Relator would learn during the important months from October 2013 through December and into January 2014, that this was one of many lies and fraudulent misrepresentations by Relator's own attorney to his client.

379.

380.    **DEFENDANT ROSEN REFUSED TO WITHDRAW FROM THE CALIFORNAI PROCEEDINGS.** Rosen refuses to withdraw from the matter. While the matter of his disqualification commences pending in August of 2013, Relator emails opposing counsel that represents Cognitive Code Defendants.

381.    As Rosen refused to even acknowledge this, Relator was informed that his securities causes of action against individual Morgenthalers were still very valid and he could pursue them as a separate action. Thus, Relator began work on a separate and distinct action against the morgenthalers and continued research and diligence and filed a bare bones complaint on September 19, 2013.

382.

383.    **Keenly Aware of Relator Odish and his Rights and Actions, the NUANCE DEFENDANTS (through Morgenthalers) take preventive action to construct false affirmative defenses by false and fraudulent filings with the SEC.**

384.    On August 27, 2013 and again on August 28, 2013, on two separate occasions Relator emails attorney Howard Fredman and specifically states his intention to file an action against the Morgenthalers in Eastern District of Michigan and perhaps consolidate the two actions. See Index of Exhibits.

385.    Defendant Gary Morgenthaler and his lawyers on August 30, 2013 filed a bogus document with the SEC a document effectuating a "10b5-1 trading plan" on his behalf, through a related Morgenthaler entity that they had funded and controlled.

386.    A "10b5-1" trading plan is used by high-ranking executives as a supposed "affirmative defense" to accusations of INSIDER TRADING.

387.    Upon the discovery in November 2013 of this August 30, 2013 SEC Morgenthaler filing that was almost certainly a result of the emails to attorney Howard Fredman, Relator - not knowing what a 10b5-1 trading plan as he was still not a securities fraud attorney - learned from his own diligence that a "10B5-1 TRADING PLAN" is a device used by executives to create an affirmative defense to claims of INSIDER TRADING.

388.     Both Rosen and attorney Fredman Cognitive Code Defendants tell Relator Odish that Cognitive Code is broke and has no money, and has yet to sign any agreement - statements which are absurd in light of the Public documents a judge or court could take judicial notice such as the FORBES ARTICLE or MIMI CHEN'S TWITTER ACCOUNT [in which she has spent last two years telling the whole world all the deals they are signing]. See Mimi Chen's Twitter Account in Index of Exhibits.  The was the most disturbing component of what took place in those proceedings was the fact that Relator's own attorney, Rosen, and opposing counsel Fredman tried to convince Relator that Cognitive Code was "broke", there "was no money, the technology was worthless and "no agreements had been signed". Not with Northrop Grumman. Not with HTC. Not with the Morgenthalers. These are all fraudulent misrepresentations.

389.     These assertions were being made despite the fact that judicial notice could be taken of the Forbes Article from July 2012 that specifically stated Spring and Cognitive Code was in business with Northrop Grumman, "one of the big three automotive companies" (which Relator knew was Chrysler even before the recent material revelations), and backed by "Angel Investor".

390.     On August 27, 2013, Relator sent opposing counsel Howard Fredman an email expressly stating his intention to file a complaint against the Morgenthalers and consolidate the two actions.

391.     During the crucial month of November 2013 less than 45 days from date of filing of this complaint and during a period where Relator was working day and night to uncover just how  came across this filing on the sec.gov website: on August 30, 2013, that same day, keenly aware of Relator Odish's actions Gary Morgenthaler files with the SEC a 10b5-1 Trading Plan.

392.     Relator Odish does not learn of this filing until November 2013, which trigger the necessity of this action - AND AFTER HE HAD FILED HIS CIVIL ACTION AGAINST MORGENTHALERS.

393.     On September 6th, 2013, Relator Odish filed a Legal Malpractice Action against Defendant Rosen in Eastern District of Michigan.

*394.*  Complaint filed against Morgenthalers in Eastern District of Michigan. On September 19, 2013, Relator Odish filed a complaint against Morgenthalers in Eastern District of Michigan. Case No. 13-14026.

395.  At the time of the filing of the complaint, Relator was not aware of the material facts he discovered in early October 2013 and would continue to discover up through the filing of this action. Relator was not aware of the NUANCE and Relator was not familiar with False Claims Act and its applicability.

396.  But Relator continued to do research on Lexis Nexis, enormous amounts of research and then revisited the SEC website when in early October 2013 he discovered the filings and actions of the NUANCE Defendants (And their agents and officers) that would trigger the filing of this action.

RELATOR ODISH BEGINS TO LEARN THE TRUTH IN SECOND WEEK OF OCTOBER 2013.

397.  Relator's october 2013 "revelations" - the sec-nuance filing discoveries that trigger and mandate the filing of this action. Relator odish first learns of the unlawful misappropriation and evil scheme by nuance's 10-k sec filing.

398.  From August through October 2013, Federal Judge Olguin has Odish and his Defendant Rosen and Bourbeau.

399.  In early October 2013, Relator realized he could not trust anything his Defendant Rosen had told him about this matter so he revisited the SEC EDGAR website for additional SEC complaints to model the action over when he reviewed NUANCE'S RECENT SEC FILINGS.

400.  Relator was genuinely shocked and disturbed to read in NUANCE'S SEC FILINGS a list of companies that match the companies listed in the FEBRUARY 28, 2012 DEMAND LETTER that his attorney Sean Walsh had sent out to Defendant Difazio.

401.    Nuance Communications, Inc. (NUAN), a multi-billion dollar publicly traded entity and as stated in Leslie Spring's email to Relator Odish had Gary Morgenthaler on its Board, was effectively being used [as RELATOR ODISH would learn over the next two months] as one of many either private or publicly traded entities that Gary Morgenthaler and NUANCE Defendants were in conspiracy with the Cognitive Code Defendants. Such unlawful actions and conspiracy are being used to generate enormous revenues through the unlawful and fraudulent use of stolen IP which was now being used on the government, private entities at both the state and federal level - and fraud of course against Relator.

402.    But the fraud being perpetrated directly against and as result of Relator Odish's contractual stock and dual signature rights was also now a multi-billion dollar fraud upon the government via the Federal False Claims act, as well as highlight the Antitrust law violations and numerous federal securities laws violations, as this was undeniable proof of a classic Insider Trading case - the "wrongful use or misappropriation of MATERIAL, NON-PUBLIC INFORMATION".

403.    THE NUANCE SEC 10-K FILING FROM SEPT 30, 2013 in conjunction with Relator Odish's own personal documentary evidence, Demand Letter and other items unequivocally prove that NUANCE Defendants (and officers, and related entities, and agents) in civil and criminal conspiracy with Cognitive Code Defendants unlawfully misappropriated MATERIAL, NON- PUBLIC INFORMATION (the information being that Cognitive Code was an acquisition target and was to be purchased by HTC and COMCAST, Two entities that are now disturbingly and unlawfully "embedded" as customers of NUANCE) and exploited it for their own tremendous gain.

404.    While this constitutes illegal and unlawful insider trading per the SEC rules, this is far more egregious than trading the stock. Gary Morgenthaler and the Nuance Defendants exploited their access to this Material, Non-Public Information and then essentially manufactured an unlawful scheme to use this Cross Platform technology in multiple entities that they control and generate billions from the Defense Sector, Heathcare, Mobile/Cellular, Automotive Telematics, Toys, Gaming, Medical, Enterprise Solutions, Cloud etc.

405.   A Detailed Review and verbatim recital of Nuance's SEC 10-K FILING DATED SEPT. 30, 2013 is necessary to appreciate the fraud upon Relator Odish and the government agencies. First and foremost, as stated above, the companies that NUANCE now could call a customer included the United States Army, HTC, ONSTAR [the last agreement Relator Odish was given by Cognitive Code Defendants in April 2011] Comcast, Amazon, Chrysler, Fiat, Mercedes, Denso.

406.   A number of these companies match the companies in the February 28, 2012 Demand

   Letter.

407.   The relevant government agencies that are defined are the United States Army, the Federal Bureau of Investigation, the United States Department of Justice, UPS, Department of Veteran Affairs, TRICARE, and a number of references that Nuance was using it's new artificially **intelligent voice applications** [WHICH WAS OBVIOUSLY THE WRONGFULLY MISAPPROPRIATED SILVIA TECHNOLOGIES] "embedded" in the products and services and aggressively selling them to the Government and all other agencies and government programs.

408.   Upon strong information and belief, as Northrop Grumman's engineers effectively took over control of the technology (and therefore the company), Northrop Grumman is assisting and working with NUANCE DEFENDANTS in the embedding of the Intellectual Property as NG's website clearly discusses commercialization and licensing of IP. And NG's SADIE is almost certainly the same fraudulent product called NINA, owned and being marketed by DEFENDANT NUANCE.

409.   The unlawful misappropriation of Intellectual Property that the United States government paid for to help develop and create through payments to Northrop Grumman involved taking the SILVIA™, this multi-billion dollar artificial intelligence software with cross platform capabilities, and either embedding it into their Dragon Nuance products or repackaging it as something new and calling it NINA™.

410.    So first there was SILVIA™, the original platform, and then Northrop Grumman develops Sadie™ and the NUANCE DEFENDANTS, in bed with Apple, and desperately needing the best and most cutting edge patents and intellectual property they can get their hands on, steal this IP and repackage it as NINA™.

411.    Basically the NUANCE DEFENDANTS, in conspiracy with Cognitive Code Defendants, have used Nuance as an "intellectual property laundromat" and this is why there is word on the street APPLE will likely acquire Nuance in the not to distance future - as contemplated by recent articles and the multi-billionaire Wall Street Investor Carl Icahn taking huge stake in Nuance. Relator will turn over information to Attorney General regarding this.

412.    If there was any doubt that NUANCE DEFENDANTS were keenly aware of Relator Odish's rights it must be stated that after reviewing the SEC filings and the website and seeing all same automotive companies that Relator was familiar with and conspicious by its absence is MAGNA.

413.    Denso is on the Nuance website, but Magna is nowhere to be found. Because they know Relator Odish brought Cognitive Code SILVIA™ to Magna and they wanted four licensing applications. [See the December 12, 2011 and December 16, 2011 emails from Leslie Spring to Odish about pitching the SILVIA software to Magna. So they specifically made a note not to approach Magna because Odish has a friend there and this would get back to him.

414.    Nuance's SEC 2013 filings also show that its customers now include APPLE and HTC, two tech giants that were formerly battling each other in court and around globe over patent infringement.

415.    As stated previously herein, in 2012 Apple and HTC subsequent to their 2011-2012 litigation entered into a quiet licensing agreement that upon information and belief is related to and potentially a result of the unlawful activities complained of herein.

416.    **Relevant Sections from Nuance's September 30, 2013 SEC Filing lifted verbatim:**

417.  *NUANCE'S SEC FILINGS show their profits surging in 2013 by 'hundreds of millions of dollars'* that strong and information and belief is a result of this unlawful misconduct and wrongful misappropriation of intellectual property. **See EXHIBITS** 124, 125 AND 126. Nuance SEC filings.

418.  NUANCE'S SEC FILINGS show that its "Customers and Resellers" include Government agencies such as FBI, U.S. Department of Justice, Department of Defense, Department of Health and Human Services (healthcare), Department of Veteran Affairs, the United States Army (which was from email sent from Spring to Odish a client of Cognitive Code that Northrop Grumman used the SILVIA technologies for) and a multiple of other government agencies and programs

419.  **Principal Contractor DEFENDANTS Actions are unlawful and exploitive of President Obama's ACA and related government programs of digitizing health records.** President Obama's massive, revolutionary healthcare reform in affordable care act aka "ACA" which created for the lawful and beneficial government interest of providing healthcare to Americans, and has lawful and legitimate government interest requiring the "digitizing" of health records, coding and compliance - which is absolutely being exploited by NUANCE, its agents and officers, by the acts discussed herein.

420.  In interview in late November 2011 with Gary Little, partner in Morgenthaler Ventures, specifically states intention to exploit components of President Obama's ACA. In an interview with CNN Money titled the "Future of Morgenthaler Ventures", Little [unaware of the fraud that Gary Morgenthaler had commenced] states that the Venture Capital company had acquired a company called Practice Fusion, a business related to e-health records.

421.  Defendant Little specifically states the new law being pushed by President Obama and how it implements FOUR YEARS of incentives for companies, then FOUR YEARS OF PENALTIES.

422.  Thus, there is over a hundred billion dollars that NUANCE DEFENDANTS are chasing, but their actions constitute healthcare fraud - exactly as contemplated by the Letter

written and signed by US Attorney General Eric Holder and Madam Secretary of HHS Katherine Sebelius. And that is why NUANCE has gone on a massive acquisition spree - and their profits are surging.

423.    There is no mention of cognitive code ip and SILVIA in SEC filings by nuance or other related Entities.

424.    In extensive review of NUANCE'S SEC FILINGS there is absolutely no mention of the name of Cognitive Code. 2013 SEC FILINGS by Nuance and Morgenthalers mention extensive acquisitions of other entities, one for 100 mm, another for nearly 300 mm US dollars, but absolutely no mention of the name Cognitive Code or SILVIA™ IP technologies, for obvious reasons.


425.    Given the fraud and criminal conspiracy PRINCIPAL CORPORATE DEFENDANTS are not entitled to any Safe Harbor in their SEC filings. Moreover, the evil and nefarious motive and Scienter is obvious: Nuance DEFENDANTS engaged in this unlawful conduct because they realized they make billions of the stolen CROSS PLATORM IP known as SILVIA™ in a multiplicity of business sectors and by using this stolen IP in countless other entities presently and in future, far beyond the entities named herein as Defendants and potential defendants.


## XV.    DECEMBER 9, 2013 – COORDINATION OF EVENTS AS PART OF THE CONSPIRACY.

426.    All of these filings submitted with the SEC are false claims filing seeking "approval" and as Relator continued to research this fraud he realized that Gary Morgenthaler and and NUANCE Defendants had created a deceptive scheme in an attempt to cover up their fraud and insulate him: improper use of CTOS, improper use of his CORPORATE partners as "Straw Men" on a great number of false filings with the SEC, improper use of NIXON PEABODY San Fran office splattering their address ONE EMBARCARDERO CENTER all over the "Name" Section of the SEC filings.

427.    NUANCE and Cognitive Code Defendants continue to perpetuate this fraud by actively marketing these corrupted products and services sold by Nuance to a number of government agencies above and beyond healthcare and defense, as they are marketing their corrupted products which contain or are now embedded with stolen Intellectual Property in Enterprise (computing, IT, Cloud) and Imaging solutions that are also used by such agencies as FBI and United States Department of Justice that are specifically listed as "Representative Customers" in Nuance's SEC filings.

428.    NUANCE has four business segments, HEALTHCARE, MOBILE, ENTERPRISE and IMAGING. A review of the NUANCE'S 2013 SEC filings show its profits surging in the last calendar, upon information and belief, as a result of the unlawful activities described herein.

429.    After learning of this proverbial smoking gun and it being obvious what Cognitive Code Conspirators have done, Relator Odish on October 15, 2013 sent opposing counsel Defendant Howard Fredman an email asking him for an explanation, (See Index of Exhibits).

430.    The email to Defendant Howard Fredman specifically had the fourteen (14) attachments, including but not limited to the following:

431.    Defendant Fredman never responded to Relator. In a subsequent conversation with Fredman when Relator discusses "suing the Morgenthalers" Fredman states "well, you have sued them" in reference to the September 19, 2013 filing of the original complaint in this action and an obvious admission that Relator's rights and actions are being closely monitored and scrutinized by the Nuance-Morgenthalers and their attorneys.

432.    Over the next few months and leading up to the filing of this action, Relator came to appreciate the magnitude of the fraud and false claims as well as the scope of violations of other federal statutes. During the months of November and December and into the first week of January 2014, as Relator conducted more and more research and diligence he came to realize that he did not want to pursue this matter.

433.    Relators scoured the SEC, NUANCE site and all over the web to see if Nuance had made any "public disclosure" regarding an acquisition or collaboration agreement with Cognitive Code. Obviously none were stated. NUANCE'S RECENT SEC FILINGS vaguely

and intentionally omit any mention of Cognitive Code, in furtherance and acknowledgment of their unlawful actions. There is simply only a vague but undefined reference to "Other Collaboration Agreement" in NUANCE'S SEC 10-K FILING from Sept. 30, 2013 and even the previous year Sept. 30, 2012.

434.    From Relator Odish's own unique original source personal knowledge, substantiated by his contractual rights (the stock rights with dual signature, affording him the right to review and sign every contract on behalf of Cognitive Code) and the documents within Relator Odish's possession, it is plainly clearly of that massive fraud that has taken place and will continue to take place until unless immediately enjoined and disgorged.

435.    But he realized it would essentially constitute an act of Silent Fraud on his part if as **LYNN MCCORMICK, PROGRAM HEAD OF CONTRACTOR FRAUD** of the Office of Inspector General he did nothing. She advised him in late October 2013 when Relator was beginning to realize the scope of the fraud that Relator, as an attorney, had to file this Qui Tam action and walk into the FBI office in Detroit or simply walk into the FBI office.

436.    No mention of cognitive code on any of the websites.

437.    A review of material portions of NUANCE's SEC 10-K FILING OF SEPT. 30, 2013 clearly displays that massive fraud and false claims being submitted and exploited to the Government through Nuance dictation product, which now is tainted because they [by Nuance's subtle admissions] have "embedded" new state of the art artificial intelligence or digital assistant technology and Intellectual property.

438.    The correspondences drafted by Relator's attorney Sean Walsh during the spring of 2012 specifically refenence the law firm of NIXON PEABODY, San Francisco, California office and Difazio's stated intention of traveling to San Francisco to meet with lawyers at Nixon Peabody on behalf of Cognitive Code Corporation. Nixon Peabody San Francisco specializes in "Life Sciences", technology, defense and other industries.

439.    Nuance Defendants unlawful use and exploitation of legitimate government interests, such as the SEC affording companies to file CONFIDENTIAL TREATMENT ORDERS (or CTOs). As Relator Odish scoured the SEC site and all over the net looking for more information, it became clear that with their private or public entities, such as

NUANCE DEFENDANTS, are benefitted by the wrongful use of CTOs and using CTOs to perpetuate their fraud. In reviewing the sec.gov site, it became clear that they use CTOs for an improper purpose, which is to bury the Cognitive Code patent and protect by CTOs.

440.    The vague Collaboration or Equity agreements that is not revealed in the NUANCE SEC FILINGS between Cognitive Code defendants and Nuance Defendants, especially the "Colloboration Agreement" vaguely referenced in NUANCE'S SEC FILINGS which of course does not specifically mention Cognitive Code at any point, is obviously illegal and potentially violative of the Sherman Act, securities laws and other federal statutes - while actively constituting Healthcare Fraud.

441.    **DEFENDANT NUANCE AND ITS OFFICERS, RELATED AFFILIATES SEC FILINGS WITH 'ONE EMBARCARDERO CENTER' LISTED "NAME" SECTION**.  In recognition of Nuance Defendants liability in this matter, the Morgenthalers and Nixon Peabody law firm filed a number of what now can rightfully be deemed fraudulent SEC filings/forms that simply had **"ONE EMBARCARDERO CENTER"** listed on the NAME section of SEC documents. One Embarcardero is the street address for the location of Nixon Peabody's San Francisco, California office.

442.    As Principal Contractor Defendants are Contractors and Subcontractors for United States Government, their filings within any agency constitute "statements"……

443.    NUANCE is contractor for the United States Government. Like Cognitive Code it must be "in compliance with all federal, state, and local laws" to receive money from the United States Government. Defendants Nuance and Cognitive Code have obviously violated a number of federal and state laws, thereby precluding them (disbarring them) from receiving federal funds.

444.    *VIOLATIONS OF SECTION 8(A).*  In 2010 when Cognitive Code became an approved Vendor for Northrop Grumman it did so on the basis of it being a qualified Minority Business under the Small Business Administration and pursuant to Section 8(a).

445.    Compliance Language NORTHROP GRUMMAN'S INFORMATION SYSTEMS subcontractor language, wherein such contract language is unambiguous. **The requirement**

**to be in compliance with all local, state, and federal laws, rules and regulations**: Standard Subcontract Terms and Conditions for Federal Procurement.

446.    The standard subcontract terms and conditions for federal procurement in Northrop Gruman's INFORMATION SYSTEMS contract are recited in THE CONTRACT. They include CLAUSE NO. 22 - Organizational Conflict of Interest, CLAUSE NO. 23 - Compliance with Laws, CLAUSE NO. 24 - Procurement Integrity. Clause No. 23 - Compliance with Laws reads as follows: "Subcontractor warrants that is shall comply with all applicable federal, state, or local laws" and Clause No. 24 regarding Procurement Integrity essentially recites the same principle: Subcontractor shall fully with any and all applicable federal, state, and local laws, rules, regulations, and ordinances, including, without limitation, Section 27 of the Office of Federal Procurement Policy Act, 41 U.S.C. 423 and its implementing regulations.

447.    The language in standard procurement contracts by Northrop Gruman not only requires "all contractors to be compliance with all state, federal, local laws, rules and regulations..",

448.    it also requires that the subcontractor specifically not engage in any unlawful anti-competitive activity that is in violation of the Sherman Anti-trust Act.

449.    The material provision of the Sherman Anti-trust Act reads in part: "*Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.*" Nuance and Cognitive Code defendants have engaged in such anti-competitive behavior, with the either the knowing assistance or reckless disregard of Northrop Gruman.

450.    Upon information and belief, Nuance Defendants are attempting to effectuate a "niche" monopoly in the healthcare sector related to coding, and needing the artificial intelligence patent to follow through on their unlawful activity.

451.    On Northrop Grumman's website, they actively engage in the process of commercially reselling or licensing their Intellectual Property. There are very curious similiarities (relating to healthcare IT on Northrop Grumman's website) that coincide with NUANCE'S website relating to Healthcare, and their aggressive marketing of Healthcare products and services to government agencies. **See Index of Exhibits.**

452.    On December 9, 2013, Cognitive Code and Northrop Grumman announced a **new** licensing agreement, **likely the third** major licensing agreement Cognitive Code Defendants have signed with Northrop Grumman.

453.    No mention of this licensing agreement on the Northrop Grumman website.

454.    On this same exact date of December 9, 2013, in conspiracy with Defendant Northrop Grumman and other Defendants, Defendants Rosen and Defendant Bourbeau filed Under Seal a motion against Odish to terminate his rights. **See Exhibit ___.**

455.    unlawfully given Cognitive Code fraudulent conduct and violations of securities state and federal securities laws dating back to incipience of company, fraudulent filing of REG D FORM with the SEC after being sued in October 22, 2012 (which contained material representations), ongoing securities fraud, and conspiracy to defraud the government, acts of perjury in the state filing required by Delaware, embezzlement and misappropriation of funds, their unlawful "collaboration agreement" Nuance Defendants (and their personal friends the Morgenthalers) as discussed herein. As well violating Section 8(a) which requires the Small Business to actually do the work, which Cognitive Code has not - as they (with knowing acquiescence of Northrop Grumman) allowed Northrop Grumman to do all the work.

456.    Willful violations of securities laws (such as refusing to issue Relator his stock certificates after nearly three years constitute criminal penalties thereby disbarring Cognitive Code from being a lawful subcontractor. Additionally, there knowing violations of contracts signed with Relator (stock, dual signature) constitute fraud.

457.    SILVIA has significant applications in the healthcare sector and in many other sectors.

458.   **VTS (Virtual Training Systems) from Northrop Grumman.** The technology they have used SILVIA for has applications for them way beyond defense, including medical and healthcare, cellular, etc. Basically all the various and multiple uses of SILVIA Northrop Grumman can and have unlawfully exploited.

459.   From Northrop Grumman's website it is clear that SAdie is nothing more than a perfected version of the SILVIA™ PLATFORM. [And NUANCE'S "NINA' is nothing more than a re- packaged and stolen version of SILVIA™]. The information regarding Northrop Grumman's SAdie is lifted directly from the NG's website and restated below.

460.   All such submitted cost reports, invoices, reimbursement claims and the like constitute false claims under the False Claims Act because they were and continue to be aware of their fraud.

461.   Relator has personal knowledge, documentary evidence and upon information and belief states that Northrop Grumman likely has some degree of liability in this action in light of what Relator know, the circumstances surrounding this fraud and unlawful misconduct could not have taken place without some degree of acquiescence on Northrop Grumman's part. Cognitive Code SILVIA™ has since spring-summer of 2011 been worked on exclusively by Northrop Grumman's engineers and they are the world's best and most knowledge experts on this valuable cutting edge artificial intelligence software. Relator does not believe that these actions could have taken place without NG officials, engineers and executives not knowing anything. NG as stated herein just gave Cognitive Code a new license on December 8, 2013, less than a month before filing and triggering.

462.   As far back as 2011, Relator felt the company was nothing more than a 'de facto' subsidiary of Northrop Grumman.

463.   Relator Odish has specific original source knowledge that Northrop Grumman obviously knew of the fraudulent misconduct, of the government violations and the likely violations of their own procurement contracts, because of the integral role that Northrop

Grumman's engineers played in the development of the SILVIA FOR UNITY (effectively SILVIA 2.0, THE SECOND VERSION OF THE INCREDIBLY VALUABLE PATENT/INTELLECTUAL PROPERTY/SOFTWARE that belongs to Cognitive Code).

464.    As stated herein previously, Northrop Grumman dedicated an ENTIRE BUSINESS UNIT to Cognitive Code's software known as SILVIA in late 2011, when NG executives, even the CEO, learned that Cognitive Code was a serious acquisition target (that two global tech behemoths such as HTC and COMCAST wanted not only to buy the company outright but wanted long-term significant licensing agreements).

465.    Cognitive Code essentially exists as a "de facto subsidiary" of Northrop Grumman and the fraud described herein with the Nuance Defendants could not take place without the knowing and wrongful acquiescense of Northrop Grumman, it's top executives and engineers, or at a bare minimum gross negligence or reckless disregard for the truth as contemplated by the False Claims Act.

466.    In 2011 Spring did not have the capability, engineering ability/muscle or know-how to complete SILVIA 2.0 (aka SILVIA FOR UNITY).

467.    On Northrop Grumman's website, it refers to Sadie™, the digital artificial assistant created by Northrop Grumman using Cognitive Code's intellectual property known as SILVIA™.


*"Sadie™ FROM NORTHROP GRUMMAN*

*Looking for an easier, more affordable and more intuitive user interface to access and manage your computer based data? Whether the task is meeting training needs, performing maintenance tasks, issuing safety alerts or conducting mission support; Northrop Grumman's SAdIE has the answer. SAdIE provides a human computer interface that increases the quality and availability of the data being accessed while reducing costs and manning requirements, critical in today's tight budget environment. SAdIE is an articulate and adaptable voice and visual interface to computer-based data. SAdIE verbally interacts with users in a natural conversational manner, answers questions concerning any topic and delivers overviews or seminars on specific subjects. Having a natural conversational interface to computerized data delivers important advantages. You can make queries verbally and*

*without an in-depth understanding of the data, database structure or search tools. When you ask SAdIE a question, the interface rapidly locates the information in documents or SAdIE accessible databases. In addition, SAdIE will also query you to further understand a topic or question to offer related information pertinent to the conversation. Depending on your preference, SAdIE can be manifested as an intelligent voice, text interface or can be visually portrayed as a speaking, animated male or female avatar. SAdIE readily interfaces with and executes commands controlling other external hardware and software applications. SAdIE "learns" and grows smarter through conversations. As SAdIE performs required tasks, new data and data relationships are stored for future reference.*

*A virtual assistant for multiple uses:*

*Northrop Grumman's SAdIE supports a wide range of uses requiring access to computer based data. SAdIE is the perfect interface for training systems, and can be an intelligent digital substitute for a live trainer."*


**See Exhibits 240-246**, "SAdie from Northrop Grumman"[1].

468.    As Northrop Grumman procures money from the federal government for nearly all of its projects, Northrop Grumman's engineers "took over" development of Cognitive Code's software SILVIA, upon information and belief, during summer of 2011, much to dismay of Relator. Relator was concerned with NG outright stealing the property and patent and cloaking such theft behind FAR regulations that allow a U.S. Defense contractor to procure intellectual property.

469.    Northrop Grumman's engineers developed the prototype for Chrysler, in late 2011. Northrop Grumman's engineers also developed the prototype cell phone for HTC in early 2012. As the emails from Spring to Relator on December 12, 2011 and December 16, 2011, written into this complaint above, clearly indicate.

470.    This is an obvious violation of SECTION 8(a), the Small Business Administration Act that requires minority-owned businesses to receive contracts from the government, wherein SECTION 8A specifically requires that the owners of the small business actually do the work. In this instance, that was not the case here.

471.    It was Northrop Grumman's engineers who did all the work on the development of the software/patent/intellectual property of Cognitive Code Corporation which commenced sometime during summer of 2011.

472.    Northrop Grumman is certainly aware of SECTION 8A requirements as it had defendant John Chen in 2010 sign purchase orders and other agreements relating to Cognitive Code's status as a SECTION 8A small and minority-owned business.

473.    Relator Odish met with prominent attorney Bruce Seyburn in late October 2011 through December 2011 to procure funding on behalf of his company, Cognitive Code Corporation. The attorney represented a number of wealthy clients that had money to invest.

UNLAWFUL "REVERSE ENGINEERING"

474.    Relator Odish states that Mimi Chen said to him in a phone conversation or possible email that her "advisor friends", the Morgenthalers, specifically Todd Morgenthaler, was an expert in "reverse engineering".

475.    Reverse Engineering of course is the unlawful theft and piracy of software and intellectual property patented in one country [UNITED STATES] that respect and honor patent right and deconstructed for unlawful theft, misappropriation and use in a foreign country that does not protect patent rights and potentially encourages such behavior.

476.    NUANCE has nearly 300 worldwide subsidiaries, a number of countries of which it could and likely did reverse engineer this technology to protect itself when this day came. Recognition of this likely fact makes the remedy of disgorgement and return of the patent and intellectual property a hollow penalty upon the Defendants and the parties mentioned herein.

477.    As recently as less than a month ago (a month prior to filing of this complaint on) on December 9, 2013 Cognitive Code made a press release announcement regarding a (NEW AND ADDITIONAL) licensing agreement with U.S. prime defense contractor NORTHROP GRUMMAN. The press release is restated herein for the Court and government agencies to appreciate the value of Cognitive Code's artificial intelligence

478.   Cognitive Code's website has for the past year specifically touted its licensing agreement from 2011 and now Cognitive Code, after burning through the 50 million dollars they received from Northrop Grumman in 2011-2012, has now signed a new licensing agreement with Northrop Grumman. On it's website, Cognitive Code links to a new licensing agreement announced December 9, 2013. The link from the website to the announcement specifically states the following:

> "*Cognitive Code Signs Licensing Agreement With Northrop Grumman - December 9, 2013*
>
> *Northrop Grumman to Develop Products Utilizing Cognitive Code's SILVIA Technology (PRWEB) December 08, 2013*
>
> *Cognitive Code Corp. announced today that Northrop Grumman (NGC) and Cognitive Code have signed a software licensing agreement that gives Northrop Grumman broad access to Cognitive Code's patented SILVIA® Platform and Technologies for Northrop Grumman's use in defense and other government markets. SILVIA is a cross-platform system for developing and deploying conversationally intelligent applications. Unlike other voice solutions, Cognitive Code's SILVIA can be deployed in compact and secure environments, and includes native unconnected operation on mobile devices and embedded systems. The SILVIA Platform's developer friendly tools and superior natural language capabilities allow for the rapid development and deployment of applications for almost any market, in almost any language.*
>
> *"For the past several years, Northrop Grumman has been an important customer for Cognitive Code, and applications using our SILVIA technologies have already been developed and put into the field by NGC. Applications incorporating our SILVIA technologies include Northrop Grumman's 'SAdIE' line of products for government and defense markets," said Defendant Spring Spring, CEO and Founder of Cognitive Code. "This licensing agreement with Northrop Grumman is the next logical step in our relationship, and Relator at Cognitive Code look forward working with Northrop Grumman on the next generation of SILVIA-enabled intelligent applications."*

> *Cognitive Code offers flexible licensing programs that give companies access to its patented SILVIA technologies, including SILVIA Studio developer tools, the cross-platform SILVIA Core runtime, and SILVIA Server for web-based deployment of conversational applications. Our technologies allow those companies to build applications and services that can work seamlessly with each other, across a number of devices and operating systems.*
>
> *Cognitive Code provides software, services, and solutions centered on its SILVIA Platform, a system for developing and deploying commercial conversationally intelligent applications. More information about Cognitive Code and the SILVIA Platform is available at www.cognitivecode.com. SILVIA: Intelligence on Command".*

479.   The article specifically quotes Defendant Defendant Spring Spring as stating that Cognitive Code has been in business with Northrop Grumman "for several years".

480.   Cognitive Code Defendants through their attorney Howard Fredman inexplicably stated and continues to state there is no agreement with Northrop Grumman.

481.   As stated previously herein, Relator were told by Defendant Spring in January 2012, two years ago, that the value of the Company [based almost entirely on PATENT/IP and software] was "several hundred millons". The commercial value of this Artificial Intelligence PLATFORM- building software cannot be overstated. One billion dollars is almost certainly well below the fair market valuation of the Cognitive Code Company, which is supposed to be the lawful holder of the SILVIA™ patent, software and Intellectual Property.

482.   The valuation of the company is based on the value of it generating revenues and comparable items. By Defendant Spring's own statement in January 2012 that the company was worth "several hundred million dollars", it most certainly has exceeded that valuation now two years later. [Comparison to the Morgenthalers Investment in Evernote, a singular "app" or application and not an incredibly valuable Cross-Platforming technology such as SILVIA™. In May of 2012, the Morgenthaler-backed "app" Evernote procured 72 million

dollars in funding predicated upon a One Billion dollar valuation as stated previously herein.]

### XVI. ROSEN AND BOURBEAU HAVE EXPLICIT KNOWLEDGE BECAUSE OF A LEGAL MALPRACTICE SUIT ODISH FILED AGAINST ROSEN AND BECAUSE RELATOR ODISH DESPERATELY TRIED TO INFORM THE LOS ANGELES JUDGE OF THE MASSIVE FRAUD BEING PERPETRATED IN A CONFIDENTIAL FILING THAT IS LISTED AS DOCKET ENTRY 94 IN THE LOS ANGELES MATTER.

483.    In docket Entry 94, in a confidential filing with the judge, Relator Odish desperately tried to inform the judge yet a third time of the massive fraud being perpetrated. And in that confidential filing, he mentioned the name of LYNN MCCORMICK AND QUI TAM ACTION.

484.    Defendant Rosen specifically violated the Court Order from California Proceedings to try and effectuate a public disclosure of the Qui Tam action in the legal mal action filed here in Eastern District of Michigan.

485.    . Relator specifically on multiple occasions has tried to inform the judge of the fraud and request that a grand jury be seated as the law requires when federal laws are violated, but he was ignored. In that filing, Relator mentioned a potential Qui Tam action. The judge required Relator to deliver a copy of it to his former (but yet still attorney of record) Robert Rosen, who continued to represent Defendant Bourbeau, so Rosen and Bourbeau both know of this action and - as stated below - are obviously acting in complicity with Cognitive Code Defendants.

486.    As the funds used to perfect the technology came from the United States government, the government does have a lawful claim to it. And given the fraud, permanent injunctive relief and a governmental custodian is required to take over Cognitive Code.

487.    In the last month, outrageously Rosen and Bourbeau have conspired to defraud Relator and have brought "terminating sanctions" in the Los Angeles proceedings. It was predicated upon a fraudulent declaration Rosen procured through threats and intimidation.

488.    Thus, Relator Odish acting in good faith and honesty, has his co-Plaintiff along with his former attorney files motions against him to terminate his claims because they are aware of what Relator knows and upon information and belief are conspiring with Cognitive Code Defendants to protect the Morgenthalers and Nuance and the fraud that is being perpetrated. And upon information and belief, receive potential promised benefits. Defendant Bourbeau has been promised Odish's board seat and a three year salary, which may constitute a "kick-back" to terminate Odish's rights.

489.    Relator Odish had filed a legal malpractice action against Rosen in September 2013 which is currently pending and he provided Rosen's attorneys pursuant to rule 26 documentation that absolutely gave them knowledge of the fraud being perpetrated. And this knowledge, upon information and belief, was imparted to Bourbeau.

490.    Cognitive Code Defendants have engaged in violations of anti-kick back statute by giving Odish's rights to Bourbeau because they know he is not an attorney and he has no concerns about all the fraud that Cognitive Code Defendants have engaged in: Odish told Bourbeau they engaged in embezzlement and he had agreed. Bourbeau openly acknowledged that Cognitive Code Defendants had defrauded them before their relationship had broken down, but now he has no qualms whatsoever being in business with them and retaliating against his former partner and friend of ten years.

**RELATOR ODISH FILES CONFIDENTIAL COMPLAINT COMPLAINT WITH FEDERAL BUREAU OF INVESTIGATION "FBI" ON JANUARY 12, 2014.**

491.    On January 12, 2014, Relator Odish in compliance with the False Claims Act statute voluntarily informed the government, specifically the FBI, DETROIT DIVISION of the fraud.

492.    On February 18, 2014, Relator Odish would file Qui Tam action (14-10736 with Honorable Judge Goldsmith) and file an amended Qui Tam complaint on March 4, 2014.

493.    It was properly filed under seal, but for whatever reason – similar to the present action – was never under seal and available to the public. One of Relator's Odish's attorneys and paralegals informed him shortly after the February 18 2014 filing that the complaint was accessible to the public.

494.    On July 5th, 2014, Relator Odish would make a filing to the Honorable Judge Goldsmith informing him that the complaint was accessible to public.

495.    During June 2014, Relator Odish would exchange emails with assistant United States Attorney General Peter Caplan, and specifically inform him via email that Apple did have liability in the action for false filings made with USPTO, even though they were not named in the Qui Tam action. The email from Relator Odish to DOJ attorney Caplan specifically had attachments related to apple patents and music and beats. **See EXHIBIT 34, JUNE 13, 2014 EMAIL FROM RELATOR ODISH TO DOJ ATTORNEY CAPLAN**.

496.    *{Over a year later in May 2015, Relator Odish would learn there was a pending investigation into APPLE related to online music streaming. SEE EXHIBIT 34.1., NY TIMES ARTICLE, 'APPLE pushing music labels to Kill Spotify Streaming Ahead of Beats Relaunch. May 14, 2015.} Relator is an Original Source of this Complaint and was acquired and filed originally in February 18, 2014, more than a year before this Article was published. Additionally, the allegations and Relator's Original Source knowledge involve matters far more serious than mere online music streaming, but Relator can assist the DOJ with the pending investigation.*

## XI.    DEFENDANTS UNLAWFUL EXPLOITATION OF THE AFFORDABLE CARE ACT AND HEALTHCARE FRAUD, TITLE 18 USCS § 1347.

497.    The SEC filings and the statements on the NUANCE WEBSITE show a company aggressively going after government money, despite their fraudulent conduct.

498.    On the NUANCE WEBSITE, FOR HEALTHCARE, DEFENDANT NUANCE IS AGGRESSIVELY MARKETING THE FOLLOWING PRODUCTS AND SERVICES (PREDICATED UPON THE STOLEN IP):

499.    Documentation Integrity; Clintegrity 360; Escription Transcription Services, numerous other products and services geared for health professionals.

500.   NUANCE AND ITS AFFILIATES have acquired Practice Fusion, DOXIMITY, Nextgen and a number of other entities to effectuate anti-competitive activity and monopolize the coding sector of the new healthcare laws, while also receiving benefits from their other business segments in enterprise, cellular, mobile, imaging.

501.   NUANCE'S DRAGON MEDICAL and other products and services IS NOW IN USE BY OVER 100,000 physicians and healthcare providers, at the state and federal level, by a number of government agencies and private entities.

502.   The Dragon Dictation version sold to individuals is sold for $79.00 dollars.

503.   But the DRAGON MEDICAL DICTATION – the military grade version – sold to Veterans Hospitals and over 100,000 physicians sells for $1799.00

504.   NUANCE'S and APPLE (wrongfully being unjustly enriched) are advertising "Access your EMR on iPad or iphone.

505.   NUANCE's SEC filings state that the company is making money off its embedded cellphone and "tablet" products. Upon information and belief, those tablets are iPads, the property of Apple. But as NUANCE'S related funding VC, Morgenthaler Ventures, owns a significant chunk of Apple Stock, preserving Apple's market domination inures to NUANCE'S benefit.

506.   A permanent injunction is necessary immediately prior to NUANCE being sold to APPLE, which is likely to take place upon information and belief.

507.   **JULY 2014 RELATOR ODISH MEETS WITH FBI AGENT TO DISCUSS THE FEDERAL CRIME REPORT**. On or about July 7, 2014, Relator Odish meets with FBI AGENT KELLI SEUSS OF FBI DETROIT DIVISION to discuss the Federal Crime report. The two had spoken in February 2014 and had set up a time to meet to discuss the complex matter. Relator Odish was advised to "focus on the theft of intellectual property" and let the Sec focus on the securities fraud and provide a summary.  Relator Odish informs the FBI AGENT he will do so once he acquires return of his client files from his former attorney, DEFENDANT ROSEN.

508.   **On July 23rd, 2014, the original qui tam action was Unsealed.** Immediately subsequent to the unsealing, Defendant Wesley Bush of Northrop Grumman made an SEC

FORM 4 FILING dated August 1, 2014 which contained an 10b5-1 trading plan as an "affirmative defense to a potential accusation of insider trading.

509.   **Obstruction of Justice**. Despite being aware of pending investigations, Defendant Rosen, Relator's former attorney, to this day has refused to return Odish's original clients files. In fact, he has destroyed over at least ten thousand pages of Odish's original client files. These were extensive documents and material evidence overnighted to Defendant Rosen on several occasions during Defendant Rosen's engagement and representation of Relator Odish in California proceedings from July 2012 through the end of 2013.

510.   While Relator Odish did email a significant number of documents to Defendant Rosen, a significant portion of the documents over the course of this period had to be overnighted because it would exceed the size limit capable of being emailed.

## XII.   GLOBAL PATENT LAUNDERING OF PATENTS BEING USED BY UNITED STATES GOVERNMENT. PATENT DILUTION AND FRAUD UPON USPTO, DEPARTMENT OF DEFENSE, HEALTHCARE RELATED TO FRAUDULENT PATENT FILINGS.

511.   Defendants are absolutely aware of what Relator knows and this is why they have retaliated against him.

512.   On September 17, 2014, Odish's attorney GUY MAILLY AND JOHN SCHALTER sent out subpoenas to the following entities (See Exhibit 99).

513.   **SEPTEMBER 2014 – NORTHROP GRUMMAN DOES <u>NOT</u> RESPOND TO A SUBPOENA REQUEST BY RELATOR ODISH IN CALIFORNIA PROCEEDINGS**. Defendants Northrop Grumman and its related spin off DEFENDANT HUNTINGTON INGALLS did NOT REPLY at all to the SUBPOENAS in the California Proceedings.

      a. Defendant Northrop Grumman did not even file an objection to the subpoena; they simply ignored the Subpoena altogether.

      b. There was absolutely no response whatsoever from Defendants Northrop Grumman and sister publicly traded entity Defendant Huntington.

c. They could not respond because they knew of their civil and criminal liability in the action and any response would be a "statement" that falls outside the "judicial exception" of Title 18 USCS 1001, and thereby constitute a felony "false statement" upon an "agency of the United States government".

514. No other entities responded to the SUBPOENAS, except Defendant Nuance which did not lawfully comply with the subpoena and simply sent along a few utterly worthless emails. See EXHIBIT 76, DEFENDANT NUANCE RESPONSE TO SUBPOENA TO CALIFORNIA PROCEEDINGS.

515. Defendant Nuance's Subpoena was produced by their Michigan based attorney, DAVID DUMOUCHEL of Butzel Long, an attorney who specializes in White Collar Crime.

516. General Motors sent a one page response citing objections to the Subpoena and nothing more.

517. Defendant Apple sent a simple one page response objecting to the Subpoena and refusing to comply.

518. All other Defendants/Parties who were sent subpoenas did not even bother to answer or object.

519. **SEPTEMBER 2014 - THE FBI REQUESTS ADDITIONAL INFORMATION FROM RELATOR ODISH PURSUANT TO THE FEDERAL CRIME REPORT**. During this period on or about September 26, 2014, the FBI contacts Relator Odish seeking additional information regarding the pending investigation. Relator Odish returns the phone call to FBI AGENT KELLI SEUSS in Detroit Division stating that he will provide supplementation of material evidence and federal crimes as soon as his former attorney, Defendant Rosen returns his files. Relator wanted to review the files for the Federal Crime Report.

520. **APPLE'S BOUTIQUE LAW FIRM AND RESPONSE TO SUBPOENA.** In early October 2014, upon receipt of Defendant Apple's objection by their attorney and California law firm, LEWIS LEWELLYN, Relator Odish clicked onto the website and saw that APPLE'S LAW FIRM was a boutique law firm with eight attorneys, all of whom were

former partners and associates at the global law firm of DEFENDANT LATHAM & WATKINS, LLP.

521.  On October 8, 2014, Relator Odish sent an email to Apple's attorney Mathew Dickman at Defendant Law Firm Lewis Lewellyn specifically inquiring about Apple's very curious and disturbing patent filings with the UNITED STATES PATENT AND TRADEMARK OFFICE, USPTO, which coincided with the fall of 2011 and material events pursuant to this matter. **SEE EXHIBIT 592**, October 8, 2014 Email from Relator Odish to Apple Attorney.

522.  A few days later, Odish's attorney in California proceedings, John Schalter would file a Request for JUDICIAL NOTICE that a) ODISH WAS COOPERATING WITH THE FBI in parallel proceedings, and b) "APPLE HAD AN INTEREST IN THESE, CALIFORNIA PROCEEDINGS".

523.  After reviewing the website of Apple's boutique law firm, it became obvious to Relator Odish that this boutique law of DEFENDANT LEWIS LEWELLYN was set up solely as "de facto" subsidiary and "front" to insulate the global law firm of DEFENDANT LATHAM WATKINS, LLP while still allowing them to maintain control and provide legal services for their most coveted and important clients who had engaged in serious misconduct with cases that were potentially "toxic".

524.  **DEFENDANT TIMOTHY COOK FILES AN SEC FORM 4 ON SEPTEMBER 21, 2014 IN RESPONSE TO ODISH SUBPOENA.** The Subpoena to Apple was sent out on September 17 2014 and filed on the record with the Court. Four days later, Defendant Timothy Cook, in an obvious response to the response inquiring about all material events related to COGNITIVE CODE, filed an SEC FORM 4 with the Securities and Exchange Commission on September 21, 2014 with an unlawfully and fraudulently backdated 10b5-1 trading plan – backdated all the way to November 2011.

525.  **DISCOVERY OF DEFENDNAT JERRY WAUGH ONLINE COGNITIVE CODE POSTINGS BACK TO 2010 BY RELATOR ODISH IN JULY 2015.** On July 27, 2015, Relator Odish made a legally enormous and significant discovery. Relator Odish discovered

online "UNITY" postings made by Jerry Waugh of Northrop Grumman dating back to 2010. **SEE EXHIBITS 246 THROUGH 246.12.**

526.   These postings clearly show that Waugh and Northrop Grumman were recruiting engineers for Cognitive Code's SILVIA during fall of 2011 when Cognitive Code was an acquisition target. See Exhibits 246 to 246.12.

527.   Relator Odish email Defendant Fredman and Rosen regarding these disturbing discovery but Defendant Fredman did not respond.

528.   One day later on July 28, 2015, Relator Odish would realize from scanning and compiling exhibits in the civil action that a "Cognition Technologies, Inc" was now listed as a subsidiary on NUANCE SEC FILINGS.

529.   **DISCOVERY OF SHAM ENTITY "COGNITION TECHNOLOGIES" LISTED AS NUANCE SUBSIDIARY.** Relator Odish emailed Defendant Fredman on July 28, 2015 and specifically asked him to provide an affidavit that "Cognition Technologies, Inc." was NOT in fact the fraudulent alter ego of Cognitive Code Corporation.

530.   Defendant Fredman refused to provide such an affidavit.

531.   Nuance and Cognitive Code are obviously engaged in fraudulent activity and conspiracy because the website for cognition technologies is www.cognition.com but the moment RELATOR ODISH would "click" onto the website of "cognition technologies" and it immediately redirects the individual to a site that reads "COGNITION IS NOW A PART OF NUANCE" and within moments before that page can be saved, that specific webpage disappears and goes to the main www.nuance.com website.

532.   **AUGUST 6, 2015 ONGOING FRAUDULENT AND UNLAWFUL "PATENT LAUDERING" AND ONLINE MONITORING OF RELATOR ODISH'S ACTIVITIES.** On August 6, 2015, less than two months prior to the filing of this action, Relator Odish was engaged in extensive compilation of exhibits and specifically the fraudulent patent filings.

533.   On this evening of August 6, 2015, Relator Odish printed off Defendant Cognitive Code's Artificial Intelligence Patent US8126832, being used by Northrop Grumman in military, healthcare and other applications. This patents is also being used by other Corporate Defendants and Contractors.

534.     At ten pm, or 22:00, Relator Odish printed off the US8126832 AI patent and as before it showed only two REFERENCE BY patents in the REFERENCE BY section of the patent. The Apple Auto-tagging Aliases Patent and the Jeremy Lieberman AI patent.

535.     Then exactly fifty-four (54) minutes later at 10:54 pm or 22:54, Relator Odish printed off THE EXACT SAME PATENT US 8126832, except now this exact same patent which had been printed off a mere 54 minutes prior, now displayed a THIRD PATENT IN THE "REFERENCE BY" PATENT SECTION.

536.     This is documented by **EXHIBIT 300**, "Odish Professional Printing Log List" which shows the time and USPATENT 8126832 being printed off only 54 minutes later.

537.     This online monitoring and patent fraud is also displayed throughout EXHIBITS 300-500 AND EXHIBITS 700-750 related IBM and Chinese shell entities, including Defendant Tweddle Group, LLC.

538.     EXHIBIT   300 specifically is titled "Professional Print Log List" of Patents from August 6th, 2015. Print off Log of Patents and other Cognitive Code exhibits in order to amend complaint and send to requisite agencies.

539.     Exhibit 300 is a document that shows that the Cognitive Code ARTIFICIAL INTELLIGENCE patent US8126832 **HAD AN ADDITIONAL 3rd** patent in the **"REFERENCE BY"** added in 54 minutes, as Odish printed off the same patent at two different times.

540.     The first printing of the US8126832 took place at ten pm, 22:00, 10 pm, PRINT JOB NUMBER 5216, and then subsequently 54 minutes at 22:54, 10:54 pm, as EXHIBIT 300 shows, the same patent US8126832 ARITICIAL INTELLIGENCE COGNITIVE CODE PATENT was printed off with a third REFERENCE BY patent listed "UNIVERSITY OF KING FAHD ARABIC SPELL CHECKING" is the 3rd REFERENCE BY patent listed (**SEE EXHIBIT 304)**, with a PRINT JOB NUMBER listed on EXHIBIT 300 as *5256*.

541.     The original Cognitive Code Artificial Intelligence patent US8126832 **(SEE EXHIBIT 9)** did not have any LIEBERMAN or APPLE PATENTS listed in the "REFERENCE BY" when originally published.

542.   **EXHIBIT 9** is the Cognitive Code Artificial Intelligence US8126832 from 2012 that Relator Odish had an option to purchase additional shares upon issuance of this patent. (Again, as exhibit 9 shows it did not have the APPLE patent or the Jeremy Lieberman patent listed in the REFERENCE BY section of the patent. Relator Odish did .

543.   Then in conspiracy to defraud the United States government and its agencies, Defendant Cognitive Code, Defendant Spring and his Intellectual Property attorney from SNR DENTON, NOW US DENTONS LLP, had filed multiple other FALSE PATENT FILINGS in order to effectuate a global patent laundering scheme to make it impossible to track the filings.

544.   This was also done with the obvious intention to bury the patents in China and Chinese Shell Entities, and now in Middle Eastern countries with obvious intention of attempting to evade criminal liability to Department of Justice, USPTO, THE FBI, and numerous other government agencies using these patents or fraudulent derivations thereof.

545.   A further delineation of this may be necessary. **EXHIBIT   301** is Cognitive Code Artificial Intelligence patent US8126832. (Dated August 6, 2015.) Printed off at 10:00 pm. It shows the Cognitive Code Patent displaying two REFERENCE BY patents: the Apple Auto Tagging Patent and the Jeremy Lieberman Patent.

546.   If compared to original same patent issued on February 28, 2012 that do not have any REFERENCED BY patents such as Lieberman or the Apple patent.

547.   It must be noted as part of the "Global patent laundering fraud and criminal conspiracy" this patent is "also published as" at least 8 other patents, with USPTO and globally.

548.   This patent is being used by US MILITARY, UNITED STATES GOVERNMENT and numerous other government agencies in fields of Department of Defense and Healthcare.

549.   The Patent Citations contain a number of Nuance Subsidiaries and other curious patents that show up elsewhere, including RACAL-DATACOM, ART-ADVANCED RECOGNITION TECHNOLOGIES, PATENT US6195638, pattern recognition system. TRANSVERSAL CORPORATION LIMITED, PATENT US20060106790.

550.   In the REFERENCED BY" section of this Patent listed as EXHIBIT 301, COGNITIVE CODE AI PATENT 8126832, there are two References, the following.

    a.   APPLE PATENT US20090063521, "AUTO-TAGGING OF ALIASES"

    b.   JEREMY LIEBERMAN PATENT US8700620 "ARTIFICIAL INTELLIGENCE METHOD AND APPARATUS".

    c.   The filing date of this Lieberman Patent is extremely important as it evidences major fraud. The filing date of Lieberman AI patent is April 26, 2011 with a Publication Date of April 15, 2014.

    d.   This is explains Leslie Spring's "bizarre behavior" on April 10, 2011. Defendant Spring knew he was engaging in criminal misconduct and this is why he wanted to sell the company.

551.   <u>EXHIBIT</u>   302 is a List of Patent Citations from above referenced patent, CC AI Patent US8126832. Last two pages of above Patent. Shows Art Advanced Recognition Technologies (a Nuance subsidiary).

552.   <u>EXHIBIT</u>   303 is a list of Defendant NUANCE SEC FILING LISTING OF its Subsidiary Names.

553.   Nuance SEC Filing showing Art Recognition, connecting the False Filing upon the USPTO and coupling it with the false filing with the SEC.

554.   Subsequent to the events of the August 6, 2015, Relator Odish would send Defendants and their attorneys an email on August 18, 2015 asking them to stop the ongoing fraud, specifically referencing the events of Patent Laudering events of August 6, 2015. **See Exhibit 970,** August 18, 2015 Email from Odish to attorneys and defendant attorneys in companion civil action.

555.   But the patent fraud continued and on August 19, 2015, Relator Odish would see that there was now a FOURTH PATENT LISTED in the REFERENCE BY section of COGNITIVE CODE ARTIFICIAL INTELLIGENCE PATENT US8126832.

556.   **IBM ACQUIRES MERGE HEALTHCARE FOR 1.3 BILLION DOLLARS TO SUPPLEMENT IBM WATSON ON AUGUST 6TH, 2015**. On this same evening of August 6th, 2015 where Relator Odish learned of the ongoing patent fraud and their online

monitoring of his activities, subsequently Relator Odish would learn that on this same date DEFENDANT IBM would acquire MERGE HEALTHCARE for $1.3 billion to supplement IBM's WATSON.

557. **GLOBAL PATENT LAUNDERING OF PATENTS BEING USED BY AND PAID FOR BY THE UNITED STATES GOVERNMENT AND CERTAIN STATES.** The description of the global patent laundering fraud and dilution – patents being used department of defense, department of justice, the FBI, HHS, and other federal and state government is difficult to describe on paper because it is akin to a massive and global money laundering scheme effectuated by a drug kingpin.

558. A detailed analysis of these patents and others referenced in Exhibit Sections 700 – 734, which show IBM burying patents in China from a straw man. And the exhibits relating to patents from 300-500 hereby incorporated into the complaint for detailed comments, must also be considered with the other patent filings and assignments.

559. Not only Principal Defendants engaged in massive patent fraud and "laundering" of AI patents being used by a significant number of government agencies and military departments, these "compromised patents" are also being used in the civil sector.

560. The patents in the exhibits scattered throughout the Index of Exhibits past 500 show Nuance and the Defendant Tweddle Entities.

561. An analysis of IBM's most recent SEC FILING 10-K ANNUAL REPORT ending in fiscal year December 31, 2014 shows that Defendant IBM has "effectuated a partnership in enterprise mobility with APPLE" and makes no further statements. **See Exhibit 124, IBM'S 2014 10-K ANNUAL REPORT.**

562. The

563. Relator Odish conducted extensive review of hundreds upon hundreds of patents. As part of the global patent laundering scheme, Defendants are now "lifting the filing dates" off relevant patents. And certain patents contain no information at all, with the obvious intention of escaping civil and more importantly criminal liability.

**VIII.  THE SELLING OF UNLAWFULLY PROCURED AND COMPROMISED TECHNOLOGY TO FBI AND DEPT OF JUSTICE BY DEFENDANTS, AND TO THE CHINESE AND RUSSIANS.**

564.     Defendants, specifically Nuance are selling "compromised" and unlawfully procured and misappropriated technology not only in healthcare field but also to FBI, DEPT OF JUSTICE. **See Exhibit 960**, 'VOICE BIOMETRICS – PUBLIC SECURITY SOLUTIONS.

565.     Exhibit 960 states in part "Nuance Offers intelligence agencies, military and law enforcement organizations with powerful speech solutions that accurately identify individuals  of interest using text-independent voice biometrics, as well as identify conversations of interest via technologies such as language, gender and keyword detection… NUANCE PUBLIC SECURITY SOLUTIONS deliver real-time alerting while monitoring telecommunication networks, select public places or in-field activities through mobile devices. Post Processing capabilities for investigation and forensic purposes are also available. Learn More about Nuance Public Security Solutions."

566.     THE FBI is using this and related VOICE BIOMETRICS "compromised" technology.

## COUNT 1 - (False Claims Act Violation(s): Presentation of False Claims) (31 U.S.C. § 3729(a)(1)) (Against All Defendants)

567.     Relator repeat and reallege each allegation in previous paragraphs, as if fully set forth herein.

568.     The defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States, including but not limited to SEC, Department of Defense and other governmental agencies.

569.     The United States government unaware of the falsity of these claims, records, and/or statements made by the Defendant(s) and in reliance of accuracy thereof paid Defendants for the claims.

570.    By virtue of the false or fraudulent claims made by the defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $ 5,500 to $ 11,000 for each false claim.

## COUNT 2 - (False Claims Act: Presentation of False Claims) (31 U.S.C. § 3729(a)(2))
## (Against all Defendants)

571.    Relator repeat and reallege each allegation in previous paragraphs, as if fully set forth herein.

572.    The defendants, through their officers, employees, and agents knowingly made, used or caused to be made or used, false records or statements, to get false or fraudulent claims paid or approved, including but not limited to substantial government contracts and business.

573.    The United States government unaware of the falsity of these claims, records, and/or statements made by the Defendant(s) and in reliance of accuracy thereof paid Defendants for the claims.

574.    By virtue of the false or fraudulent claims made by the defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $ 5,500 to $ 11,000 for each false claim.

## COUNT 3 - False Claims Act: Making or Using False Record or Statement; (31 U.S.C. § 3729(a)(2))
## (Against all Defendants)

575.    Relator repeat and reallege each allegation in all previous paragraphs, as if fully set forth herein.

576.    Upon information and belief, the defendant Northrop Grumman, knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States.

577.    The United States government unaware of the falsity of these claims, records, and/or statements made by the Defendant(s) and in reliance of accuracy thereof paid Defendants for the claims.

578.    By virtue of the false records or statements made by the defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $ 5,500 to $ 11,000 for each false claim.

579.    Under the false claims statute, Northrop Grumman knew that Cognitive Code was a Section 8(a) corporation and therefore by turning over the work to Northrop Grumman's engineers was it was knowingly violating Section 8(a), which requires the minority business to do its own work.

580.    Cognitive Code, its agents and employees and officers knew they were in violation as did Nuance and its officers and employees.

581.    The United States has suffered significant damages as result.

**COUNT 4 - (False Claims Act: Reverse False Claims) (31 U.S.C. § 3729(a)(7)) (Against all Defendants, agents, officers and employees)**

582.    Relator repeat and reallege each allegation in all previous paragraphs, as if fully set forth herein.

583.    The defendants knowingly made, used or caused to be made or used a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the United States.

584.    The United States government unaware of the falsity of these claims, records, and/or statements made by the Defendant(s) and in reliance of accuracy thereof paid Defendants for the claims.

585.    By virtue of the false records or statements made by the defendants Cognitive Code and Nuance and their agents and officers, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $ 5,500 to $ 11,000 for each false claim.

## COUNT 5 - FALSE CLAIMS ACT VIOLATION - CONSPIRACY (31 U.S.C. §3729(a)(3))

### (against all Defendants)

586.    Relators repeat and reallege each allegation in all previous paragraphs, as if fully set forth herein.

587.    Upon information and belief, Defendants, their agents, employees, officers and related affiliates conspired to defraud not only Relator but also the government and its agencies by agreeing to submit false or fraudulent claims, (or acquiescing) that were subsequently paid by federal agencies for their services.

588.    Defendants conspired to violate certain acts, federal statutes and submitted in conspiracy false claims, reports, including but not limited to SEC, SBA, Department of Defense, Department of Treasury, United States Patent Office and a number of other federal agencies.

589.    The United States government unaware of the falsity of these claims, records, and/or statements made by the Defendant(s) and in reliance of accuracy thereof paid Defendants for the claims.

590.    As Defendants Cognitive Code, Defendant Nuance and their agents, employees, officers, including Bourbeau knew of such violations and caused federal agencies to make payments, knowingly, in violation of federal regulations, laws and statutes, Defendants conspired to violate False Claims act, and other statutes.

591.    The United States government and its agencies would have never paid or been in business with these Defendants had they known of such illegal activity.

592.    Defendants Cognitive Code Defendants, its agents, officers conspired to violate Service Contract Act, including other federal statutes as Relator Odish was only paid $8,000 dollars by Defendant Cognitive Code Corporation for over 3000 hours of work as stated herein.

593.    Defendants, by and through their officers, agents, employees, to take actions in conspiracy and violation of federal laws, state laws. Moreover, Defendants as coconspirators, are individually and collectively liable for each other acts that were reasonably foreseeable and within the scope of these conspiracies.

594.   The United States reasonably relied upon Defendants misrepresentations of compliance and or accuracy in paying all sums due and owing under the contracts and therefore, the United States government is entitled to full recovery of the fraudulent sums paid by its agencies.

595.   As set forth in the preceding paragraphs, Defendants knowingly violated (31 U.S.C. § 3729(a)(3)) and have damaged the United States by their actions in an amount to be determined at trial.


**COUNT 7 - FALSE CLAIMS ACT VIOLATION RETALIATION VIOLATION, 31 U.S.C. § 3730 (h) (Against all Defendants, agents, employees, officers, and Defendant Bourbeau)**


596.   The allegations of the preceding paragraphs are realleged as if fully set forth herein and below.

597.   Defendants had a duty under the False Claims Act, 31 U.S.C. § 3730(h), to refrain from taking retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action, including investigation for, testimony for, or assistance in an action filed under this section.

598.   Defendants reasonably believed that submitting claims to the Department of Defense, Department of Justice, Federal Bureau of Investigation, and other relevant agencies that constituted a violation of the False Claims Act.

599.   In retaliation for protected activities, Defendants stripped Relator Odish of his board seat, refused to deliver stock certificates, refused to honor contractual obligations and annual salaries and stripped him management duties, harassed him, wrongfully denied granting him his stock certificates and took other actions to cover up their wrongdoing.

600.   And Bourbeau, outrageous Relator Co-Plaintiff in Los Angeles, proceedings is retaliating against him by instructing Relator Odish's former Defendant Rosen to bring motion terminating Relator claims based upon fraudulent declarations and court materials.

**COUNT 12 - TRUTH-IN-NEGOTIATIONS ACT, 10 U.S.C. § 2306(f),**

609.    Nuance through its unlawful misconduct is a subcontractor to the United States which has violated subcontractor payment methodology, as well as other violations of federal law.

610.    Each such documents, upon presentation of each such claim for payment, or used to get payment of the above referenced false claims, constitutes a separate violation of the False Claims Act.

611.    Pursuant to 31 U.S.C. § 3729(a) the defendants are further liable to the United States for a civil penalty of not less than $ 5,500.00 and not more than $ 11,000.00 for each month of false payments, for each violation of the False Claims Act.


## COUNT 14 - DEFENSE CONTRACT AUDIT AGENCY CLAIMS

### (Against Cognitive Code defendants and Nuance Defendants)


612.    Relator repeat and reallege all previous paragraphs as if fully set forth herein.

613.    For previous years, defendants in conspiracy have unlawfully misappropriated funds from department of defense and other defense programs, and then wrongfully embezzled those funds and failed to account for them.

614.    The financial impact on federal projects is approximately $ 100,000,000 (at least) as a result of the routine and willful failure to comply with accounting standards.

615.    Defendants knew or should have known that by failing to comply with accounting standards, knowing that it was false and presenting the same directly or indirectly for payment by the United States was false, and/or an action in deliberate ignorance of the truth or falsity thereof, and/or in reckless disregard of the truth and was in violation of 31 U.S.C. § 3729(a)(2).

616.    Defendants knowingly made or used, or caused others to make or use, false records or statements to get, or have false and/or fraudulent claims approved by the federal government.

617.   Each such documents, upon presentation of each such claim for payment, or used to get payment of the above referenced false claims, constitutes a separate violation of the False Claims Act.

618.   Pursuant to 31 U.S.C. § 3729(a) the defendants are further liable to the United States for a civil penalty of not less than $ 5,500.00 and not more than $ 11,000.00 for each month of false payments, for each violation of the False Claims Act.

## COUNT 16 - VIOLATION OF THE ANTI-KICKBACK ACT

### (Against all Defendants)


619.   All previous paragraphs of this Complaint are hereby realleged and incorporated as though set forth in full herein.

620.   This is a claim against above named Defendants under the Anti-Kickback Act.

621.   Upon information and belief and facts stated herein, all of the named defendants have violated the anti-kickback act.

622.   The arrangements and activities described above in connection with Defendants' were knowingly carried out by Defendants "for the purpose of improperly obtaining or rewarding favorable treatment in connection with a prime contract or in connection with a subcontract relating to a prime contract," 41 U.S.C. § 52(2), and thus constituted illegal kickbacks in violation of 41 U.S.C. § 53, as well as in violation of Defendants' contracts with the Government.

623.   By reason of the conduct alleged herein, Defendants knowingly engaged in conduct prohibited by 41 U.S.C. § 53 with respect to kickbacks received from certain parties by Defendants on Government contracts and subcontracts.

624.   By reason of the conduct alleged herein, Defendants knowingly caused, directly or indirectly, the kickbacks to be included in the charges to the United States Government, in violation of 41. U.S.C. § 53(3).

625.   Defendant Bourbeau has unlawfully received kickbacks in order to destroy Relator's rights, and facilitate the fraud of Cognitive Code Defendants, such as being given a Board

**(Against all Principal Contractor defendants, agents, employees, officers)**

601.   The United States and Relators reallege all previous paragraphs as if fully set forth herein.

602.   The United States is entitled under each sole source negotiated contract and the Truth-in-Negotiations Act to not only a downward adjustment but outright cancellation of an unlawful agreement and parties that are knowingly in violation of securities laws, tax laws, numerous other federal laws.

603.   The United States government unaware of the falsity of these claims, records, and/or statements made by the Defendant(s) and in reliance of accuracy thereof paid Defendants for the claims.

604.   As a result of this unlawful misconduct which prevented truth in negotiations, the United States has sustained damages likely in excess of 100 million dollars, plus pre-judgment interest.

## COUNT 12 - VIOLATION OF SUBCONTRACTOR PAYMENT METHODOLOGY

**(Against Northrop Grumman, Cognitive Code Defendants, Nuance Defendants, their agents, employees and officers)**

605.   Relator repeat and reallege all previous paragraphs as if fully set forth herein.

606.   According FAR regulations, federal legislation and rules and law, subcontractors must be paid lawfully. Defendants violated subcontractor payment methodology.

607.   Defendants knew or should have known that by failing to pay the subcontractors, knowing that it was false and presenting the same directly or indirectly for payment by the United States, the action was in deliberate ignorance of the truth or falsity thereof, and/or in reckless disregard of the truth and was in violation of 31 U.S.C. § 3729(a)(2).

608.   Cognitive Code through its relationship with Northrop Grumman is a subcontractor which violated subcontract payment methodology willfully and unlawfully.

Seat that belonged to Relator Odish and three years annual salary, as kickbacks in order to conspire against Odish.

626.    The United States is entitled to recover from Defendants double the amount of the kickbacks plus $10,000 per kickback. In the alternative, pursuant to section 55(a)(2), the United States is entitled to recover the amount of the kickbacks from Defendants.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Relator prays that judgment be entered against Defendants, jointly and severally and/or there agents, employees, officers, related affiliates as follows:

a.      that Defendants cease and desist from violating <u>31 U.S.C. § 3729</u> et seq, and the equivalent provisions of the State statutes set forth above;

b.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $ 5,500 and not more than $ 11,000 for each violation of <u>31 U.S.C. § 3729</u> et seq;

c.      award Relator the maximum allowed pursuant to 3730(d) of the Federal False Claims Act and state (and District) false claims act;

d.      reinstate Relator in his and their position and make Relator whole for civil damages, and any all other damages from flowing wrongful misconduct of defendants, including but not limited retaliatory discharge.

e.      award Relator and the United States liquidated damages, compensatory damages, special damages and punitive damages in a combined amount to be determined at trial but in no event no less than the amounts paid out by the United States government that the company was worth by Defendant Spring on multiple occasions in early January 2012 when company was acquisition target before they engaged in fraudulent conduct - see *Lynch v. Vickers case* regarding target valuation statements by corporate managers being relevant for valuation purposes) Defendants wrongful misconduct pursuant to this unlawful misconduct in order to address the damages and deter this type of conduct.

f.   award Relator and United States all costs of this action, including attorney fees and
expenses.

g.      issue and grant a temporary restraining and permanent injunctive relief against
Defendants and co-conspirators to immediately enjoin them from continuing to violate the
federal and state statutes.

h.   award Relator any and all damages related to their civil claims to make them whole
under statute, common law and equity.

i.      that Relator be awarded the maximum amount allowed pursuant to the federal False
Claims Act 31 U.S.C. § 3730(d), and the equivalent provisions of the state statutes set forth
above;

j. that Relator be awarded all costs of this action, including attorneys' fees and expenses; and

k.      that Relator have such other and further relief that this Court deems just and proper.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demand trial by
jury as to all issues so triable.


DATED: February 13, 2017

/s/ Timothy Hurban
TIMOTHY HURBAN P72991
/s/ J. G. Odish
**/s/ Joseph G. Odish P53629**